**THE LAW OFFICES OF DALLAS JOLLEY**
4707 South Junett Street, Suite B
Tacoma, WA 98409
(253) 761-8970 (Telephone)
(253) 761-7910 (Facsimile)
Dallas Jolley, Esq.

*Counsel to the Debtor and Debtor in Possession*

## UNITED STATES BANKRUPTCY COURT

## WESTERN DISTRICT OF WASHINGTON AT SEATTLE

In re:

VADIUM TECHNOLOGY, INC.,

                       Debtor.

Case No.: 12-10808

---

**DISCLOSURE STATEMENT FOR THE
CHAPTER 11 PLAN OF VADIUM TECHNOLOGY, INC.**

---

**Dated: July 3, 2012**

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS OF THE PLAN MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED.**

# IMPORTANT INFORMATION FOR YOU TO READ

**THE DEADLINE TO VOTE ON THE CHAPTER 11 PLAN IS AUGUST 31, 2012 AT 5:00 P.M. PREVAILING PACIFIC TIME. FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE <u>ACTUALLY RECEIVED</u> BY THE VOTING AGENT BEFORE THE VOTING DEADLINE DESCRIBED HEREIN**

The Debtor is providing the information in this Disclosure Statement for the *Chapter 11 Plan* [Docket No.37] (as may be amended, modified or supplemented from time to time, the "*Plan*") to holders of Claims and Interests entitled to vote on the Plan for the purpose of soliciting votes to accept the Plan. Capitalized terms used but not otherwise defined in this Disclosure Statement shall have the meaning given to those terms in the Plan; the terms of which are adopted and incorporated here by reference. <u>Nothing in this Disclosure Statement may be relied upon or used by any entity for any other purpose.</u>

This Disclosure Statement may not be deemed as providing any legal, financial, securities, tax or business advice. The Debtor urges any holder of a Claim or Interest to consult with its own advisors for any legal, financial, securities, tax or business advice in reviewing this Disclosure Statement, the Plan and each of the proposed transactions contemplated thereby. The Debtor has not authorized any entity to give any information about or concerning the Plan other than the information contained in this Disclosure Statement. The Debtor has not authorized any representations concerning the Debtor or the value of their property other than as set forth in this Disclosure Statement.

The Debtor urges every holder of a Claim entitled to vote on the Plan to (1) read the entire Disclosure Statement and Plan carefully, (2) consider all of the information in this Disclosure Statement, including, importantly, the risk factors described in section XI of this Disclosure Statement and (3) consult with your own advisors with respect to reviewing this Disclosure Statement, the Plan and all documents that are attached or were filed in connection with the Plan and Disclosure Statement before deciding whether to vote to accept or reject the Plan.

This Disclosure Statement contains summaries of the Plan, certain statutory provisions, events in the Debtor's chapter 11 case and certain documents related to the Plan. Although the Debtor believes that these summaries are fair and accurate, the same are all qualified in their entirety. In the event of any inconsistency or discrepancy between a description in this Disclosure Statement and the terms and provisions of the Plan or other referenced documents, the Plan or other referenced documents will govern for all purposes. Except where otherwise specifically noted, factual information contained in this Disclosure Statement has been provided by the Debtor' management. The Debtor does not represent or warrant that the information contained in or attached to this Disclosure Statement is without any material inaccuracy or omission.

Although the Debtor has used their reasonable business judgment to ensure the accuracy of the financial information contained in, or incorporated by reference into, this Disclosure Statement, none of that financial information has not been audited. The Debtor is generally making the statements and providing the financial information contained in this Disclosure Statement as of the date of the Plan where feasible, unless otherwise specifically noted. Although the Debtor may subsequently update the information in this Disclosure Statement, the Debtor has no affirmative duty to do so, and parties reviewing this Disclosure Statement should be aware that, at the time of their review, the facts may have changed since this Disclosure Statement was filed.

Neither this Disclosure Statement nor the Plan is or should be construed as an admission of fact, liability, stipulation or waiver, and nothing stated herein shall be admissible in any proceeding involving the Debtor or any other person, or be deemed conclusive evidence of the tax or other legal effects of the Plan on the Debtor or holders of Claims or Interests. Rather, holders of Claims and Interests and other parties in interests should construe this Disclosure Statement as a statement made in settlement negotiations related to contested matters, adversary proceeding and other pending or threatened litigation or actions. The Debtor may seek to investigate, file and prosecute Causes of Action and may object to Claims after the Confirmation or Effective Date irrespective of whether this Disclosure Statement identifies any such Causes of Action or contested matters, adversary proceeding and other pending or threatened litigation or actions.

**CERTAIN OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE FORWARD LOOKING STATEMENTS, PROJECTIONS AND FORECASTS, BASED UPON CERTAIN ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCETHAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES.**

## QUESTIONS AND ADDITIONAL INFORMATION

**If you would like to obtain copies of this Disclosure Statement, the Plan or any of the documents attached hereto or referenced herein, or if you have questions about the solicitation and voting process or this Chapter 11 Case generally, please contact Dallas Jolley by calling (253) 761-8970.**

**<<Remainder of Page Left Intentionally Blank>>**

**Vadium Technology, Inc.**
**Disclosure Statement - 7/3/2012**
**Page 3 of 102**

# TABLE OF CONTENTS

IMPORTANT INFORMATION FOR YOU TO READ ......................................................................... 2

QUESTIONS AND ADDITIONAL INFORMATION .......................................................... 3

TABLE OF CONTENTS ............................................................................... 4

I - EXECUTIVE SUMMARY ..................................................................... 12

    A.   Overview of this Disclosure Statement and Executive Summary ..................................... 12

    B.   Explanation of the Plan and the Chapter 11 Case ......................................................... 12

    C.   Summary of Treatment of Claims and Interests and Description of Recoveries Under the Plan 13

        1.   Overview of Classification of Claims and Interests Under the Plan ........................... 13

        2.   Summary of Treatment, Estimated Range of Recoveries and Voting Rights of Claims and Interests Under the Plan ....................................................................... 14

    D.   Voting Deadline.................................................................................. 15

    E.   Procedures for Voting on the Plan ........................................................... 15

II - IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT ............. 16

III - QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN ....................................................................... 17

    A.   What is Chapter 11?........................................................................... 17

    B.   Why is the Debtor sending me this Disclosure Statement?........................................ 17

    C.   Am I entitled to vote on the Plan?  What will I receive from the Debtor if the Plan is consummated? ....................................................................... 17

    D.   If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what do you mean when you refer to "Confirmation," "Effective Date" and "consummation?" ....................................................................... 18

    E.   What is included in the solicitation packages to be sent to creditors who are eligible to vote on the Plan? ....................................................................... 18

    F.   What is the deadline to vote on the Plan?...................................................... 18

    G.   How do I vote for or against the Plan?........................................................ 18

    H.   When is the Confirmation Hearing set to occur?............................................... 19

    I.   What is the deadline to object to Confirmation? ............................................... 19

J.   What is the effect of Confirmation on the Debtor's ongoing business?........................................19

K.   What role does the Bankruptcy Court play after the Confirmation Hearing? ..............................20

L.   Does the Debtor recommend voting in favor of the Plan? ............................................................20

**IV - THE DEBTOR'S HISTORY**......................................................................................................**21**

A.   Company Overview .........................................................................................................................21

    1.   The AlphaCipher Technology Platform ..................................................................................22

B.   The Company's Organizational Structure ......................................................................................23

    1.   Overview of the Debtor's Organizational Structure................................................................23

C.   The Debtor's Prepetition Capital Structure ....................................................................................23

    1.   Overview.................................................................................................................................23

    2.   Description of Prepetition Liabilities .....................................................................................24

    3.   Stockholders' Equity .............................................................................................................25

D.   Claims and Interests of Officers, Directors and 5% Equity Interest Holders...................................26

**V - EVENTS LEADING TO COMMENCEMENT OF THE CHAPTER 11 CASE**...............**27**

**VI - INITIAL MOTIONS OF THE CHAPTER 11 CASE AND CERTAIN RELATED
RELIEF** ............................................................................................................................................**29**

A.   Procedural Orders, Retention of Professionals and Related Relief ................................................29

    1.   Retention of Professionals .....................................................................................................29

    2.   Debtor-In-Possession Financing ............................................................................................29

**VII - DEVELOPMENTS DURING THE CHAPTER 11 CASE** ................................................**30**

A.   Appointment of the Statutory Committee .....................................................................................30

B.   The Statement of Financial Affairs and Overview of the Claims Process ........................................30

    1.   Filing of the Debtor's Statements of Financial Affairs and Schedules of Assets and Liabilities 30

    2.   Establishment of the Claims Bar Date ...................................................................................30

    3.   Claims Review and Objection Process ...................................................................................31

C.   Assumption or Rejection of Executory Contracts and Unexpired Leases .......................................31

D.   Exclusivity.......................................................................................................................................31

E.   The Motion to Dismiss or Convert the Chapter 11 Case to a Chapter 7 Liquidation.......................31

F.   The Debtor's Sale Process and Section 363 Sale.............................................................................32

    1.   Prepetition ..............................................................................................................................32

    2.   Post-petition ...........................................................................................................................36

    3.     Search and Consideration of Potential Alternative Transactions.................................36

    4.     Motion to Approve the Asset Sale.................................................................................37

    5.     Significant Terms of the Purchase Agreement and Sale Order....................................37

    6.     Overview of AAC Post Closing of the Asset Purchase ................................................38

    7.     Projected Balance Sheet, Capital Structure of AAC and Officers and Directors of AAC After the Closing of the Asset Sale.....................................................................................39

    8.     Purchasers Amended and Restated Articles of Incorporation, Bylaws and Equity Incentive Plan as of the Closing Date. ...............................................................................43

**VIII - DESCRIPTION OF THE CHAPTER 11 PLAN ...................................................................44**

   A.    ADMINISTRATIVE CLAIMS, U.S. TRUSTEE FEES, AND PRIORITY TAX CLAIMS..................................44

    1.    Administrative Claims .......................................................................................................44

    2.    Professional Compensation................................................................................................44

    3.    Administrative Claims Bar Date ........................................................................................45

   B.    U.S. Trustee Fees ...................................................................................................................45

   C.    Priority Tax Claims .................................................................................................................45

   D.    CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ..............................................46

    1.    General Rules of Classification .........................................................................................46

    2.    Classification and Designation of Claim Classes..............................................................47

    3.    Treatment of Claims and Interests by Class.......................................................................48

   E.    ACCEPTANCE REQUIREMENTS ......................................................................................................55

    1.    Acceptance or Rejection of the Plan ................................................................................55

    2.    Vacant Classes...................................................................................................................55

    3.    Confirmation Pursuant to Sections 1129(a)(10) ..............................................................56

   F.    MEANS FOR IMPLEMENTATION OF THE PLAN ..........................................................................56

    1.    Sale of Assets.....................................................................................................................56

    2.    Principles of the Plan Structure and Settlement of Claims................................................56

    3.    Sources of Consideration for Plan Distributions...............................................................58

    4.    Operations of the Debtor between the Confirmation Date, the Effective Date and the Closing Date58

    5.    Term of Injunction or Stays ...............................................................................................58

    6.    Corporate Existence............................................................................................................59

    7.     Amended Certificates of Incorporation and New By-Laws ...................................... 59

    8.     Reorganized Debtor's Boards of Directors ................................................................ 59

    10.    Corporate Action ..................................................................................................... 59

    11.    Effectuating Documents; Further Transactions ...................................................... 60

    12.    Section 1146 Exemption from Certain Taxes and Fees ........................................... 60

    13.    Preservation of Rights and Causes of Action .......................................................... 60

    14.    Dissolution of Corporate Entities ............................................................................ 60

G.    TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ........................................ 61

H.    POVISIONS GOVERNING DISTRIBUTIONS ........................................................................ 61

    1.     Initial Distribution Date ........................................................................................... 61

    2.     Closing Date Payment Distribution Date ................................................................. 61

    3.     Record Date for Distributions .................................................................................. 61

    4.     Timing and Calculation of Amounts to Be Distributed ........................................... 61

    5.     Fractional Distributions ............................................................................................ 61

    6.     Disbursing Agent ...................................................................................................... 62

    7.     Rights and Powers of Disbursing Agent ................................................................... 62

    8.     Distributions to Holders of Disputed Claims ........................................................... 62

    9.     Delivery of Distributions and Undeliverable or Unclaimed Distributions ............... 62

    10.    Withholding and Reporting Requirements .............................................................. 63

    11.    Setoffs ...................................................................................................................... 63

    12.    Claims Paid or Payable by Third Parties .................................................................. 64

    13.    Post-Petition Interest ............................................................................................... 64

    14.    Section 506(c) Reservation ...................................................................................... 64

I.    PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS ........... 64

    1.     Prosecution of Objections to Claims ....................................................................... 64

    2.     Allowance of Claims ................................................................................................. 64

    3.     Estimation of Claims ................................................................................................ 65

    4.     Deadline to File Objections to Claims ...................................................................... 65

J.    SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS ........................................ 65

    1.     Compromise and Settlement of Claims, Interests and Controversies ...................... 65

2.    Releases by the Debtor ................................................................................................ 66

3.    Releases by Holders of Claims and Interests ................................................................ 66

4.    Exculpation ................................................................................................................... 67

5.    Discharge of Claims and Termination of Interests ....................................................... 67

6.    Injunction ..................................................................................................................... 68

7.    Term of Injunctions or Stays ........................................................................................ 69

8.    Injunction Against Interference With The Plan ............................................................ 69

9.    Injunction Related to Releases and Exculpation .......................................................... 69

10.   Protection Against Discriminatory Treatment ............................................................. 69

11.   No Consent to Change of Control Required ................................................................. 69

12.   Release of Liens ............................................................................................................ 70

K.    CONDITIONS PRECEDENT TO CONFIRMATION OF THE PLAN AND THE EFFECTIVE DATE ........ 70

1.    Conditions Precedent to Confirmation ........................................................................ 70

2.    Conditions Precedent to the Effective Date ................................................................. 70

3.    Waiver of Conditions .................................................................................................... 70

4.    Effect of Failure of Conditions ..................................................................................... 71

L.    MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN ............................................ 71

1.    Modification and Amendments .................................................................................... 71

2.    Effect of Confirmation on Modifications ...................................................................... 71

3.    Revocation or Withdrawal of the Plan ......................................................................... 71

M.    RETENTION OF JURISDICTION ................................................................................................ 72

N.    MISCELLANEOUS PROVISIONS ............................................................................................... 74

1.    Immediate Binding Effect ............................................................................................. 74

2.    Additional Documents .................................................................................................. 74

3.    Dissolution of Creditors' Committee ............................................................................ 74

4.    Successors and Assigns ................................................................................................. 74

5.    Service of Documents ................................................................................................... 75

6.    Entire Agreement ......................................................................................................... 75

7.    Severability of Plan Provisions ..................................................................................... 75

8.    Exhibits ......................................................................................................................... 76

9.     Votes Solicited in Good Faith ...................................................................................... 76

10.    Closing of Chapter 11 Case ..................................................................................... 76

11.    Conflicts.......................................................................................................................... 76

**IX - SOLICITATION AND VOTING PROCEDURES** .................................................. **77**

A.    Holders of Claims Entitled to Vote on the Plan................................................. 77

B.    Voting Record Date .................................................................................................... 78

C.    Voting on the Plan ...................................................................................................... 78

D.    Ballots Not Counted ................................................................................................... 78

**X - CONFIRMATION OF THE PLAN** .......................................................................... **80**

A.    The Confirmation Hearing........................................................................................ 80

B.    Deadline to Object to Confirmation of the Plan ................................................. 80

C.    Requirements for Confirmation of the Plan......................................................... 81

D.    Standards Applicable to Releases .......................................................................... 82

E.    Best Interests of Creditors/ Hypothetical Liquidation Analysis .................... 82

F.    Feasibility ...................................................................................................................... 83

G.    Acceptance by Impaired Classes ............................................................................ 83

H.    Effect of Confirmation and Consummation of the Plan ................................... 84

**XI - SECURITIES LAW MATTERS** ............................................................................ **85**

A.    Bankruptcy Code Exemptions from Registration Requirements. ................... 85

1.    Securities Issued in Reliance on Section 1145 of the Bankruptcy Code. ................... 85

2.    Subsequent Transfers of 1145 Securities Distributed Pursuant to the Plan and Additional Restrictions on Transfers Imposed by Purchaser. ................................................. 86

**XII - RISK FACTORS** .................................................................................................. **88**

A.    Risks Related to Confirmation of the Plan ........................................................... 88

1.    The Debtor May Not be Able to Obtain Confirmation of the Plan. ...................... 88

2.    Parties in Interest May Object to the Releases Provided by the Plan......................... 89

3.    Parties in Interest May Object to the Debtor' Classification of Claims and Equity Interests ..... 89

4.    The Conditions Precedent to the Effective Date of the Plan May Not Occur ........... 89

5.    The Debtor May Object to the Amount or Classification of a Claim.......................... 89

6.    The Debtor Cannot State with Certainty what Recovery Will be Available to Creditors .......... 89

7.    The Debtor Cannot State with Certainty when Funds Will be Available for Distribution to Creditors .................................................................................................................................. 90

B.    Certain Risks Relating to the AAC Equity Interests to be Distributed Under the Plan ................... 90

1.    Significant Holders ............................................................................................................ 90

2.    No Public Market or Established Unit Price ...................................................................... 90

3.    Incomplete Management Team ........................................................................................... 90

4.    Minimal Revenues; History of Losses ............................................................................... 90

5.    Risk of Additional Dilution ............................................................................................... 91

6.    Dependence on, and Ability to Retain and Recruit, Key Personnel ................................... 91

7.    Uncertain Ability to Secure and/or Protect Proprietary Technology and Intellectual Property Rights .......................................................................................................................................... 91

8.    Success Dependent on Acceptance of Products and Services ............................................ 91

9.    Difficulties Associated with Brand Development May Harm the Company's  Ability to Attract Customers .................................................................................................................................. 92

10.   Inability to Respond to Rapid Change in the Company's Industry ....................................... 92

C.    Risks Relating to Forward-Looking Statements ............................................................................. 92

1.    Financial Information is Based on the Debtor' Books and Records and, Unless Otherwise Stated, no Audit was Performed ................................................................................................ 92

D.    Risks Relating to Recoveries Under the Plan .................................................................................. 93

1.    The Recovery to Holders of Allowed Claims Cannot Be Stated with Absolute Certainty ......... 93

E.    Disclosure Statement Disclaimer .................................................................................................... 93

1.    No Representations Made Outside this Disclosure Statement are Authorized .......................... 93

2.    The Disclosure Statement was not Approved by the Securities Exchange Commission or Any State Regulatory Authority ........................................................................................................ 93

3.    The Information Herein was Provided by the Debtor and Relied upon by Their Advisors ........ 94

4.    Potential Exists for Inaccuracies and the Debtor have No Duty to Update ................................ 94

5.    No Legal or Tax Advice is Provided to you by this Disclosure Statement ................................. 94

6.    No Admissions are Made by this Disclosure Statement ............................................................ 94

7.    Forward-Looking Statements in this Disclosure Statement ....................................................... 95

XIII - CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ....... 97

A.    Certain U.S. Federal Income Tax Consequences to the Reorganized Debtor ................................. 98

1.    Sale of Assets to Purchaser ...................................................................................... 98

2. Cancellation of Debt and Reduction of Tax Attributes .................................................. 98

3. Corporate Alternative Minimum Tax ........................................................................ 99

B. Certain U.S. Federal Income Tax Consequences to the U.S. Holders under the Plan .................... 99

1. Consequences to U.S. Holders of Allowed Unsecured Claims (Classes 2, 6, 7, 9, 10, 11, 12, 13 and 14) ........................................................................... 99

2. Limitations on Use of Capital Losses ...................................................................... 100

3. Information Reporting and Backup Withholding.......................................................... 100

C. Importance of Obtaining Professional Tax Assistance ............................................................ 100

**XIV - RECOMMENDATION** ........................................................................................ **101**

**Exhibits** .................................................................................................................. **102**

Exhibit A – Plan of Reorganization
Exhibit B – Disclosure Statement Order and Solicitation Procedures Order
Exhibit C – Debtor's Organizational Structure
Exhibit D – Schedule and Treatment of Claims and Interests of Officers, Directors and 5% Equity Interest Holders of the Debtor
Exhibit E – Purchase Agreement
Exhibit F – Sale Order Approving Asset Purchase Agreement
Exhibit G – AAC / Belhara Term Sheet for Asset Sale Financing
Exhibit H – AAC / Belhara Term Sheet for Long-Term Growth Capital
Exhibit I - Projected Balance Sheet of AAC
Exhibit J – Projected AAC Equity Capitalization Table
Exhibit K – Projected Terms and Conditions of Purchasers Series A Preferred Stock
Exhibit L – Restrictive Covenants of Purchasers Common Stock Issued Pursuant to the Plan of Reorganization
Exhibit M – Projected Amended and Restated Articles of Incorporation of Purchaser
Exhibit N – Projected Equity Incentive Plan of Purchaser
Exhibit O – Bylaws of Purchaser
Exhibit P – Projected Organizational Chart of the Purchaser
Exhibit Q – Chart of Distributions by Class of Cash and AAC Equity Interests Under the Plan
Exhibit R – Hypothetical Liquidation Analysis

# I - EXECUTIVE SUMMARY

### A. Overview of this Disclosure Statement and Executive Summary

Vadium Technology, Inc., a Washington corporation with its corporate offices in Seattle, Washington (the "**Debtor**") filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Western District of Washington (the "**Bankruptcy Court**") on January 30, 2012 (the "**Petition Date**"). The Debtor's Chapter 11 Case is administered under case number 12-10808-MLB. The Debtor submits this Disclosure Statement pursuant to Bankruptcy Code section 1125 to holders of Claims against and Interests in the Debtor because the Debtor are asking holders of Claims to accept the Debtor's Chapter 11 Plan (as amended from time to time, the "**Plan**"), July 3, 2012. A copy of the Plan is attached hereto as Exhibit-A.

Before soliciting acceptances of a proposed chapter 11 plan, Bankruptcy Code section 1125 requires a debtor to prepare a disclosure statement that contains information of a kind, and in sufficient detail, to permit a hypothetical reasonable investor to make an informed judgment regarding acceptance of the plan. The Bankruptcy Court approved this Disclosure Statement at a hearing held on _____, 2012 [Docket No._____]. A copy of the order approving the Disclosure Statement is attached hereto as Exhibit-B (the "**Disclosure Statement and Solicitation Procedures Order**").

A hearing to consider Confirmation of the Plan is scheduled to be held before the Honorable Marc L. Barecca at 9:30 a.m.(prevailing Pacific Time) on September 7, 2012 at the Bankruptcy Court, located at 700 Stewart Street, Suite 6301, Seattle, WA 98101. Additional details with respect to Confirmation are provided in section X of this Disclosure Statement, entitled "Confirmation of the Plan."

This Disclosure Statement contains, among other things, descriptions and summaries of certain provisions of, and financial transactions contemplated by, the Plan being proposed by the Debtor. Certain provisions of the Plan (and the descriptions and summaries contained herein) remain the subject of continuing negotiations among the Debtor and various parties and have not been finally agreed upon and may be modified.

**THIS EXECUTIVE SUMMARY IS ONLY A GENERAL OVERVIEW OF THIS DISCLOSURE STATEMENT AND THE MATERIAL TERMS OF, AND TRANSACTIONS PROPOSED BY THE PLAN, AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO, AND SHOULD BE READ IN CONJUNCTION WITH, THE MORE DETAILED DISCUSSIONS APPEARING ELSEWHERE IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS ATTACHED TO THIS DISCLOSURE STATEMENT, INCLUDING THE PLAN.**

### B. Explanation of the Plan and the Chapter 11 Case

The consummation of a chapter 11 plan is the principal objective of a Chapter 11 case. A Chapter 11 plan sets forth how a debtor will treat its claims and interests. On July 3, 2012, the Debtor filed the Plan with the Bankruptcy Court to facilitate the liquidation of the Debtor's estates and the distribution of the proceeds from the Sale Transaction and any other remaining assets to holders of Allowed Claims. A copy of the Plan is attached hereto as Exhibit A and incorporated herein by reference.

A bankruptcy court's confirmation of a plan binds the debtor, any entity or person acquiring property under the plan, any creditor of or equity security holder in a debtor and any other entities and persons as may be ordered by the bankruptcy court to the terms of the confirmed plan, whether or not such creditor or equity security holder is impaired under or has voted to accept the plan or receives or retains any property under the plan.

Among other things (subject to certain limited exceptions and except as otherwise provided in the Plan or the Confirmation Order), the Confirmation Order will discharge the Debtor from any debt arising before the Effective Date, distribute the remaining proceeds from the Sale Transaction to holders of Claims on the terms set forth in the Plan and terminate all of the rights and interests of pre-bankruptcy equity security holders. Under the Plan, Claims and Interests are divided into Classes according to their relative priority and other criteria. The Debtor is a proponent of the Plan within the meaning of Bankruptcy Code section 1129.

**ACCORDINGLY, FOR ALL OF THESE REASONS AND THE OTHER REASONS DESCRIBED IN THIS DISCLOSURE STATEMENT, THE DEBTOR URGES YOU TO RETURN YOUR BALLOT ACCEPTING THE PLAN BY THE VOTING DEADLINE.**

**C. Summary of Treatment of Claims and Interests and Description of Recoveries Under the Plan**

**1. Overview of Classification of Claims and Interests Under the Plan**

The Plan organizes the Debtor's various creditor and equity constituencies into groups called "Classes." For each Class, the Plan describes (a) the underlying "Claim" or "Interest," (b) the recovery available to the holders of Claims or Interests in that Class under the Plan, (c) whether the Class is "Impaired" under the Plan, meaning that each holder will receive less than the full value on account of its Claim or Interest or that the rights of holders under law will be altered in some way (such as receiving stock instead of holding a Claim) and (d) the form of consideration (e.g., Cash or AAC Equity Interests), if any, that such holders will receive on account of their respective Claims or Interests.

The table below provides a summary of the classification and description of Claims and Interests under the Plan. This information is provided in summary form below for illustrative purposes only and is qualified in its entirety by reference to the provisions of the Plan. For a more detailed description of the treatment of Claims and Interests under the Plan, see section VIII of this Disclosure Statement, entitled "Description of the Chapter 11 Plan." Certain Claims have not been classified under the Plan and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan, and shall have the following treatment:

> **Allowed Administrative and Priority Tax Claims**. Administrative Claims include Claims for costs and expenses of administration of this chapter 11 case pursuant to sections 503(b), 507(a)(2), 507(b) or 1114(e)(2) of the Bankruptcy Code. Priority Tax Claims include any Claim of a governmental unit, as defined in section 101(27) of the Bankruptcy Code, of the kind specified in section 507(a)(8) of the Bankruptcy Code.

> **Payment of Statutory Fees**. Statutory fees include all U.S. Trustee quarterly fees payable under 28 U.S.C. § 1930(a)(6), plus interest due and payable under 31 U.S.C.§ 3717, on all disbursements, including Plan payments and disbursements in and outside the ordinary course of the Debtor's business, until the entry of a Final Order, dismissal of the chapter 11 case or conversion of the chapter 11 case to a case under chapter 7 of the Bankruptcy Code.

Under the proposed Plan, holders of Allowed Administrative Claims and Priority Tax Claims and all statutory fees will be paid in full, in cash, and will otherwise be left Unimpaired or granted such other treatment as agreed between the Debtor and the applicable creditor, all as further provided in Article II of the Plan and section VIII of this Disclosure Statement.

2.  **Summary of Treatment, Estimated Range of Recoveries and Voting Rights of Claims and Interests Under the Plan**

The table below summarizes the classification, status, voting rights, treatment, estimated range of recoveries and estimated amount of classified Claims and Interests under the Plan accounting for these various factors. This information is provided in summary form below for illustrative purposes only and is qualified in its entirety by reference to the provisions of the Plan. For a more detailed description of the treatment of Claims and Interests under the Plan, see section VIII of this Disclosure Statement, entitled "Description of the Chapter 11 Plan."

**THE ESTIMATED PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND ARE THEREFORE SUBJECT TO CHANGE.**

| Class | Claim Description | Status and Voting Rights | Est. Recovery Percentage for the Class | Estimated Amount of Allowed Claims / Interests | |
|---|---|---|---|---|---|
| 1 | Secured Creditors - Liquidated | Unimpaired, Does Not Vote | 100.00% | $3,812,330 | N/A |
| 2 | Secured Creditors – Participatory | Impaired, Votes | 21.95% | $2,087,000 | N/A |
| 3 | Other Priority Creditors | Unimpaired, Does Not Vote | 100.00% | $0.00 | N/A |
| 4 | Unsecured Creditors - Liquidated | Unimpaired, Does Not Vote | 100.00% | $1,340,338 | N/A |
| 5 | Unsecured Creditors – Furloughed Former Employees | Unimpaired, Does Not Vote | 100.00% | $411,856 | N/A |
| 6 | Unsecured Creditors - Participatory | Impaired, Votes | 25.97% | $1,683,962 | N/A |
| 7 | Unsecured Creditors – Assumptions and Settlements | Impaired, Votes | 100.00% | $866,142 | N/A |
| 8 | Unsecured Creditor - Purchaser | Unimpaired, Does Not Vote | 100.00% | $2,931,325 | N/A |
| 9 | Unsecured Creditors - Compromised | Impaired, Votes | 15.00% | $4,118,095 | N/A |
| 10 | Interest Holders – Series A-2 Equity | Impaired, Votes | 25.97% | $5,200,575 | 20,802,300 |
| 11 | Interest Holders – Series A-1 Equity | Impaired, Votes | 64.91% | $165,633 | 1,656,331 |
| 12 | Interest Holders – Series Z Equity | Impaired, Votes | 25.97% | $500,000 | 2,000,000 |
| 13 | Interest Holders – Common Equity | Unimpaired, Does Not Vote | 100.00% | $312,130 | 14,728,225 |
| 14 | Interest Holders – Common Stock Options | Unimpaired, Does Not Vote | 100.00% | $0.00 | 3,266,500 |

| 15 | Interest Holders – Common Stock Warrants | Impaired, Votes | 0% | | $0.00 | 5,617,464 |

D.       **Voting Deadline**

The deadline to vote on the Plan is 5:00 p.m. (prevailing Pacific Time) on August 31, 2012 (the "***Voting Deadline***").

E.       **Procedures for Voting on the Plan**

This Disclosure Statement, accompanied by a ballot ("***Ballot***") to be used for voting on the Plan, is being distributed to the holders of Claims entitled to vote on the Plan. If you are a holder of Claims in Classes 2, 6, 7, 9, 10, 11, 12 and 15, you may vote for or against the Plan by completing the Ballot and returning it in the envelope provided in accordance with the instructions provided on the Ballot and in the Voting and Tabulation Procedures. The Debtor, with the approval of the Bankruptcy Court, have engaged its Counsel for these Bankruptcy Proceedings, The Law Offices of Dallas Jolley to serve as Special Counsel and voting agent for claims and generally oversee the voting process (the "***Voting and Claims Agent***"). The Voting and Claims Agent will also process and tabulate Ballots for each Class entitled to vote to accept or reject the Plan.

**DELIVERY OF BALLOTS:**

Ballots and Note Ballots must be **actually received** by the Voting and Claims Agent by the Voting and Claims Agent by the Voting Deadline of 5:00p.m. (prevailing Pacific Time) on August 31, 2012 at the following addresses by hand, delivery or courier delivery:

Vadium Technology, Inc.
c/o The Law Offices of Dallas Jolley
ATTN: _____
PO Box_____
Tacoma, WA_____

If you have any questions on the procedure for voting on the Plan, please call the Voting and Claims Agent at the following telephone number: 253-761-8970.

More detailed instructions regarding how to vote on the Plan are contained on the Ballots distributed to holders of Claims that are entitled to vote on the Plan as well as the Voting and Tabulation Procedures. For your vote to be counted, your Ballot must be completed, signed and actually received by 5:00 p.m. (prevailing Pacific Time), on the Voting Deadline, August 31, 2012.

Any Ballot that is properly executed by the holder of a Claim, but which does not clearly indicate either an acceptance or rejection of the Plan or which indicates both an acceptance and a rejection of the Plan, will not be counted. Each holder of a Claim may cast only one Ballot per each Claim held. It is important to follow the specific instructions provided on each Ballot. For information regarding voting, see the section herein entitled "Solicitation and Voting Procedures," which begins on page 77 as well as the Solicitation, Voting and Tabulation Procedures, which are set forth in the Disclosure Statement and Solicitation and Voting Procedures Order, attached hereto as <u>Exhibit B.</u>

**THE PLAN WILL BIND ALL HOLDERS OF CLAIMS AGAINST, AND INTERESTS IN, THE DEBTOR TO THE FULLEST EXTENT AUTHORIZED OR PROVIDED UNDER THE BANKRUPTCY CODE, INCLUDING SECTIONS 524 AND 1141 THEREOF, AND BY ALL OTHER APPLICABLE LAW.**

# II - IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT

This Disclosure Statement provides important information regarding the Debtor's Chapter 11 Plan, which the Debtor is seeking to have confirmed by the Bankruptcy Court.

**THE DEBTOR BELIEVES THAT THE PLAN IS IN THE BEST INTERESTS OF ALL STAKEHOLDERS. THE DEBTOR URGES ALL HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE ON THE PLAN TO VOTE IN FAVOR OF THE PLAN.**

All capitalized terms used but not defined herein will have the meanings provided to them in the Plan.

The summary of the Plan provided herein is qualified in its entirety by reference to the Plan. In the case of any inconsistency between the summary provided in this Disclosure Statement and the Plan, the Plan will govern.

The Debtor submits this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code for the purposes of soliciting acceptances with respect to, and confirmation of, the Plan. The Disclosure Statement and the information it contains may not be relied on for any other purpose. The Debtor believe that the summary of certain provisions of the Plan and certain other documents and financial information contained or referenced in this Disclosure Statement is fair and accurate. The summaries of the financial information and the documents annexed to this Disclosure Statement, including the Plan, are qualified in their entirety by reference to those documents.

No representations concerning the Debtor or the value of the Debtor' property has been authorized by the Debtor other than as set forth in this Disclosure Statement. Any other information, representations or inducements made to obtain acceptance of the Plan should not be relied on by any holder of a Claim or Interest entitled to vote on the Plan.

The Debtor has sought to ensure the accuracy of the financial information provided in this Disclosure Statement, but the financial information contained in, or incorporated by reference into, this Disclosure Statement has not been and will not be audited or reviewed.

**<<Remainder of Page Left Intentionally Blank>>**

# III - QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN

## A.  What is Chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  In addition to permitting debtor rehabilitation, chapter 11 of the Bankruptcy Code promotes equality of treatment for similarly situated creditors and similarly situated interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that includes all of the legal and equitable interests of the debtor in property as of the bankruptcy commencement date.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a chapter 11 plan is the principal objective of a chapter 11 case.  A plan that is confirmed by the bankruptcy court is binding on the debtor, any person acquiring property under the plan, any creditor or interest holder of the debtor and any other entity as may be ordered by the bankruptcy court, in accordance with the applicable provisions of the Bankruptcy Code.  Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's claims and interests in accordance with the terms of the confirmed plan.

## B.  Why is the Debtor sending me this Disclosure Statement?

The Debtor is seeking to obtain Bankruptcy Court approval of the Plan.  Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtor to prepare a Disclosure Statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan.  The Bankruptcy Court approved this Disclosure Statement under section 1125 of the Bankruptcy Code by order dated _____ [Docket No. ____].  A copy of the Disclosure Statement and Voting and Solicitation Procedures Order is attached hereto as Exhibit B.  This Disclosure Statement is being submitted to the Debtor's stakeholders in accordance with these Bankruptcy Code requirements, the Disclosure Statement and Voting and Solicitation Procedures Order.

## C.  Am I entitled to vote on the Plan?  What will I receive from the Debtor if the Plan is consummated?

Your ability to vote and the distribution and consideration that you will receive under the Plan, if any, depend on what kind of claim or interest you hold.  As described in section I.C of this Disclosure Statement, Article III of the Plan creates categories of holders of claims and interests, each of which is referred to as a "*Class*."  A summary of the Classes of Claims and Interests and a description each Class's voting status are set forth in the Executive Summary of this Disclosure Statement.  You should refer to this entire Disclosure Statement and the Plan for a complete description of the classification and treatment of each Class of Claims, and Interests.  For more information about the treatment of Claims and Interests, see "Description of the Chapter 11 Plan," which begins on page 44.

**D.  If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what do you mean when you refer to "Confirmation," "Effective Date" and "consummation?"**

"Confirmation" refers to approval of the Plan by the Bankruptcy Court.  Confirmation does not guarantee that you will receive the distribution indicated under the Plan.  After Confirmation, there are certain conditions that need to be satisfied or waived so that the Plan can be consummated or become effective.  References to the "Effective Date" mean the date that all conditions to the Plan have been satisfied or waived and the Plan has been fully consummated.  Distributions will only be made on the Effective Date or as soon as practicable thereafter, in accordance with Article X of the Plan (and for claims that are not yet Allowed, distributions will be further delayed). Certain distributions will only be made upon the Closing Date of the Sale Transaction (or earlier, as set forth in the Sale Order and the Plan).  *See Draft Sale Order in* <u>*Exhibit-F*</u>. *See* "Confirmation of the Plan," which begins on page 80, for a discussion of the conditions to consummation.

**E.  What is included in the solicitation packages to be sent to creditors who are eligible to vote on the Plan?**

All parties in interest will receive notice of the Confirmation Hearing, which is the hearing at which the Debtor will seek confirmation of the Plan.  Additionally, creditors who are eligible to vote on the Plan will receive appropriate solicitation materials, including ballots.  Specifically, accompanying this Disclosure Statement are, among other things, copies of: (1) the Plan (attached as <u>Exhibit A</u> hereto); (2) the notice of, among other things, the time for submitting Ballots to accept or reject the Plan, the date, time and place of the hearing to consider the confirmation of the Plan and related matters, and the time for filing objections to the confirmation of the Plan (the "***Confirmation Hearing Notice***"); and (3) if you are entitled to vote, one or more Ballots (and return envelopes) to be used by you in voting to accept or to reject the Plan (collectively, the "***Solicitation Package***").

The notices to be sent to parties in interest will state that this Disclosure Statement, the Plan and all of the exhibits thereto are available for viewing by any party free of charge by:  calling Dallas Jolley at (253) 761-8970.

**F.  What is the deadline to vote on the Plan?**

5:00 p.m. (prevailing Pacific Time) on August 31, 2012.

**G.  How do I vote for or against the Plan?**

This Disclosure Statement, accompanied by a Ballot to be used for voting on the Plan, is being distributed to the holders of Claims entitled to vote on the Plan.  If you are a holder of Claims in Classes 2, 6, 7, 9, 10, 11, 12 and 15, you may vote for or against the Plan by completing the Ballot, and returning it in the envelope provided in accordance with the instructions provided on the Ballot and in the Voting and Tabulation Procedures.

<<Remainder of Page Left Intentionally Blank>>

The Debtor, with the approval of the Bankruptcy Court, has engaged Beresford Booth, PLLC to serve as the Voting and Claims Agent and t o generally oversee the voting process. The Voting and Claims Agent will also process and tabulate Ballots for each Class entitled to vote to accept or reject the Plan and will process and tabulate any Ballots for Classes 2 , 6 , 7 , 9 , 1 0 , 1 1 , 1 2 a n d 1 5 .

Vadium Technology, Inc.<br>
c/o The Law Offices of Dallas Jolley<br>
ATTN: Dallas Jolley<br>
PO Box_____<br>
Tacoma, WA_____

Any Ballot that is properly executed by the holder of a Claim, but which does not clearly indicate either an acceptance or rejection of the Plan or which indicates both an acceptance and a rejection of the Plan, will not be counted.

Each holder of a Claim may cast only one Ballot per each Claim held. It is important to follow the specific instructions provided on each Ballot. For information regarding voting, see the section herein entitled "Solicitation and Voting Procedures," which begins on page 77 as well as the Solicitation, Voting and Tabulation Procedures, which set forth in the Disclosure Statement and Voting and Solicitation Procedures Order, attached here to as Exhibit B.

**H. When is the Confirmation Hearing set to occur?**

The Bankruptcy Court has scheduled the Confirmation Hearing for S e p t e m b e r 7 , 2012 to take place at 9:30 a.m. (prevailing Pacific Time) before the Honorable Marc L. Barecca, United States Bankruptcy Judge, in the United States Bankruptcy Court for the Western District of Washington, located at 700 Stewart Street, Suite 6301, Seattle, WA 98101. **The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any adjournment thereof.**

**I. What is the deadline to object to Confirmation?**

Objections to Confirmation must be filed and served on the Debtor, and certain other parties in interest, so that they are **actually received** no later than 5:00 p.m. on August 31, 2012 (prevailing Pacific Time) in accordance with the requirements set forth in the Disclosure Statement and Voting and Solicitation Procedures Order, which is attached to this Disclosure Statement as Exhibit B. Unless objections to Confirmation are timely served and filed in compliance with the Disclosure Statement and Voting and Solicitation Procedures Order, they may not be considered by the Bankruptcy Court. For further information on Confirmation see the section of this Disclosure Statement titled "Confirmation of the Plan," which begins on page 80.

**J. What is the effect of Confirmation on the Debtor's ongoing business?**

Following Confirmation, the Plan will be consummated on the Effective Date, which is a date selected by the Debtor that is the first business day after which all conditions to consummation have been satisfied or waived. *See* Article X of the Plan. The Debtor expects to remain in existence following the Effective Date for the sole purposes of (i) operating the business until consummation of the Sale Transaction (as further set forth herein) and (ii) liquidating any remaining assets after the consummation of the Sale Transaction and for winding-up their affairs after consummation of the Sale Transaction.

In the event that the Plan is not consummated, the Plan will be null and void in all respects. Accordingly, any settlement or compromise, distribution on account of any Claim or Interest, assumption or rejection of Executory Contracts or Unexpired Leases affected by the Plan and any document or agreement executed pursuant to the Plan shall be deemed null and void.

**K.  What role does the Bankruptcy Court play after the Confirmation Hearing?**

After the Plan is confirmed, the Bankruptcy Court will still have exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Case and the Plan.

**L.  Does the Debtor recommend voting in favor of the Plan?**

Yes.  The Plan represents a distribution of the Cash and AAC Equity Interests received pursuant to the Sale Transaction.  It is the Debtor's opinion and belief that the Plan provides for the most fair and equitable distribution to the Debtor's creditors and equity interest holders.  The Debtor further believes that any further litigation regarding the distributions set forth in the Plan will only further erode unsecured creditor and equity interest holder recoveries, because the costs of such litigation will be borne by unsecured creditors and equity interest holders of the Debtor, and the benefits to any single creditor are not significant enough to warrant such continued litigation. As such, the Debtor believes that the Plan is in the best interests of all holders of Claims and Interests.  Thus, the Debtor recommend that holders of Claims and Interests who are entitled to vote on the Plan vote to accept it.

<<Remainder of Page Left Intentionally Blank>>

# IV - THE DEBTOR'S HISTORY

## A. Company Overview

Vadium Technology, Inc. is a Washington corporation formed on April 16, 2001 ("Debtor"). The Debtor is a privately held software and information security company, The Debtor was founded after nearly two decades of research and development by Wolfgang and Elizabeth Hammersmith on the practical implementation of the classical One-Time Pad cipher system ("OTP") in a computerized and digital format, now commonly known by the names AlphaCipher or the AlphaCipher Technology Platform. The OTP is the only cipher to ever be mathematically proven to produce permanently unbreakable cipher text when properly implemented. From 2001 through 2009 the Debtor has researched, developed, and licensed a series of digital data and communication security products based on the AlphaCipher Technology Platform. The AlphaCipher Technology Platform and products based thereon have the potential to dramatically and substantially change and improve the way organizations and individuals safeguard digital information in motion or at rest. AlphaCipher represents the strongest possible commercially available protocol for delivering unbreakable and unconditional protection of digital data. AlphaCipher can be deployed to protect and secure matters of national security, homeland defense, the orderly flow of financial markets and banking transactions, continuity of industry and the preservation of vital infrastructure services of a host country. It can also perform at its best in individual and enterprise exchange of all data, including voice, video and data generated, whether in fixed or mobile communications anywhere. The AlphaCipher platform can be deployed on a multi-point basis, to and from the field and across the entire enterprise/ network domain with efficiency of speed, ease and cost effectiveness. Applications of this technology can be designed for use in VOIP systems, mobile phones, PDAs, RFID chips and robotic devices, essentially any computerized device operating on any computer hardware platform and operating system configuration. AlphaCipher has been positioned to respond to the rapidly changing needs of the marketplace to preserve the integrity of all electronic data from an avalanche of security threats caused not just by lone hackers or disgruntled employees, but by those who are directed by sovereign states and organized crime syndicates.

The Debtor began conducting active business operations in February 2002 with the opening of an office in downtown Seattle, and the hiring of initial executive and employees. Prior to starting initial active operations, Wolfgang and Elizabeth Hammersmith contributed to the Debtor their entire right, title and interest in the AlphaCipher Technology Platform that they had developed prior to formation of the Debtor and startup of initial active operations in exchange for Common Stock in the Debtor. From February 2002 through approximately July 2003 the Debtor conducted operations in Seattle by starting to commercialize its initial product, AlphaCipher for Desktop for Windows.

In the summer of 2003 the Debtor relocated its operations to a Fife, Washington, into a building owned by Mr. Kenyon Luce, who was a substantial shareholder and director of the Debtor at the time. At the time of this relocation, the Debtor's personnel count was approximately 9 full time employees. Once relocated to Fife, the Company's operations began to expand, it entered into multiple sales representation agreements with sales channel partners both domestically and abroad establish an initial sales and distribution channel for the Debtor developing product line. In 2004, the Debtor, through one of its sales channel partners in Washington, D.C. got its first major sale in the form of a research, test and evaluation contract with the United States Air Force ("USAF"), through the sales channel partner. The Company delivered and fulfilled this initial contract successfully with the USAF, however, given budget priorities and other choices for technology the contract was not extended, but the initial phases. At the same time and after the USAF contract the Debtor continued to develop its sales channels and product lines, developing an entire suite of data and communication security products that operated on the Microsoft Windows Operating System Platform. From the period from the end of the USAF contract through the November 2009 the Debtor generated additional sales for its products with customers located in the United States, Mexico, United Kingdom, Singapore and Argentina. However, this entire time the Debtor was operating continually at a net operating loss and has never generated positive cash flow from its operations. The Debtors operations were financed primarily by the private placement of equity and debt to angle investors who qualified as Accredited Investors within the meaning of Rule 501 of Regulation D

of the Security Act of 1933.

On November 15, 2009 the Debtor ran out of working capital, failed to meet a payroll and was effectively forced to suspend active operations. Many of the Debtor's employees either quit and sought alternative employment or were furloughed by the Debtor in anticipation of a recapitalization of the Debtor to restart active operations. From the period from November 15, 2009 through the approximately December 29, 2011 the Debtor actively sought investors, financier and or purchase to fund a recapitalization and reorganization of the Debtor to restart operations. On December 29, 2011 the Debtor entered into a Letter of Intent to sell all of its assets to a new company in exchange for cash and stock in the new company in order to recapitalize and reorganization the Debtor and restart active operations. On January 30, 2012 at the request of the Purchaser under the Letter of Intent of the Debtor's Asset, the Debtor voluntarily sought protection under Chapter 11 of the United States Bankruptcy Code in order to protect the asset sale and provide for an orderly reorganization of the Debtor for the benefit of all of the stakeholders of the Debtor.

The Debtor is currently headquartered in Seattle in the offices of the Purchaser. As of January 30, 2012, the Debtor has no employees, and all operations have been suspended pending final closing of the asset sale to the Purchaser, the planned final liquidation, winding down and final dissolution of the Debtor pursuant to the Plan of Reorganization.

## 1. The AlphaCipher Technology Platform

The Debtor's competitive advantage lies in its unique patented and patent-pending unbreakable encryption technology. The core of Vadium's AlphaCipher technology is the One-Time Pad ("OTP") Cipher, the only cipher that produces provably permanent unbreakable ciphertext. The unique benefit of Vadium's OTP Cipher approach is that it avoids the obsolescence faced by other cipher and digital security solutions that is caused by advances in computer processing power and mathematical algorithms. Vadium's AlphaCipher Solutions empower organizations and individuals dealing with high-value information to confidently transmit and store this information in a secure manner knowing that no matter what advance occurs now or in the future that there secured data will permanently remain secure. The AlphaCipher Technology Platform consists of the following:

i)     computer source code written primarily in C++ and ANSI 99 C, along with object and executable computer code compiled therefrom for the Debtor's product lines described above (collectively "Code Base");

ii)    United States and Foreign patents, patent applications, pending patent applications;

iii)   Copyrights;

iv)    United States Trademark registrations;

v)     trade secrets; and

vi)    all related product designs, concepts, ideas and documentation.

<<Remainder of Page Left Intentionally Blank>>

**B. The Company's Organizational Structure**

**1. Overview of the Debtor's Organizational Structure**

Attached as <u>Exhibit-C</u> to this Disclosure Statement is an organizational chart summarizing the corporate structure of the Debtor, as of January 30, 2012, the date upon which the Chapter 11 Case was commenced. As demonstrated by the organizational chart, the Debtor is a Washington corporation.

**C. The Debtor's Prepetition Capital Structure**

**1. Overview**

As of the Petition Date, the Debtor had debt facilities in place with an aggregate amount of approximately $20,027,425. The chart below summarizes the Debtor's prepetition debt and equity capital structure, including approximate outstanding amounts as of the Petition Date. Further detail with respect to each category of debt obligation and equity class is provided below.

| *Pre Petition Liabilities:* | | |
|---|---|---:|
| Secured Creditors | $ | 6,790,344 |
| Unsecured Priority Creditors | $ | 1,621,227 |
| Unsecured Creditors – Accounts Payable | $ | 1,310,338 |
| Unsecured Creditors Furloughed & Former Employees | $ | 5,057,401 |
| Unsecured Creditors Shareholders | $ | 2,079,791 |
| Unsecured Creditors | $ | 3,168,325 |
| | | |
| ***Total Pre Petition Liabilities:*** | $ | 20,027,425 |
| | | |
| *Equity:* | | |
| Series A-2 Preferred Stock | $ | 5,200,575 |
| Series A-1 Preferred Stock | $ | 165,633 |
| Series Z Preferred Stock | $ | - |
| Common Stock | $ | 312,130 |
| Stock Options | $ | - |
| Warrants | $ | - |
| Accumulated Deficit | $ | (21,663,937) |
| | | |
| ***Total Equity:*** | $ | (15,985,599) |
| | | |
| ***Total Liabilities & Equity:*** | $ | 4,041,826 |

**2.** **Description of Prepetition Liabilities**

**a.** **Secured Creditors**

The Debtor has eight (8) perfected secured and judgment lien holder creditors. These Creditors generally have a perfected lien on all of the assets of the Debtor either through a valid UCC Filing with the Washington Secretary of State or a properly recorded judgment. . The detailed list of these Creditors is presented in <u>Exhibit-4</u> and <u>Exhibit-5</u> to the Plan of Reorganization.

**b.** **Unsecured Creditors – Priority Tax Liabilities**

The Debtor's Unsecured Creditors – Priority Tax Liabilities are for unsecured Claims of the United States Federal and various State Taxing authorities for payroll, excise and business and occupation taxes. The detailed list of these Creditors is presented in <u>Exhibit-2</u> to the Plan of Reorganization.

**c.** **Unsecured Creditors – Accounts Payable**

The Debtor's Unsecured Creditors – Accounts Payable consists of Creditors of the Debtor who hold Unsecured Claims against the Debtor by way of providing prepetition goods and services to the Debtor in the normal course of both the Debtor's and the Unsecured Creditor's course of business. The detailed list of these Creditors is presented in <u>Exhibit-7</u> to the Plan of Reorganization.

**d.** **Unsecured Creditors – Furloughed & Former Employees**

The Debtor's Unsecured Creditors – Furloughed & Former Employees consists of Creditors of the Debtor who hold Unsecured Claims against the Debtor by way of employment that was suspended or terminated, and such Claims are not eligible for treatment as Priority Claims under the United States Bankruptcy Code. The detailed list of these Creditors is presented in <u>Exhibit-8</u> to the Plan of Reorganization.

**e.** **Unsecured Creditors - Shareholders**

The Debtor's Unsecured Creditors – Shareholders consists of Creditors of the Debtor who hold Unsecured Claims against the Debtor by way of employment that was suspended or terminated, and such Claims are not eligible for treatment as Priority Claims under the United States Bankruptcy Code. The detailed list of these Creditors is presented in <u>Exhibit-9</u> to the Plan of Reorganization. None of these Creditors are Officer or Directors of the Debtor, but they may be Insiders of the Debtor as they may hold Equity Interests directly or through attribution that equal or exceed five percent (5%) of the Debtor's Equity Interests.

**f.** **Unsecured Creditors - Others**

The Debtor's Unsecured Creditors – Others of Creditors of the Debtor who hold Unsecured Claims against the Debtor in some other manner than classified above. The principal Creditor / Claim Holder in this grouping of Creditors is AlphaCipher Acquisition Corporation, the Purchaser of the Debtor's assets under the Purchase Agreement. The detailed list of these Creditors is presented in <u>Exhibit-11</u> to the Plan of Reorganization.

## 3. Stockholders' Equity

### a. Series A-2 Preferred Stock

The Debtor has 20,802,300 shares of Series A-2 Preferred Stock issued and outstanding. The Holders of Series A-2 Preferred Stock get one vote for each share of stock they hold, and they are convertible into Common Stock of the Debtor on a share for share basis. The Debtor's Series A-2 Preferred Stock has a senior $.15 per share liquidation priority over all other classes of stock of the Debtor. Once the Series A-2 Preferred Stock Receives its Senior Liquidation Preference, it shares in a further $.10 per share liquidation preference ("Junior Liquidation Preference") on a pro rata basis with the Holders of Series A-1 Preferred Stock. The Series A-2 Preferred Stock liquidation preference ranks superior to all other classes of the Debtor's capital stock or Equity Interests. The detailed list of these Equity Interest holders is presented in Exhibit-13 to the Plan of Reorganization.

### b. Series A-1 Preferred Stock

The Debtor has 1,656.331 shares of Series A-1 Preferred Stock issued and outstanding. The Holders of Series A-1 Preferred Stock get one vote for each share of stock they hold, and they are convertible into Common Stock of the Debtor on a share for share basis. The Debtor's Series A-1 Preferred Stock has a $.10 per share liquidation priority that it shares with the Debtor's Series A-2 Preferred Stock on a prorate basis after the Series A-2 Preferred Stock has first received a $.15 per share liquidation preference. The Series A-1 Preferred Stock liquidation preference ranks superior to the Debtor's Series Z Preferred Stock, Common Stock, Common Stock Options and Common Stock Purchase Warrants. The detailed list of these Equity Interest holders is presented in Exhibit-14 to the Plan of Reorganization.

### c. Series Z Preferred Stock

The Debtor has 2,000,000 shares of Series Z Preferred issued and outstanding. These shares are held by Wolfgang and Elizabeth Hammersmith, Founders and Insiders of the Company. The Holders of Series Z Preferred Stock get ten votes for each share of stock they hold, and they are convertible into Common Stock of the Debtor on a share for share basis. The Debtor's Series Z Preferred Stock liquidation priority ranks on parity with the Debtor's Common Stock and is junior to the Series A-2 and Series A-1 Preferred Stock and ranks superior to the Debtor's Common Stock Options and Common Stock Purchase Warrants.

### d. Common Stock

The Debtor has 14,728,225 shares of Common Stock issued and outstanding. The Holders of Common Stock get one vote for each share of stock they hold, and they are not convertible into any other class of capital stock of the Debtor. The Debtor's Common Stock liquidation priority ranks on parity with the Debtor's Series Z Preferred Stock and is junior to the Series A-2 and Series A-1 Preferred Stock and ranks superior to the Debtor's Common Stock Options and Common Stock Purchase Warrants. The detailed list of these Equity Interest holders is presented in Exhibit-16 to the Plan of Reorganization.

### e. Common Stock Options

The Debtor has issued to employees, consultants and advisors pursuant to its stock option plan 3,266,500 options to purchase Common Stock of the Debtor. Each option entitles the Holder to purchase one share of Common Stock at a price of $.25 per share. The detailed list of these Equity Interest holders is presented in Exhibit-17 to the Plan of Reorganization.

**f.    Common Stock Purchase Warrants**

The Debtor has issued, in connection with loans made to the Debtor by Shareholders, 5,617,464 Common Stock Purchase Warrants of the Debtor. Each warrant entitles the Holder to purchase one share of Common Stock at a price ranging from $.25 to $.40 per share depending on the specific warrant issued to the Holder.   The detailed list of these Equity Interest holders is presented in <u>Exhibit-18</u> to the Plan of Reorganization.

**D.   Claims and Interests of Officers, Directors and 5% Equity Interest Holders**

Attached as <u>Exhibit-D</u> to this Disclosure Statement Chart showing all of the Claims and Equity Interests of the Officers, Directors and 5% or greater Equity Interest Holders of the Debtor as of the Petition Date of the Chapter 11 Case, along with their expected treatment of those interests under the Plan of Reorganization.

**<<Remainder of Page Left Intentionally Blank>>**

**Vadium Technology, Inc.**
**Disclosure Statement - 7/3/2012**
**Page 26 of** 102

# V - EVENTS LEADING TO COMMENCEMENT OF THE CHAPTER 11 CASE

The following is a general description of factors that ultimately led to the of the Debtor's chapter 11 case.

As discussed above, the Debtor' business model is premised upon the development, licensing and delivery of innovative and disruptive security products to replace incumbent solutions with substantial market presence and brand equity. Innovation and displacement of incumbent solutions does not happen overnight, nor does it come with a low price tag. The Debtor spent years developing and attempting to profitably commercialize the AlphaCipher Technology Platform and the products derived from that technology on an undercapitalized relative to the market opportunity bootstrapped budget, relying on financing from angel investors. Angel investors can only carry a start-up technology business so far in the path to positive cash flow operations and self-sustaining profitability. On top of actually developing the very complex technology itself, the Debtor had to carefully identify, select and train its personnel, sales channel partners, market a new and innovative concept to a market place that selects and adopts solutions very slowly even though the threats facing the incumbent solutions already deployed are failing in real-time. All these tasks had to be completed while attempting to obtain financing on a private placement basis through rising equity and or debt capital. This scenario in reality involved long, and time intensive sales and product development cycles, without the support of ongoing profitable cash flow from revenue.

Accordingly, throughout the years preceding commencement of the chapter 11 case, the Debtor's business model had largely been premised upon a substantial amount of capital expenditures with very little in the way of revenue or equity financing in relation to the costs incurred in developing both the underlying products and market place for the products. The Debtor now has a mature technology platform that is fully ready to globally commercialize. Nonetheless, despite achieving the significant milestone of turning a technology concept into a mature technology platform with an initial commercial product set, the Debtor required significant financing for further development and marketing before it could become profitable enough to service their prepetition debt and meet their capital requirements for continued technological development and market expansion of their product. Just as the Debtor was reaching the development of a mature technology platform that was market ready, and the market for its products was developing in a manner that it was starting to demand our products, the global capital markets literally imploded for all investment classes and types starting in October 2008. Hit particularly hard was the capital markets for early stage, pre-positive cash-flow technology companies that needed to be capital intensive. Essentially since early 2009 there has not existed an active market to provide financing for these types of companies.

The willingness of the Debtor's investors to contribute millions of dollars to fund the development of the Debtor' technology over the course of the years preceding their chapter 11 filings is a testament to such investors' belief in the Debtor's business and future, in spite of the challenges faced by the existing capital market situation. Nevertheless, the Debtor's angel investor's ability to provide the level of financing to fund the Debtor was not deep enough to meet the Debtor's needs and requirements. This fact taken together with the recent destabilizing traumatic shocks to the global economic order and the financial markets due to the global debt and economic crisis that started in late 2008 meant that the Debtor had not been able to obtain the necessary financing liquidity needed to satisfy working capital requirements, operating expenses, debt and other obligations without either an infusion of new capital or a restructuring of their balance sheet.

Amidst one of the most challenging financing markets in recent history, in the 24 months before the Petition Date, the Debtor persistently explored and attempted a number of initiatives to find financing as described herein. While all these efforts were successful in bringing together an Asset Sale and consensual Plan of Reorganization that will provide for cleaning up the Debtor's balance sheet and satisfaction of all stakeholder interests, for both creditor and shareholder through cash payments and equity issuances, this success was not proceeding at a pace that was fast enough for one particular Creditor of the Debtor, who in an attempt to force the Asset Sale and payment of its debt to happen faster than could practically be completed under any reasonable scenario, given the circumstances ,threatened to take numerous different courses of legal actions, that would have  most likely caused substantial harm to the Asset Sale, the prepetition plan of reorganization and the overall estate of the Debtor when considering the interests and welfare of the entirety of the creditors and shareholders of the Debtor. As such the Purchaser under the Asset Sale acting for the benefit of all the Debtor's stakeholders specifically asked the Debtor to seek Chapter 11 bankruptcy protection in order to protect the Asset Sale and the estate of the Debtor from a disorderly reorganization.

**<<Remainder of Page Left Intentionally Blank>>**

# VI - INITIAL MOTIONS OF THE CHAPTER 11 CASE AND CERTAIN RELATED RELIEF

On the Petition Date, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Western District of Washington. The Debtor's Chapter 11 case is being administered for procedural purposes only under the caption *In re Vadium Technology, Inc.*, Case No. 12-10808-MLB, before the Honorable Marc L. Barecca. The Debtor continues to operate its business and manage its properties as Debtor in possession under the jurisdiction of the Bankruptcy Court and in accordance with the applicable provisions of the Bankruptcy Code and orders of the Bankruptcy Court.

## A. Procedural Orders, Retention of Professionals and Related Relief

To date there has not been a need to request any procedural orders; the Debtor anticipates obtaining a Claims Bar Date order in the near future.

### 1. Retention of Professionals

On May 25, 2012, the Debtor filed an application seeking Bankruptcy Court approval to retain the following professionals to assist in carrying out its duties as Debtor in possession and to represent its interests in the chapter 11 case:

➢ The Law Offices of Dallas Jolley, as Bankruptcy attorneys [Docket No.25]

A hearing for this Motion is scheduled for July 6, 2012 to take place at 9:30 a.m. (prevailing Pacific Time) before the Honorable Marc L. Barecca, United States Bankruptcy Judge, in the United States Bankruptcy Court for the Western District of Washington, located at 700 Stewart Street, Suite 6301, Seattle, WA 98101.

### 2. Debtor-In-Possession Financing

On May 25, 2012, the Debtor sought approval for entering into a $250,000 debtor-in-possession financing agreement with the Purchaser. The DIP Financing Agreement provides the Debtor with up to $250,000 in working capital to pay various Administrative costs of the bankruptcy on a no priority unsecured basis. On July ____, 2012, the Bankruptcy Court entered an order approving the Debtor' entry into the DIP Financing Agreement (the "***DIP Order***") [Docket No. _____].

# VII - DEVELOPMENTS DURING THE CHAPTER 11 CASE

## A. Appointment of the Statutory Committee

Section 1102 of the Bankruptcy Code requires that, absent an order of the Bankruptcy Court to the contrary, the U.S. Trustee must appoint a committee of unsecured creditors as soon as practicable. On February 28, 2012, the U.S. Trustee appointed the Creditors' Committee. The Creditors' Committee, as originally appointed, was comprised of the following five members:

- Mr. David Tingstad, Esq. as Co-Chair of the Committee;
- Mr. Terry Korotzer, as Co-Chair of the Committee
- Mr. Walter Smith;
- Dr. Lawerence Lavine, D.O.; and
- Mr. James Lynch, Esq., General Counsel, Grindstone Management, LLC

On June 4, 2012, the U.S. Trustee appointed the following additional member to Creditors' Committee:

- Ms. Pepper Fernandez, President & CEO of Solutionzs, Conferencing, Inc.

On June 28, 2012, Mr. James Lynch, General Counsel of Grindstone Management, LLC on behalf of himself and Grindstone Management, LLC withdrew from participation on the Creditors'' Committee. [Docket No.36]

As of July 3, 2012 the Creditors' Committee has not sought to retain any Professional Advisors. It is anticipated the Creditors' Committee will retain legal counsel to advise it during the approval and confirmation process for the Plan of Reorganization and Disclosure Statement.

## B. The Statement of Financial Affairs and Overview of the Claims Process

### 1. Filing of the Debtor's Statements of Financial Affairs and Schedules of Assets and Liabilities

On January 30, 2012, the Debtor filed their initial schedules of assets and liabilities and statements of financial affairs (collectively, the "**SOFAs and Schedules**") pursuant to section 521 of the Bankruptcy Code and Bankruptcy Rule 1007. The SOFAs and Schedules provide information concerning each of the Debtor's assets, liabilities (including accounts payable), executory contracts and other financial information as of the Petition Date. These have been amended from time to time during the Bankruptcy process by the Debtor. Copies of the Debtor's SOFAs and Schedules are available free of charge by contacting the Debtor's counsel.

### 2. Establishment of the Claims Bar Date

On July___, 2012, the Bankruptcy Court entered an order [Docket No._____] (the "**Bar Date Order**") establishing August ____ , 2012 (the "**Bar Date**") as the deadline by which each person or entity asserting a claim against any of the Debtor was required to file written proof of such claim. In accordance with the Bar Date Order, the Debtor provided written notice of the Bar Date to each of the parties and entities identified as creditors on the SOFAs and Schedules and to all known actual or potential creditors of the Debtor according to the Debtor's books and records at the time of mailing of the notice. Where possible, this notice was accompanied by a proof of claim form approved by the Bankruptcy Court.

### 3.  Claims Review and Objection Process

As of the date of this Disclosure Statement, the Debtor has been actively reviewing and analyzing their claims, and has been actively seeking to reconcile any difference in amount claimed owed by Claim and Interest Holders and the amounts for said Claims and Interests the Debtor has filed in it SOFAs and Schedules.  To date the Debtor has been able to amicable resolve any differences and at the date of this Disclosure Statement does not expect to file any objections to any Claims.  As the Debtor resolves any Claim differences, if necessary the Debtor is filing amendments to the SOFAs and Schedules to record this reconciliation.

### C.  Assumption or Rejection of Executory Contracts and Unexpired Leases

The Debtor has non Unexpired Leases and as of the Petition Date the only Executory Contract the Debtor had was the Letter of Intent for the sale of all the Debtor's assets to AlphaCipher Acquisition Corporation, which has been further refined into the definitive Purchase Agreement, which the Debtor has filed a Motion on May 25, 2012 to approve.

### D.  Exclusivity

Under the Bankruptcy Code, a debtor has the exclusive right to file and solicit acceptance of a plan or plans of reorganization for an initial period of 120 days from the date on which the debtor filed for voluntary relief (the "*Exclusive Filing Period*").  If a debtor files a plan during the Exclusive Filing Period, then the debtor has the exclusive right for 180 days from the petition date to solicit acceptance of the Plan (the "*Exclusive Solicitation Period*" and, together with the Exclusive Filing Period, the "*Exclusive Periods*").  During the Exclusive Periods, no other party in interest may file a competing plan of reorganization.  However, a court may extend these periods upon the request of a party in interest.

The Debtor's initial Exclusive Filing Period and Exclusive Solicitation Period were set to expire on May 29, 2012 and July 28, 2012, respectively.  Accordingly, on July__, 2012, the Debtor filed its motion to extend the Exclusive Filing Period for the Debtor through and including _____, 2012 and (b) extend the Exclusive Solicitation Period for the Debtor through and including _____, 2012 [Docket No._____]. The Bankruptcy Court entered an Order reflecting these extensions of the Debtor's Exclusive Periods on _____, 2012 [Docket No._____].

### E.  The Motion to Dismiss or Convert the Chapter 11 Case to a Chapter 7 Liquidation

On April 30, 2012, the Attorney General for the State of Washington filed a Motion to Dismiss or Convert the Debtor's Chapter 11 Case to a Chapter 7 Liquidation [Docket No.24].  A hearing for this Motion is scheduled for July 6, 2012 to take place at 9:30 a.m. (prevailing Pacific Time) before the Honorable Marc L. Barecca, United States Bankruptcy Judge, in the United States Bankruptcy Court for the Western District of Washington, located at 700 Stewart Street, Suite 6301, Seattle, WA 98101.

<<Remainder of Page Left Intentionally Blank>>

**F. The Debtor's Sale Process and Section 363 Sale**

**1. Prepetition**

Prepetition the Debtor had spent considerable time and effort searching for a financier to provide the necessary funds to clean up the balance sheet and provide the necessary capital to finance the Debtor's development and operations to reach positive cash flow and profitability. In the two years prior to the commencement of the Chapter 11 Case the Debtor approached both financial and strategic investors on a global basis as an extension of the previous capital raising efforts. Those previous efforts included solicitation of financing from over 300 venture capital, private equity and strategic investors around the world. Most of these potential investors did not even respond to the initial solicitation and those who did generally rejected the potential investment due to the extreme distress in the financial markets, little or no positive cash flow in the Debtor's current operations and the significant insolvency and complexity of the Debtor's balance sheet. During this period however, three potential investors attempted to finance the Debtor. Of the potential financiers two are strategic industry participant investors, including the current Purchaser under the Purchase Agreement and the third was financial investor with no strategic or operational ties to the computer or digital security industry.

On March 22, 2010, the Debtor received a written Confidential Expression of Interest and Intent Regarding an SRC – Vadium Strategic Relationship ("First SRC LOI"), from SRC Technologies, Inc. ("SRC"). SRC is an artificial intelligence ("AI") software company headquartered in Chicago, Illinois. SRC has developed a unique and powerful AI software platform that could be combined with the Debtor's technology platform in order to develop unique products in the marketplace. Under the First SRC LOI, SRC expressed an interest to form a multi-part strategic relationship with the Debtor that would involve two simultaneous transactions. The first would be a strategic cross -licensing of both the Debtor's and SRC's technology to each other, and the second would involve SRC leading a $17 million dollar private placement investment in the debtor of senior Series B Preferred Stock in which SRC would provide $7.5 million of the $17 million in new investment. Their leadership and participation in this financing was contingent upon the completion of due diligence, ordinary and customary negotiations, execution of definitive agreements and SRC closing a $30 million financing round it was working on along.

On March 29 2010, the Debtor also received a Letter of Intent to purchase all of the Debtor's assets from Global Expand, LLC, ("GEX") a financial advisory company located in Charlottesville, Virginia ("GEX Letter.") The purchase price for the Debtor's assets under the GEX Letter was approximately $7.5 million plus a 40% equity stake in a new company that would be given in exchange for all of Debtor's assets. The cash proceeds from this sale would be used to pay certain secured creditors of the Debtor in full, along with the outstanding liabilities to the various taxing authorities owed by the Debtor. The 40% equity stake in the new company would be distributed to the remaining un-liquidated creditors of the Debtor, and the shareholders of Debtor would lose its entire investment. GEX completed substantial due diligence on the assets, liabilities and business prospects of the Debtor and while it was completing due diligence, GEX represented that it, through a small but financial strong group of financial partners, had the necessary resources at hand to complete this transaction. This transaction was to close on or about May 31, 2010.

In June of 2010 GEX stopped pursuing the acquisition of the Debtor's assets as it could not line up the necessary financing from its funding partners to fund and close the transaction. The reason provided for this lack of capacity to fund the deal was the overall negative conditions of the Capital markets in general, essentially their funding partners had lost their investment appetite to make early stage high risk equity investments. The Debtor viewed this as a positive sign for both the creditors and shareholders of the Debtor; since if this transaction had been consummated there would have likely been substantial and complete losses for many of the creditors and all of the shareholders of the Debtor.

During the period of the GEX due diligence from March 29, 2010 through the June 16, 2010 SRC continued to conduct due diligence on the Debtor and to press forward with a possible investment in a parallel process to the one that was being conducted by GEX. On June 16, 2010, SRC issued an updated letter of intent to the First SRC LOI issued on March 22, 2010 (the "Second SRC LOI.") The Second SRC LOI reiterated SRC interest and intent to enter into a strategic relationship with the Debtor under the terms outlined in the First SRC LOI and set anticipated funding for its financing as July 15, 2010. It was anticipated that after July 15, 2010, SRC would be able to begin finalizing a transaction with the Debtor. On July 15, 2010, SRC orally communicated that due to circumstances beyond its control, SRC financing did not close on July 15, 2010, and the pending strategic relationship with Debtor was going to be delayed.

On August 4, 2010, SRC issued another updated letter of intent (the "Third SRC LOI") further reiterating SRC interest and intent in forming the strategic relationship with Vadium. The Third SRC LOI expanded the anticipated overall Series B Preferred Stock private placement to be in the range of $17 million to $22.5 million, and was contingent on SRC closing its financing on August 31, 2010. During this time the Debtor kept in close contact with SRC on its financing progress while also soliciting other potential investors that could co-invest with SRC when it was ready to complete its investment. SRC did not complete its financing due to delays and capital market conditions on August 31, 2010, but orally kept expressing its desire and anticipation to complete the investment and transaction. As the discussions developed with SRC, it was determined that the investment in the Debtor by SRC would probably need to involve the complete reorganization of the Debtor into a new corporate entity. Therefore, on October 10, 2010, officers of the Debtor formed AlphaCipher Acquisition Corporation in Washington State ("AAC") with the sole purposes of effecting a reorganization and recapitalization of the Debtor through an asset sale involving an arm's length transaction with a third party like SRC. These discussions with SRC continued through January of 2011. However, by November of 2010, the officer and directors of the Debtor did not believe that, given financial market conditions and track record to date SRC would be able to obtain the necessary financing to complete the transaction. With this conclusion the Debtor began searching again for another investor and financing source to recapitalize the Debtor, using AAC as the corporate vehicle.

In November of 2010, the Debtor was contacted by Absolute Identification, Inc., a security software company located in Santa Cruz, California ("ABID.") ABID had developed a unique and powerful security software solution that transformed a removable storage device into a very secure special purpose s computer with a hardened and trusted computer operating system. ABID had successfully developed and sold this technology to the United States Department of Defense through a strategic relationship with a large system integrator and was now looking to commercialize a derivative version of this technology globally in a specific application to provide for safe, secure and trusted online banking and financial transactions. In December 2010 the Debtor met with an executive from ABID to learn about this technology and for ABID to learn about the Debtor's technology. It was quickly identified that while the technology developed by ABID was a superior technology in the market place for creating secure operating environments to conduct computerized operations, however, once the data left their environment it was not practically secured due to the flaws associated with current cipher systems and security technologies, essentially leaving the ABID as a robust but soon to be commodity security product that could be replicated by competitors. However, if the Debtor's AlphaCipher Technology Platform was incorporated into ABID's technology platform a superior solution for securing online banking and financial transaction would emerge and it would be unique in the global marketplace. With this condition identified, the parties begin negotiating a strategic relationship and undertaking due diligence. The parties held several additional meetings in Seattle, Washington in December 2010 and January 2011, and follow on meetings in Vancouver, British Columbia in January and February 2011 and again in Bellevue, Washington in February 2011.

During this period ABID identified that in order to fully maximize the economic potential of its technology in the global market place it would need a separate non-United States based company to take it to market outside the United States. ABID proceeded to form Belhara Security Systems, Inc., to be headquartered in Vancouver, British Columbia, Canada ("Belhara".)  Belhara was founded by ABID in December 2010, as a wholly owned subsidiary by contributing an exclusive license to its technology. With Belhara formed, ABID's interest in a strategic relationship with the Debtor was transferred from ABID to Belhara, and the Debtor and Belhara begin to negotiate the potential structure of a strategic relationship that was mutually beneficial to both parties.  Concurrent with the time this negotiation was occurring, Belhara was raising seed capital to fund its initial operations and those resulting from the pending interlocking strategic relationship with the Debtor.

On March 30, 2011 the Debtor, along with Belhara and AAC entered into a Memorandum of Understanding that outlined the potential strategic relationship between the parties and provided a framework to proceed to execute the relationship.  Based on the due diligence and discussions between the parties it was determined that a recapitalization through an asset sale was the best approach to take, and given the complexity of the Debtor debt and equity structure, along with the condition of the global capital and financial markets that the development, funding and execution of the strategic relationship was going to have to be a staged work out that would happen over several informal phases.

The overall structure of the strategic relationship was formulated as follows:

1) The Debtor would issue an exclusive global license to commercialize the AlphaCipher Technology Platform in the Online Banking and Financial Market industry vertical.  The initial license was exclusive for one year with the payment of $100,000 license fee.  Upon the investment and payment of an additional $2 million into AAC, which AAC would use to begin the purchase of the entire Debtor's as a down payment on the transaction, the exclusivity in the license would be extended to 4 years, and further, upon completion of the asset purchase the exclusive license would be extended to 15 years.

2) Belhara would invest $25 million into AAC in exchange for a combination of debt and equity securities that would result in Belhara owning up to a 60% ownership position in AAC after the asset purchase described below.

3) AAC would use up to $10 million of the cash proceeds from Belhara investment in AAC, along with up to a 32% equity stake in AAC to purchase all of the assets of debtor.

4) The remaining $15 million invested in AAC by Belhara would be used by AAC to fund its operations into the future.

In April 2011, Belhara made the license payments to the Debtor and the building of the relationship began. From April through August the parties conducted due diligence on each other, Belhara began building its financing plan and started raising the necessary capital to fund the acquisition.  In August 2011, the parties amended the Memorandum of Understanding to further define the details of the anticipated structure and Belhara formalized a follow on multi stage capital plan to fund the investment, and AAC opened an office in downtown Seattle, Washington.  It was anticipated that Belhara would raise $4 million in September 2011, another $20 million in Q1-2012 and a follow on $40 million plus in Q3-2012 to fully fund both the strategic relationship with the Debtor and its own business plans.

From April 2011 through September 2011, along with building the strategic relationship with Belhara, the Debtor was concurrently working with an informal group of the creditors, Belhara and its major shareholders ("Informal Workout and Reorganization Group) to put together a mutually beneficial plan of reorganization that would be implemented as part of the Asset Sale transaction. By the end of September 2011 the Debtor had built an overall framework for a reorganization plan that would be implemented concurrently with the Asset Sale that was agreeable in principle to the Informal Workout and Reorganization Group. The prepetition reorganization plan was designed to be a full and complete workout and reorganization of the Debtor outside of Bankruptcy or Receivership.

In September 2011, Belhara raised an additional $4 million in capital in the first phase of its capital plan and over October 2011 invested an additional $3 million in AAC. These funds were used to begin the asset acquisition by AAC on behalf of Belhara. At the same time that Belhara was formulating its capital plan, the Debtor was formulating a reorganization plan to fully initiate the asset purchase transaction. The Debtor presented its initial plan to major creditors and shareholders to achieve buy in to the plan and to insure that it would gain the necessary corporate approvals in accordance with Washington State law implementation the plan. By September 2011, the Debtor believed it had obtained the necessary informal approvals to begin implementing the plan. Upon the receipt of additional investment funds from Belhara, AAC used those funds to make payments on defaulted debt held by secured creditors to begin implementing the plan based on the understanding of the parties in the Amended Memorandum of Understandings. To complete the next round of Belhara's capital plan, Belhara needed to complete a formal business plan, achieve certain internal milestones that are confidential to Belhara that do not involve the Debtor or AAC and have their financial statements audited. These activities were expected to be completed in early Q1-2012.

On December 29, 2011, the Debtor, AAC and Belhara entered into a Letter of Intent ("AAC LOI") for the Asset purchase which formalized the asset acquisition process and contractual arrangements for this process that had already been substantially implemented. The execution of the AAC memorialized the already in process transaction, and called for the execution of the final definitive asset purchase agreement no later than May 15, 2012. It additionally provided for a no shop clause of the assets. At the time of the execution of the LOI, the Debtor already had obtained the verbal approval of the numbers of shareholders that would be required by Washington State Law and the Bylaws of the Debtor to approve the transaction. With this support the Debtor executed this transaction, pending final payment by AAC and the formalities of a shareholder meeting and formal approval. By December 29, 2011, the Debtor had moved all of its assets into AAC's offices; AAC had made down payments on the asset purchase by making payments directly to secured creditors of the Debtor in excess of 23% of the cash portion of the entire asset purchase price, and Belhara had produced significant information that the Debtor believes that Belhara's capital plan will be fully funded.

As the transaction began to proceed, one of the junior secured creditors of the Debtor experienced financial distress of their own in January 2012 and began putting extreme pressure on the Debtor to expedite the process for the sole benefit of junior secured creditor. They threatened and attempted to forcibly accelerate the reorganization and asset sale, by attempting to disrupt it or cause it to fail through business or legal actions. These threats were made irrespective to the consequences to other senior and junior creditors of the Debtor as well as the shareholders of the Debtor, as well of the creditor making these threats. This creditor threatened to use every means possible to take an orderly sale and reorganization process and turn it into a disorderly process. These threats caused substantial harm to the pending sale and to Belhara's capital raising process. Over January as these threats by the creditor caused more and more strain on the overall sale process, the specter of a disorderly transaction process began to appear. It was becoming clear to all parties involved that the sales process could quickly devolve into chaos. This scenario caused Belhara to request that the Debtor voluntarily seek protection under Chapter 11 of the United States Bankruptcy Code in order to protect the assets of Vadium, insure an orderly sale process of the assets, along with an orderly reorganization process of the Debtor for the benefit of all in accordance with the plan of reorganization that the parties had agreed to implement during 2011. Therefore, at the request of Belhara, and for the benefit of all of the creditors and shareholders of the

Debtor, the Debtor filed the Chapter 11 petition, on January 30, 2012.

## 2. **Post-petition**

The commencement of the Chapter 11 Case was done on an emergency basis. This emergency filing of the Chapter 11 petition provided little or no warning to the Debtor's, or Belhara's stakeholders, creditors or shareholders. As such, the effect of the Chapter 11 petition was to slow down the overall reorganization and recapitalization. The various parties needed time to conduct a new round of due diligence and assess and consider the effect of the filing of the Chapter 11 petition in order to formulate a revised plan to move forward given the new legal landscape represented by the commencement of the Chapter 11 Case. During the period from February 2012 through April 2012 the Debtor and Belhara proactively worked with their respective stakeholders to communicate the effect of the Chapter 11 petition on the overall transaction and to reshape the prepetition plan of reorganization into a formal plan of reorganization for Bankruptcy purposes. During this process, the Debtor sought to obtain what it believed to be informal pre filing approval of the Information Workout and Reorganization Group of the Asset Sale and Plan of Reorganization. By the end of April 2012 the respective parties had solidified an execution strategy to implement the Asset Sale and had negotiated the final terms and conditions of the definitive Asset Purchase Agreement.

Based on the numerous discussions the Debtor had with its stakeholders during this process the Debtor believes it has developed a plan for a consensual restructuring through the Plan of Reorganization using the Asset Sale defined by the Purchase Agreement as the vehicle to affect the Plan. Furthermore the Debtor believes that the Asset Sale and Plan maximizes the value of the estate for all the stakeholders involved

## 3. <u>Search and Consideration of Potential Alternative Transactions</u>

For over two years prior to December 29, 2011, which was thirty two (32) days prior to the commencement of the Chapter 11 Case, the Debtor actively sought, solicited, entertained and responded to calls and inquiries from any prospective financiers, purchasers or investors. Specifically, the Debtor and their advisors contacted numerous parties to gauge their potential interest to enter into any transactions (any such transaction, an "**_Alternative Transaction_**") for the sale of any or all of the Debtor's assets which could result in greatest possible return for the Debtor' stakeholders and estate. Additionally, post-petition and prior to the final execution of the Purchase Agreement on May 10, 2012, the Debtor entertained an inquiry from Counsel RB Capital Inc., headquarter in Los Angeles, California ("CRB Capital.") CRB Capital is a value-driven, innovative leader in distressed and surplus capital assets transactions. The Company focuses on identifying, acquiring and monetizing distressed and surplus capital assets. It specializes in acquiring turnkey manufacturing facilities, surplus industrial machinery and equipment, industrial inventories, accounts receivable portfolios and related intellectual property. They specifically asked if there was a chance to make an overbid on the intellectual property portfolio and other assets of the Debtor. We advised CRB of the details of the Purchase Agreement and the Purchase Price for the Assets. CRB Capital quickly expressed that it would be looking to pay a small fraction of what the Purchaser is committed to pay under the Purchase Agreement and stated that it would not be pursuing an overbid or any bid for that matter of the Debtor's Assets.

Ultimately, during the prepetition period and the very short petition period to date, the Debtor concluded that prosecution of the prepetition plan or reorganization was the best means to maximize value for the estate, and completed the final negotiations for the Purchase Agreement and executed it on May 10, 2012. As an integral part of coming to this conclusion the Debtor had numerous discussions with its stakeholders regarding the Asset Sale, Purchase Agreement, Plan of Reorganization, potential alternatives to the Plan and reorganization and likely return if to the estate and the Debtor's stakeholders (if any in certain alternative scenarios) For over two years the Debtor has undertaken an exhaustive search for the best possible means of financing the reorganization of the Debtor is such a manner that maximizes value to the estate, and firmly believes that the transaction represented by the Purchase Agreement is the highest and best possible offer for the estate.

Under the current Plan of Reorganization all of the non-shareholder creditors of the Debtor are being paid their Claims against the Debtor in 100% in full and the remaining creditors are shareholder creditors who are consensually participating in the pending Plan. With the very limited resources at hand and all of these facts taken into consideration the Debtor believes any further sale efforts would likely be fruitless, waste valuable time and resources and could have the possibility of reducing the value of the estate. As such the Debtor believes it is in the best interests of the estate and all of the stakeholders to cease any further alternate sale efforts. As such the Debtor is fully focused on obtaining approval to close the Purchase Agreement and get the pending Plan of Reorganization, along with this Disclosure Statement approved and confirmed so the Sale can be closed and the Debtor's Plan implemented fully as soon as practicable.

4. **Motion to Approve the Asset Sale**

On May 25, 2012, the Debtor filed its Motion to Approve the Asset Purchase Agreement and Sell the Assets Free and Clear of All Encumbrances (as defined in the Sale Motion), in the *Order Pursuant to 11 U.S.C. §§105, 363, 364, 503 and 507 and F. R. Bankr. P. 2002, 4001, 6004, 6006, 9008, and 9014 Approving (a) the Asset Purchase Agreement, and (b) Sale of the Assets free and Clear* (the "**Sales Order**") [Docket No. 34]. This motion is schedule to be heard on at 9:30 a.m.(prevailing Pacific Time) on July 6, 2012 at the Bankruptcy Court, located at 700 Stewart Street, Suite 6301, Seattle, WA 98101 [Docket No. 34].

5. **Significant Terms of the Purchase Agreement and Sale Order**

The Purchase Agreement and Sale Order, pursuant to which substantially all of the Debtor's assets will be transferred to the Purchaser, are attached hereto as Exhibit-E and Exhibit-F, respectively. The Purchase Agreement's most significant features are as follows:

(a) Purchase Price: up to $12.5 million in Cash, $2,931,325 of which was paid prepetition before January 30, 2012, with the remaining balance of approximately $9.2 million, along with 10,477,500 common shares of the Purchaser to be paid on the Closing Date (or earlier in certain circumstances described in the Purchase Agreement).

(b) Purchaser: AlphaCipher Acquisition Corporation, a Washington corporation.

(c) Purchased Assets: All of Debtor's rights, title and interest in and to all of their Assets, other than the Retained Assets.

(d) Assumption of Liabilities: The Purchaser shall assume the following liabilities of the Debtor: (i); and (vi) all liabilities and obligations of the Purchaser under Section 6.7 of the Purchase Agreement; provided, that Purchaser shall not assume the Employee Obligations to the extent they exceed $30 million in the aggregate.

(e) Non-Assumed Liabilities: Any Debtor Liabilities or any obligations or liabilities of any of their Subsidiaries or Affiliates or the Business, other than the Assumed Liabilities.

(f) Representations, Warranties and Covenants: The Purchase Agreement includes customary representations, warranties, and covenants for transactions of this type and size in chapter 11.

     i.      All Third Party consents necessary for the Transfer of the Acquired Assets not previously delivered shall have been obtained.

     ii.      Receipt of an Order, acceptable to the Purchaser, Approving the Asset Purchase Agreement and the Sale of the Assets free and clear of all encumbrances and liens to the Purchaser.

     iii.      Receipt of an Order of the Bankruptcy Court, acceptable to the Purchaser, Confirming the Debtor's Plan of Reorganization

## 6. Overview of AAC Post Closing of the Asset Purchase

AlphaCipher Acquisition Corporation ("AAC") was formed on October 10, 2012, as a Washington corporation, for the purpose of providing a new corporate entity for the reorganization and recapitalization of the Debtor through a sale of all of the Debtor's assets in exchange for enough cash to liquidate all non-shareholder liabilities of the Debtor ("Debt Liquidation"), and the swapping of equity interests in the new corporate entity for the shareholder interests in the Debtor ("Shareholder Equity Swap") (collectively the "Reorganization Transaction.") Once the Debt Liquidation and Shareholder Equity Swap are completed the Debtor would be debt free and then wound down and administratively dissolved and the current shareholders of the Debtor would be shareholders of the new corporate entity. Immediately after the Closing of the Reorganization Transaction, the Debtor will change its name to VTI Holdings, Inc. and AAC will be renamed Vadium Technology, Inc.

Upon Closing of the Asset Sale, AAC will file an amendment to its Articles of Incorporation changing the name of the Company to Vadium Technology, Inc. Concurrent with AAC's filing, the Debtor will be filing an amendment to its Articles of Incorporation changing its name to VTI Holdings, Inc. Once this name change is completed, the AAC rebranded as Vadium Technology, Inc., will begin active operations focusing on the full commercialization of the AlphaCipher Technology Platform ("ATP"), and the suite of products derived from that platform.

To fund the full commercialization of the ATP, the Purchaser will enter into two o financing transactions with Belhara. The first is a $12.5 million in financing in a concurrent private placement of $7.5 million in equity instruments and a $5.0 million placement of unsecured long-term debt to Belhara. The Term Sheet for this first financing transaction is attached to this Disclosure Statement as Exhibit-G. The proceeds from this financing transaction will be used to complete the Asset Sale under the Purchase Agreement. The second financing which will happen either concurrently with or shortly after the Closing of the Asset Sale, is the private placement of an additional $15.0 million long-term debt security to Belhara. The proceeds from this private placement will be used to fund the Purchasers start operations and expansion into the market place. The Term Sheet for the second financing transaction is attached to this Disclosure Statement as Exhibit-H.

Upon completion of both of these financings and the Asset Sale, AAC will recruit and hire the rest of the executive management team members for position unfilled (See Purchaser Officers Below), hire the core engineering , sales and support teams and begin an expedited product development campaign focusing on the following four anticipated product lines:

     ➢      Updated AlphaCipher Software Developers Kit (SDK);

     ➢      The AlphaCipher Enterprise Communication Suite;

> ➤ The AlphaCipher Enterprise Productivity Suite; and

> ➤ The AlphaCipher Security Infrastructure Toolkit.

Additionally, the Purchaser will be providing product development and support for Belhara FinanceSafe product line that incorporates the ATP under the previously executed license of the ATP to Belhara. The Purchaser anticipates that the majority of the new product development will occur at the company's headquarters in Seattle Washington by employees of the company. On a selective basis, the Purchaser anticipates that it will use contract engineers along with strategic partners to develop products on an accelerated basis to meet market demand or requirements.

AAC intends to sell and market these products from these four product lines on a global basis by targeting key accounts on a direct basis and working with third party value added resellers, technology distributors, independent software vendors, system integrators and original equipment manufacturer, as its primary sales force and distribution strategy. The sales and marketing efforts will be directed on a global basis from the Purchaser's Seattle, Washington headquarters, with the company expecting to set up regional sales and marketing offices around the globe in key markets to support sales efforts to both our direct key accounts and the activities of our sales channel partners. The Purchasers initial sales targets for its products will be enterprise customers in the telecommunications, financial services, aerospace & defense, and information technology vertical industries, along with national security and defense department entities domestically and internationally.

As the business operations, product lines, and revenue develop and grow for the Purchaser it intends to seek an initial public offering of its Common Stock at a strategically appropriate time. AAC anticipates that such an offering will be conducted either in Europe or the United States on a recognized national securities exchange. It is anticipated that both AAC and its majority owner upon the Closing of the Asset Sale, will both be publicly traded companies listed on national securities exchanges, similar to the model of where EMC Corporation and VMware, Inc. Both are major technology companies, listed on the national securities exchanges in the United States, and EMC Corporation owns in excess of 60% of VMware and is its corporate parent company.

## 7. Projected Balance Sheet, Capital Structure of AAC and Officers and Directors of AAC After the Closing of the Asset Sale

Projected Balance Sheet of AAC Immediately After the Closing of the Asset Sale

At the Closing of the Asset Sale and after final funding of AAC by Belhara, the Projected Balance Sheet of AAC is presented in Exhibit-I.

AAC Post Asset Sale Closing Equity Capitalization Table

AAC anticipated Equity Capitalization Table as of immediately after the Closing of the Asset Sale Pursuant to the Purchase Agreement is presented in Exhibit-J. At the Closing of the Asset Sale the Purchaser will have two classes of equity issues an outstanding. The senior class with be Series A Preferred Stock which will be primarily held by Belhara and some minor co-investors. The second class of stock will be Common Stock which will be primarily held by the Debtor's stakeholders pursuant to the Plan of Reorganization. The key features of each class of the Purchasers stock are described below and presented in Exhibit-K for the Series A Preferred Stock and Exhibit-L for the Common Stock.

**<<Remainder of Page Left Intentionally Blank>>**

**a. Description of the Purchaser's Series A Preferred Stock**

The Series A Preferred Stock Holders as a class will have the right to directly elect two (2) members of the Purchaser's Board of Directors, will enjoy a $.33 per share liquidation preference over the Purchaser's Common Shareholders, will enjoy a $.33 per share weighted average anti-dilution price protection for future equity issuance over the common shareholders, will have the right of first offer at the next round of financing for the Purchaser, and under certain restrictive covenants of the Series A Preferred Stock class, will have the right to approve by a 51% vote of the Series A Preferred Stock holders all

> ➤ Payments of any dividends or other distributions or capital stock or repurchases or redemptions of Common Stock other than pursuant to employee vesting or repurchase agreements;

> ➤ Any lease, sale or transfer of all or substantially all of the assets;

> ➤ Merger unless the Company's shareholders hold a majority of the voting power of the surviving entity; and

> ➤ Any liquidation or winding up.

The holder of the Purchaser's Series A Preferred Stock will receive one vote for each share of stock they hold on all other corporate matters. The holders of Series A Preferred Stock will be subject to standard six (6) month underwriter lock up provisions in the event of an IPO, and prior to an initial public offering of the Purchaser's Common Stock cannot be transferred to an unrelated third party without first offering it to the Purchaser and the Purchaser's Common Stockholders. Additionally, the Series A Preferred Stockholders have the following two additional affirmative covenants:

> ➤ Within six (6) months of issuance of the Series A Preferred Stock and Closing of the Asset sale, the Purchaser shall have retained one of the four Big Four independent certified public accounting firm ("Auditor") to provide annual audits and quarterly reviews of its financial statements. and

> ➤ After the Auditor is retained, within sixty (60) days of the end of each fiscal quarter and within one hundred twenty (120) days of the end of each fiscal year, the Purchaser shall provide to all of its shareholders quarterly or annual reports as the case may be in the form of quarterly reports and annual reports reviewed by the Accounting firm designated above, as prescribed by the United States Securities and Exchange Commission in the form the is similar to or in substantially the form of the United States Securities and Exchange Commission's forms 10-Q and 10-K as appropriate.

<<Remainder of Page Left Intentionally Blank>>

### b. Description of the Purchaser's Common Stock

The holders of the Purchaser's Common Stock will receive one vote for each share of stock they hold on all corporate matters, and they are not convertible into any other class of capital stock of the Debtor. The Purchaser's Common Stock liquidation priority junior to the Series A Preferred Stock. The 10,477,500 Shares of Common Stock of the Purchaser paid to the Debtor's as part of consideration for the Acquired Assets in the Asset Sale, which are to be further distributed to Holders of Claims and Equity Interests in satisfaction of their Claims pursuant to the Plan of Reorganization, are subject to following issuance restrictions:

(i) Notwithstanding the provision of Section 1145 of the United States Bankruptcy Code as described in Section 13 of this Disclosure Statement, the Common Shares distributed pursuant to the Plan, have not been registered under the Securities Act or any other applicable securities laws, and the Shares must be held indefinitely unless subsequently registered under the Securities Act or an exemption from such registration is available (such as Rule 144 or the resale provisions of Rule 701 under the Securities Act) and the Company is under no obligation to register the Shares;

(ii) The share certificate representing the Common Shares of the Purchaser issued pursuant to the Plan will be stamped with the legends specific as identified in <u>Exhibit-19</u> to the Plan; and

(iii) The Purchaser will make a notation in its records of the aforementioned restrictions on transfer and legends.

<u>The Anticipated Officers and Directors of AAC Immediately After the Closing of the Asset Sale Pursuant to the Purchase Agreement</u>.

| Name | Title |
|------|-------|
| Jose Antonio Rios | Executive Chairman |
| Rod Nicholls | President & CEO |
| To Be Appointed | Chief Financial Officer |
| Kim Holmes | SVP – Software Development |
| To Be Appointed | SVP – Sales & Marketing |
| Wolfgang S. Hammersmith | SVP – Advanced Research |

**<<Remainder of Page Left Intentionally Blank>>**

<u>The Anticipated Board of Directors of AAC Immediately After the Closing of the Asset Sale Pursuant to the Purchase Agreement</u>:

| Director Class | Name |
| --- | --- |
| Executive Management | Jose Antonio Rios (Chair) |
| Executive Management | Rod Nicholls |
| Executive Management | Wolfgang S. Hammersmith |
| Series A Director | Tilo Kunz |
| Series A Director | To Be Appointed By The Series A Preferred Stockholders |
| Independent Director | James K. Anderson |
| Independent Director | Ronald C. Norris |
| Independent Director | To Be Elected |
| Independent Director | To Be Elected |

The Bylaws of AAC provide for the company to have a board of directors of at least 5 members but no more than 11 members. The directors of the company are divided into the following three classes:

i)     <u>Executive Management Directors (3)</u>: of the company of which there are three directorships reserved for the executive of the company.

ii)     <u>Series A Directors (2)</u>: Belhara Secure Mobile Solutions, Inc., AAC's overall majority shareholder and the majority holder of the company's Series A Preferred Stock, as of the closing of the Asset Sale shall appoint two directors to the company's board of directors, subject to approval of the appointees by the Executive Management Directors of the company.

iii)     <u>Independent Director (4)</u>: Within six (6) months of the closing of the Asset Sale the company shall have a minimum of 4 independent directors who are neither appointed by the Series A Preferred Shareholders or are an employee, officer, director or 5% shareholder of the company. The independent directors shall be recruited and appointed by the Executive Management Directors of the company, and confirmed by election of the shareholders as a whole.

**<<Remainder of Page Left Intentionally Blank>>**

**8.** **Purchasers Amended and Restated Articles of Incorporation, Bylaws and Equity Incentive Plan as of the Closing Date.**

After Confirmation of the Plan but before the Closing Date of the Asset Sale, the Purchaser is going to amend and restate its Articles of Incorporation to the form attached to this Disclosure Statement as Exhibit-M.

After Confirmation of the Plan but before the Closing Date of the Asset Sale, the Purchaser is going to adopt the Equity Incentive Plan in the form attached to this Disclosure Statement as Exhibit-N.

After Confirmation of the Plan but before the Closing Date of the Asset Sale, the Purchaser is going to adopt the Bylaws attached to this Disclosure Statement as Exhibit-O.

Attached as Exhibit-P to this Disclosure Statement is an organizational chart summarizing the corporate structure of the Purchaser, as of the Closing of the Asset Sale.

<<Remainder of Page Left Intentionally Blank>>

# VIII - DESCRIPTION OF THE CHAPTER 11 PLAN

This section provides a summary of the structure and means for implementation of the Plan and the classification and treatment of Claims and Interests under the Plan and is qualified in its entirety by reference to the Plan (as well as the exhibits thereto and definitions therein).

## A. ADMINISTRATIVE CLAIMS, U.S. TRUSTEE FEES, AND PRIORITY TAX CLAIMS

### 1. Administrative Claims

Except with respect to Administrative Claims that are Claims for Accrued Professional Compensation and except to the extent that a holder of an Allowed Administrative Claim agrees to less favorable treatment, each holder of an Allowed Administrative Claim shall, in complete satisfaction of such Allowed Administrative Claim, be paid Cash in the full amount of such Allowed Administrative Claim on the later of: (a) the Initial Distribution Date; (b) the first date such Administrative Claim is Allowed or as soon as reasonably practicable thereafter; and (c) the date such Allowed Administrative Claim becomes due and payable by its terms, or as soon thereafter as is reasonably practicable; provided, however, that (1) the Debtor may pay certain Administrative Claims from the DIP Financing Agreement that have already been approved by the Bankruptcy Court or incurred in the ordinary course of business, upon receipt of the Working Capital Fund, and (2) payment of any Administrative Claims (other than Accrued Professional Compensation, which shall be treated in accordance with the next subsection) incurred after May 10, 2012 shall be paid pursuant to the terms of the Purchase Agreement.

### 2. Professional Compensation

    (a)    Claims for Accrued Professional Compensation

Professionals or other Entities asserting a Claim for Accrued Professional Compensation for services rendered before the Effective Date must file and serve on the Debtor and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order, the Interim Compensation Order or other order of the Bankruptcy Court an application for final allowance of such Claim for Accrued Professional Compensation no later than 45 days after the Effective Date, or any other date scheduled by the Bankruptcy Court. Objections to any Claim for Accrued Professional Compensation must be filed and served on the Reorganized Debtor, the Creditors' Committee, the Office of the U.S. Trustee and the requesting party no later than the earlier of (a) 30 days after such application is filed or (b) 75 days after the Effective Date. All Accrued Professional Compensation and all claims for professional compensation sought under section 503(b) of the Bankruptcy Code shall be paid either by the Debtor or the Purchaser pursuant to the terms of the Purchase Agreement.

    (b)    Treatment of Claims for Accrued Professional Compensation

A Claim for Accrued Professional Compensation in respect of which a final fee application has been properly filed and served pursuant to the Plan shall be payable to the extent approved by order of the Bankruptcy Court. Subject to the Holdback Amount, on the Effective Date, or as soon thereafter as reasonably practicable, to the extent not otherwise paid, all Allowed Claims for Accrued Professional Compensation (including estimated Accrued Professional Compensation through the Effective Date) shall be paid in full in Cash. To receive payment on the Effective Date for unbilled fees and expenses incurred through the Effective Date, each Professional shall reasonably estimate fees and expenses due for unbilled fees and expenses for periods that will not have been billed as of the Effective Date and shall deliver such estimates to the Debtor, the Purchaser, and the U.S. Trustee prior to the Effective Date. If the estimated payment received by such Professional exceeds the actual allowed Accrued Professional Compensation for the estimated period, such excess amount shall be deducted from the Holdback Amount for such Professional and if the Holdback Amount is insufficient, such Professional shall disgorge the difference to: (i) the Debtor; or (ii) the Purchaser, in each case, pursuant to the terms of the Purchase Agreement. If the estimated payment received by the

Professional is lower than the Accrued Professional Compensation of such Professional, the difference shall be promptly paid to the Professional by: (i) the Debtor; or (ii) the Purchaser, in each case, pursuant to the terms of the Purchase Agreement. For the avoidance of doubt, all Accrued Professional Compensation and all claims for professional compensation sought under section 503(b) of the Bankruptcy Code shall be paid either by the Debtor or the Purchaser, in each case pursuant to the terms of the Purchase Agreement.

On the Effective Date, the Reorganized Debtor and the Purchaser shall fund the Holdback Amount Reserve for payment of the Holdback Amount in accordance with the terms of the Purchase Agreement. Upon final allowance by the Bankruptcy Court of the Accrued Professional Compensation, or entry of an earlier order of the Bankruptcy Court granting the release of any Holdback Amounts, such amounts, less any excess paid in connection with estimated fees and expenses through the Effective Date, shall be paid promptly and directly to the Professionals.

(c)     Post- Effective Date Fees and Expenses

Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtor and the Disbursement Agent may employ and pay any Professional its reasonable, actual and documented fees and expenses for services rendered or expenses incurred after the Effective Date in the ordinary course of business without any further notice to any party or action (including, without limitation, without the need to file a fee application), order or approval of the Bankruptcy Court; provided, however, that to the extent such compensation or expense reimbursement is incurred, accrued, payable or paid prior to the Closing Date, the Purchaser shall be provided with an invoice showing all reasonable, actual and documented fees and expenses.

## 3.   Administrative Claims Bar Date

Except as otherwise provided in Article II.A of the Plan, requests for payment of Administrative Claims must be filed and served on the Reorganized Debtor and the Purchaser pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than 45 days after the Effective Date. Holders of Administrative Claims that are required to, but do not, file and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped and enjoined from asserting such Administrative Claims against the Debtor or Reorganized Debtor or their property and such Administrative Claims shall be deemed discharged as of the Effective Date. Objections to such requests, if any, must be filed and served on the Reorganized Debtor and the requesting party no later than 90 days after the Effective Date. Notwithstanding the foregoing, no request for payment of an Administrative Claim need be filed with respect to an Administrative Claim previously Allowed by Final Order, including all Administrative Claims expressly Allowed under this Plan. For the avoidance of doubt, all Administrative Claims incurred after January 30, 2012, 2012 shall be paid in accordance with the Purchase Agreement.

## B.   U.S. Trustee Fees

On the Effective Date, the Debtor shall pay all U.S. Trustee Fees that are due and owing as of the Effective Date.

## C.   Priority Tax Claims

Each holder of an Allowed Priority Tax Claim due and payable on or before the Effective Date shall receive, on the Distribution Date, at the option of the Debtor, one of the following treatments, in complete satisfaction of such Allowed Priority Tax Claim: (1) Cash in an amount equal to the amount of such Allowed Priority Tax Claim; or (2) such other treatment as may be agreed upon by such holder and the Debtor or otherwise determined upon an order of the Bankruptcy Court. A detail schedule of the Priority Tax Claims

against the Debtor is presented on Exhibit-2 in the Plan.

## D. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

### 1. <u>General Rules of Classification</u>

(i) Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims against and Interests in the Debtor. A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim or Interest is also placed in a particular Class for the purpose of receiving Distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim in that Class and such Claim or Interest has not been paid, released, or otherwise settled prior to the Effective Date.

(ii) The Plan constitutes a chapter 11 plan for the Debtor. And it shall include the classifications set forth below. For the avoidance of doubt, to the extent a Class contains Allowed Claims or Interests with respect to the Debtor; such Class is designated with respect to the Debtor. To the extent there are no Allowed Claims or Interests in a Class with respect to the Debtor, such Class is deemed to be omitted with respect to the Debtor. To the extent that certain Allowed Claims or Interests do not exist with respect to the Debtor, such Class is deemed to include only the Allowed Claims or Interests that do exist with respect the Debtor. In accordance with section 1123(a)(1) of the Bankruptcy Code, the Debtor has not classified Administrative Claims and Priority Tax Claims, as described in Article II.

<<Remainder of Page Left Intentionally Blank>>

## 2.  **Classification and Designation of Claim Classes**

The following chart represents the general classification of Claims and Interests against the Debtor pursuant to the Plan and voting rights thereto.

| Class | Claim Description | Status | Voting Rights |
|:---:|:---:|:---:|:---:|
| 1 | Secured Creditors - Liquidated | Unimpaired | Deemed to accept the plan not entitled to Vote |
| 2 | Secured Creditors – Participatory | Impaired | Entitled to Vote |
| 3 | Other Priority Creditors | Unimpaired | Deemed to accept the plan not entitled to Vote |
| 4 | Unsecured Creditors - Liquidated | Unimpaired | Deemed to accept the plan not entitled to Vote |
| 5 | Unsecured Creditors – Furloughed Former Employees | Unimpaired | Deemed to accept the plan not entitled to Vote |
| 6 | Unsecured Creditors - Participatory | Impaired | Entitled to Vote |
| 7 | Unsecured Creditors – Assumptions and Settlements | Impaired | Entitled to Vote |
| 8 | Unsecured Creditor - Purchaser | Unimpaired | Deemed to accept the plan not entitled to Vote |
| 9 | Unsecured Creditors - Compromised | Impaired | Entitled to Vote |
| 10 | Interest Holders – Series A-2 Equity | Impaired | Entitled to Vote |
| 11 | Interest Holders – Series A-1 Equity | Impaired | Entitled to Vote |
| 12 | Interest Holders – Series Z Equity | Impaired | Entitled to Vote |
| 13 | Interest Holders – Common Equity | Unimpaired | Deemed to accept the plan not entitled to Vote |
| 14 | Interest Holders – Common Stock Options | Unimpaired | Deemed to accept the plan not entitled to Vote |
| 15 | Interest Holders – Common Stock Warrants | Impaired | Entitled to Vote |

Exhibit-Q presented a chart showing Claims by Class along with the total distribution by Class for both Cash and AAC Equity Interests as described in the Plan.

<<Remainder of Page Left Intentionally Blank>>

**Vadium Technology, Inc.**
**Disclosure Statement - 7/3/2012**
**Page 47 of** 102

### 3. **Treatment of Claims and Interests by Class**

1. Class 1 – Secured Creditors - Liquidated Claims

    (a) <u>Classification</u>: Class 1 is Designated as <u>Secured Creditors – Liquidated Claims</u> and consists of Creditors of the Debtor who hold a secured interest in the assets of the Debtor either by through a security agreement between the Debtor and the Creditor which has perfected by a UCC filing with the Secretary of the State of Washington, or a Creditor holding a Lien on the assets of the Debtor through properly recorded Judgment. A detailed list of Secured Creditor – Liquidated Claims is presented in <u>Exhibit-4 to the Plan</u>.

    (b) <u>Treatment</u>: Except to the extent that a holder of an Allowed Secured Creditor Liquidated Claim (i) has been paid by the Debtor, in whole or in part, prior to the Effective Date or (ii) agrees to a less favorable treatment, each holder of an Allowed Secured Creditor – Liquidated Claim shall receive, on the Distribution Date and in full satisfaction, settlement, release, and discharge of, and in exchange for such Secured Creditors Liquidated Claim, Cash in the full amount of such Allowed Secured Creditor – Liquidated Claims.

    (c) <u>Voting</u>: Class 1 is Unimpaired, and the holders of Secured Creditor – Liquidated Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Secured Creditor – Liquidated Claims are not entitled to vote to accept or reject the Plan.

2. Class 2 – Secured Creditor Participatory Claims

    (a) <u>Classification</u>: Class 2 is designated as <u>Secured Creditor Participatory Claims</u> and generally consists of Creditors of the Debtor who hold a secured interest in the assets of the Debtor either by through a security agreement between the Debtor and the Creditor which has perfected by a UCC filing with the Secretary of the State of Washington, or a Creditor holding a Lien on the assets of the Debtor through properly recorded Judgment. As described in the Introduction of the Plan, Prior to the commencement of this Chapter 11 Case, the Debtor had a working plan of reorganization that was being implemented outside of court protection and was preliminarily agreed to in principle by a significantly number of the Debtor's Creditors and Interest Holders. As part of the prepetition plan of reorganization a number of the Debtor's secured creditors had agreed to convert a portion of the Claim into AAC Equity Interests. This Class represents these specific creditors. .

    (b) <u>Treatment</u>: Each holder of an Allowed Secured Creditor Participatory Claim shall receive in full and final satisfaction of its Claim, its Pro Rata share (calculated with reference to all Allowed and Disputed Class 2 Claims against the Debtor) of the Sale Proceeds as described in <u>Exhibit-5 to the Plan</u>.

    (c) <u>Voting</u>: Holders of Secured Creditor Participatory Claims in Class 2 are Impaired, and receiving Cash and an AAC Equity Interests in the Purchaser under the Plan. Therefore, holders of Secured Creditor Participatory Claims in Class 2 are entitled to vote to accept or reject the Plan.

Case 12-10808-MLB   Doc 39   Filed 07/03/12   Ent. 07/03/12 18:51:32   Pg. 48 of 102

3. <u>Class 3 – Other Priority Creditors</u>

    (a)     <u>Classification</u>: Class 3 is designated as <u>Other Priority Creditors</u> and generally consists of the entire Claims of United States Federal and State Taxing Authorities that are not considered Priority Tax Claims under Article II.C of the Plan. A detailed list of Other Priority Creditors is presented in <u>Exhibit-6 to the Plan</u>.

    (b)     <u>Treatment</u>: Except to the extent that a holder of an Other Priority Creditor Claim (i) has been paid by the Debtor, in whole or in part, prior to the Effective Date or (ii) agrees to a less favorable treatment, each holder of an Allowed Other Priority Creditor Claim shall receive, on the Distribution Date and in full satisfaction, settlement, release, and discharge of, and in exchange for such Other Priority Creditor Claim, Cash in the full amount of such Allowed Other Priority Creditor Claim.

    (c)     <u>Voting</u>: Class 3 is Unimpaired, and the holders of Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Other Priority Creditor Claims are not entitled to vote to accept or reject the Plan.

4. <u>Class 4 – Unsecured Creditors – Liquidated Claims</u>

    (a)     <u>Classification</u>: Class 4 is designated as <u>Unsecured Creditors – Liquidated Claims</u> and consists of Creditors of the Debtor who hold Unsecured Claims against the Debtor by way of providing prepetition goods and services to the Debtor in the normal course of both the Debtor's and the Unsecured Creditor's course of business. A detailed list of Unsecured Creditors – Liquidated Claims is presented in <u>Exhibit-7 to the Plan</u>.

    (b)     <u>Treatment</u>: Except to the extent that a holder of an Unsecured Creditors – Liquidated Claim (i) has been paid by the Debtor, in whole or in part, prior to the Effective Date or (ii) agrees to a less favorable treatment, each holder of an Allowed Unsecured Creditors – Liquidated Claim shall receive, on the Distribution Date and in full satisfaction, settlement, release, and discharge of, and in exchange for such Unsecured Creditors – Liquidated Claim, Cash in the full amount of such Allowed Unsecured Creditors – Liquidated Claim.

    (c)     <u>Voting</u>: Class 4 is Unimpaired, and the holders of Unsecured Creditors – Liquidated Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Unsecured Creditors – Liquidated Claims are not entitled to vote to accept or reject the Plan.

**<<Remainder of Page Left Intentionally Blank>>**

5.  Class 5 – Unsecured Creditors – Furloughed Former Employee Claims

    (a)    <u>Classification</u>:  Class 5 is designated as <u>Unsecured Creditors – Furloughed Former Employee Claims</u> and consists of Creditors of the Debtor who hold Unsecured Claims against the Debtor by way of employment that was suspended or terminated, and such Claims are not eligible for treatment as Priority Claims under the United States Bankruptcy Code.  A detailed list of Unsecured Creditors – Furloughed Former Employee Claim s is presented in <u>Exhibit-8 to the Plan</u>.

    (b)    <u>Treatment</u>:  Except to the extent that a holder of an Unsecured Creditors – Furloughed Former Employee Claim (i) has been paid by the Debtor, in whole or in part, prior to the Effective Date or (ii) agrees to a less favorable treatment, each holder of an Allowed Unsecured Creditors – Liquidated Claim shall receive, on the Distribution Date and in full satisfaction, settlement, release, and discharge of, and in exchange for such Unsecured Creditors – Furloughed Former Employee Claim, Cash in the full amount of such Allowed Unsecured Creditors - Furloughed Former Employee Claim.

    (c)    <u>Voting</u>:  Class 5 is Unimpaired, and the holders of Unsecured Creditors – Furloughed Former Employee Claim s are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Unsecured Creditors – Furloughed Former Employee Claim s are not entitled to vote to accept or reject the Plan.

6.  Class 6 – Unsecured Creditor Participatory Claims

    (a)    <u>Classification</u>: Class 6 is designated as <u>Unsecured Creditor Participatory Claims</u> and consists of Creditors of the Debtor who are also hold Equity Interests of the Debtor or at the time of becoming a Creditor of the Debtor wanted to become an Interest Holder of the Debtor and is also an Accredited Investor within the meaning of Rule 501 of Regulation D of the Securities Act of 1933.  A detailed list of Unsecured Creditor Participatory Claim s is presented in <u>Exhibit-9 to the Plan</u>.

    (b)    <u>Treatment</u>:  Each holder of an Allowed Unsecured Creditor Participatory Claim shall receive in full and final satisfaction of its Claim, its Pro Rata share (calculated with reference to all Allowed and Disputed Class 6 Claims against the Debtor) of the Sale Proceeds as described in <u>Exhibit-9 to the Plan</u>.

    (c)    <u>Voting</u>:  Holders of Unsecured Creditor Participatory Claims in Class 6 are Impaired, and receiving AAC Equity Interests in the Purchaser under the Plan. Therefore, holders of Unsecured Creditor Participatory Claims in Class 6 are entitled to vote to accept or reject the Plan.

**<<Remainder of Page Left Intentionally Blank>>**

7. <u>Class 7 – Unsecured Creditor Purchaser Assumption and Settlements</u>

    (a)     <u>Classification</u>:  Class 7 is designated as <u>Unsecured Creditor Purchaser Assumption and Settlement Claims</u> and consists of Creditors of the Debtor who are also hold an Equity Interest of the Debtor or at the time of becoming a Creditor of the Debtor wanted to become an Equity Interest holder of the Debtor and is also an Accredited Investor within the meaning of Rule 501 of Regulation D of the Securities Act of 1933. Who the Purchaser in its sole judgment has decided to assume the either part or all of these particular Claims at the Closing Date as part of the Purchase Agreement as consideration for the Acquired Assets.  A detailed list of Unsecured Creditors – Liquidated Claims is presented in <u>Exhibit-10 to the Plan</u>.

    (b)     <u>Treatment</u>:      Each holder of an Allowed <u>Unsecured Creditor Purchaser Assumption and Settlement Claims</u> shall receive in full and final satisfaction of its Claim, a combination of the assumption of part of its Claim by the Purchaser, along with a share of the Sale Proceeds as described in <u>Exhibit-10 to the Plan</u>.

    (c)     <u>Voting</u>: Holders of <u>Unsecured Creditor Purchaser Assumption and Settlement Claims</u> in Class 7 are Impaired, and receiving AAC Equity Interests in the Purchaser under the Plan.  Therefore, holders of Unsecured Creditor Participatory Claims in Class 7 are entitled to vote to accept or reject the Plan.

8. <u>Class 8 – Unsecured Creditor – Purchaser Claim</u>

    (a)     <u>Classification</u>:  Class 8 consists of <u>Unsecured Creditor – Purchaser Claim</u>, which is the Claim held by the Purchaser for all the payments it has or will make pursuant to the Purchase Agreement or the DIP Financing Agreement prior to the Closing Date.  The Unsecured Creditors – Purchaser Claim is described in <u>Exhibit-11 to the Plan</u>.

    (b)     <u>Treatment</u>:  The Unsecured Creditor Purchaser Claim is being credited as part of the consideration being paid for the Acquired Assets under the Purchase Agreement and as such the Unsecured Creditor Purchaser Claim shall receive, on the Distribution Date and in full satisfaction, settlement, release, and discharge of, and in exchange for such Unsecured Creditor – Purchaser Claim the Acquired Assets in the full amount of such Unsecured Creditor Purchaser Claim plus all of the other consideration to be paid by the Purchaser under the Purchase Agreement.

    (c)     <u>Voting</u>: Class 8 is Unimpaired and the holder of the Unsecured Creditor – Purchase Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the holder of the Unsecured Creditor – Purchaser Claim is not entitled to vote to accept or reject the Plan.

**<<Remainder of Page Left Intentionally Blank>>**

9. <u>Class 9 – Creditors- Compromised Claims</u>

    (a)   <u>Classification</u>: Class 9 is designated as <u>Creditors- Compromised Claims</u> and consists of Creditors of the Debtor who hold either a secured interest in the assets of the Debtor either by through a security agreement between the Debtor and the Creditor which has perfected by a UCC filing with the Secretary of the State of Washington, or a Creditor holding a Lien on the assets of the Debtor through properly recorded Judgment or an Unsecured Claim against the Debtor that is held by an officer, director or other insider of the Debtor. As described in (b) below and <u>Exhibit-12</u>, the Creditors in this Class will be receiving a partial cash payment in exchange for their Claim and shall release, forgive and have the balance of their Claim against the Debtor be cancelled.

    (b)   <u>Treatment</u>: Each holder of a Creditors- Compromised Claim shall receive shall receive in full and final satisfaction of its Claim, its share (calculated with reference to all Allowed and Disputed Class 9 Claims against the Debtor) of the Sale Proceeds as described in <u>Exhibit-12 to the Plan</u>.

    (c)   <u>Voting</u>: Holders of Unsecured Creditors- Compromised Claims in Class 9 are Impaired, and receiving a partial Cash payment under the Plan. Therefore, holders of Unsecured Creditors- Compromised Claims in Class 9 are entitled to vote to accept or reject the Plan.

10. <u>Class 10 – Equity Interests – Series A-2 Preferred Stock</u>

    (a)   <u>Classification</u>: Class 10 is designated as <u>Equity Interests – Series A-2 Preferred Stock</u> consists of holders of Series A-2 Preferred Stock issued by the Debtor pursuant to an exemption from registration with the Securities and Exchange Commission under Section 4(2) or Regulation D of the Securities Act of 1933 and are Accredited Investor within the meaning of Rule 501 of Regulation D of the Securities Act of 1933. A detailed list of Equity Interests – Series A-2 Preferred Stock is presented in <u>Exhibit-13 to the Plan</u>.

    (b)   <u>Treatment</u>: Each holder of an Allowed Equity Interests – Series A-2 Preferred Stock Claim shall receive in full and final satisfaction of its Claim, its Pro Rata share (calculated with reference to all Allowed and Disputed Class 10 Claims against the Debtor) of the Sale Proceeds as described in <u>Exhibit-13</u> to the Plan.

    (c)   <u>Voting</u>: Holders of Equity Interests – Series A-2 Preferred Stock Claims in Class 10 are Impaired, and receiving AAC Equity Interests in the Purchaser under the Plan. Therefore, holders of Equity Interests – Series A-2 Preferred Stock Claims in Class 10 are entitled to vote to accept or reject the Plan.

**<<Remainder of Page Left Intentionally Blank>>**

11. Class 11 – Equity Interests – Series A-1 Preferred Stock

    (a)   Classification:  Class 11 is designated as Equity Interests – Series A-1 Preferred Stock and consists of holders of Series A-1 Preferred Stock issued by the Debtor pursuant to an exemption from registration with the Securities and Exchange Commission under Section 4(2) or Regulation D of the Securities Act of 1933 and are an Accredited Investor within the meaning of Rule 501 of Regulation D of the Securities Act of 1933. A detailed list of Equity Interests – Series A-1 Preferred Stock is presented in Exhibit-14 to the Plan.

    (b)   Treatment:  Each holder of an Allowed Equity Interests – Series A-1 Preferred Stock Claim shall receive in full and final satisfaction of its Claim, its Pro Rata share (calculated with reference to all Allowed and Disputed Class 11 Claims against the Debtor) of the Sale Proceeds as described in Exhibit-14 to the Plan.

    (c)   Voting: Holders of Equity Interests – Series A-1 Preferred Stock Claims in Class 11 are Impaired, and receiving AAC Equity Interests in the Purchaser under the Plan. Therefore, holders of Equity Interests – Series A-1 Preferred Stock Claims in Class 11 are entitled to vote to accept or reject the Plan.

12. Class 12 – Equity Interests – Series Z Preferred Stock

    (a)   Classification:  Class 12 is designated as Equity Interests – Series Z Preferred Stock and consists of Series Z Preferred Stock issued by the Debtor to Wolfgang and Elizabeth Hammersmith, Founders, Insiders, Directors and Officers of the Debtor as applicable.

    (b)   Treatment:  Each holder of an Allowed Equity Interests – Series Z Preferred Stock Claim shall receive in full and final satisfaction of its Claim, its Pro Rata share (calculated with reference to all Allowed and Disputed Class 12 Claims against the Debtor) of the Sale Proceeds as described in Exhibit-15 to the Plan.

    (c)   Voting: Holders of Equity Interests – Series Z Preferred Stock Claims in Class 11 are Impaired, and receiving AAC Equity Interests in the Purchaser under the Plan. Therefore, holders of Equity Interests – Series Z Preferred Stock Claims in Class 12 are entitled to vote to accept or reject the Plan.

<<Remainder of Page Left Intentionally Blank>>

13. <u>Class 13 – Equity Interests – Common Stock</u>

    (a)    <u>Classification</u>:   Class 13 is designated as <u>Equity Interests – Common Stock</u> and consists of holders of Common Stock issued by the Debtor to Founders, Consultants, Stock Option Holders and others pursuant to an exemption from registration with the Securities and Exchange Commission under Section 4(2) or Regulation D of the Securities Act of 1933 as the case may be in each individual issuance.  A detailed list of Equity Interests – Common Stock is presented in <u>Exhibit-16 to the Plan</u>.

    (b)    <u>Treatment</u>:   Each holder of an Allowed Equity Interests – Common Stock Claim shall receive in full and final satisfaction of its Claim, its Pro Rata share (calculated with reference to all Allowed and Disputed Class 13 Claims against the Debtor) of the Sale Proceeds as described in <u>Exhibit-16 to the Plan</u>.

    (c)    <u>Voting</u>: Class 13 is Unimpaired and the holders of the Equity Interests – Common Stock are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the holder of the Equity Interests – Common Stock are not entitled to vote to accept or reject the Plan.

14. <u>Class 14 – Equity Interests – Common Stock Options</u>

    (a)    <u>Classification</u>:   Class 14 is designated as <u>Equity Interests – Common Stock Options</u> and consists of holders of Common Stock Options issued by the Debtor to furloughed employees, officer, directors, consultant, advisors and others pursuant to the Debtor Stock Option Plan.  A detailed list of Equity Interests – Common Stock is presented in <u>Exhibit-17 to the Plan</u>.

    (b)    <u>Treatment</u>:   Each holder of an Allowed Equity Interests – Common Stock Option Claim shall receive in full and final satisfaction of its Claim, its Pro Rata share (calculated with reference to all Allowed and Disputed Class 14 Claims against the Debtor) of the Sale Proceeds as described in <u>Exhibit-17 to the Plan</u>.

    (c)    <u>Voting</u>: Class 14 is Unimpaired and the holders of the Equity Interests – Common Stock Options are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the holder of the Equity Interests – Common Stock Options are not entitled to vote to accept or reject the Plan.

**<<Remainder of Page Left Intentionally Blank>>**

15. <u>Class 15 – Equity Interests – Common Stock Warrant Holders</u>

   (a)   <u>Classification</u>:  Class 15 is designated as <u>Equity Interests – Common Stock Warrant Holders</u> and consists of holders of Common Stock Warrants issued by the Debtor to Equity Interest holders who provided debt financing to the Debtor pursuant to an exemption from registration with the Securities and Exchange Commission under Section 4(2) or Regulation D of the Securities Act of 1933 as the case may be in each individual issuance.  A detailed list of Equity Interests – Common Stock Warrant Holders is presented in <u>Exhibit-18 to the Plan</u>.

   (b)   <u>Treatment</u>:   On the Effective Date, all Equity Interests – Common Stock Warrant Holders shall be deemed cancelled and shall be of no further force and effect, whether surrendered for cancellation or otherwise, and there shall be no distribution to the holders of Equity Interests – Common Stock Warrant Holders.

   (c)   <u>Voting</u>:    Holders of Equity Interests – Common Stock Purchase Warrant Holders Claims in Class 15 are Impaired, and are not receiving property under the Plan, however the Debtor is requesting that this Class vote to accept or reject the Plan.

## E.  ACCEPTANCE REQUIREMENTS

### 1.  <u>Acceptance or Rejection of the Plan</u>

   1.   <u>Voting Classes</u>

   Classes 2, 6, 7, 9, 10, 11, 12 and 15 are Impaired under the Plan and are receiving Distributions under the Plan.  Therefore, these Classes are entitled to vote to accept or reject the Plan.

   2.   <u>Presumed Acceptance of the Plan</u>

   Classes 1, 3, 4, 5, 8, 13 and 14 are Unimpaired under the Plan and are, therefore, conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

   3.   <u>Presumed Rejection of the Plan</u>

   No Class is presumed to Reject the Plan.

### 2.  <u>Vacant Classes</u>

   Any Class of Claims or Interests that does not have a holder of an Allowed Claim or Allowed Interest, as applicable, or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed to accept the Plan for purposes of determining acceptance or rejection of the Plan by such Class pursuant to sections 1129(a)(8) and 1129(a)(10) of the Bankruptcy Code.

3. **Confirmation Pursuant to Sections 1129(a)(10)**

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by an Impaired Class of Claims as determined without including any acceptance of the Plan by any Insider. The Debtor reserves the right to modify the Plan in accordance with Article XI hereof .

## F. MEANS FOR IMPLEMENTATION OF THE PLAN

1. **Sale of Assets**

On December 29, 2011, the Debtor entered into that certain Letter of Intent for the Sale of Substantially all of its Assets to the Purchaser. On May 10, 2012, the Debtor, subject to Bankruptcy Court approval, executed the Purchase Agreement. On _____, the Bankruptcy Court approved the Sale and entered the Sale Order. Pursuant to the Purchase Agreement, the Sale will be consummated and the Acquired Assets will be transferred to the Purchaser on the Closing Date, which shall occur after satisfaction or waiver of the conditions in Section 9 of the Purchase Agreement. Pursuant to Article V.E of the Plan, after the Effective Date and before the Closing Date, all property of the Estate (including the Acquired Assets, to the extent the Closing Date does not occur on or before the Effective Date) will vest in the Reorganized Debtor and the Reorganized Debtor will operate the Business until the Closing Date in accordance with the Plan and subject to the Purchase Agreement and the Sale Order. Should the Closing Date occur on or before the Effective Date, the only activities of the Reorganized Debtor after the Effective Date will be the winding up of operations in accordance with the Plan, the Purchase Agreement and the Sale Order and the implementation of the terms of the Plan. Proceeds from the Sale will be used (1) by the Disbursement Agent to satisfy Claims, as provided herein. Subject to the terms of the Purchase Agreement and the DIP Financing Agreement, after January 30, 2012, Purchaser will provide the necessary funding to operate the Business and administer the Chapter 11 Case pursuant to the Purchase Agreement and DIP Financing Agreement.

2. **Principles of the Plan Structure and Settlement of Claims**

The overall Plan was structured and designed based on a prepetition plan of reorganization the Debtor was implementing prior to commencement of the Chapter 11 Case on January 30, 2012. The overall design and structure of the Plan is created to settle the Claims of all Claim and Equity Interest Holders using the following principles:

    i)    The Plan will be a Liquidating Chapter 11 Plan, on the Asset Sale is completed, and the Disbursements under the Plan are completed, the Reorganized Debtor will be wound down and administratively dissolved as provided under Washington State law.

    ii)    All Administrative Claims, Priority Tax Claims, and Secured Creditors Claims, unless they agreed to an alternative treatment will be paid in Cash in full on the Effective Date of the Plan.

    iii)    Certain Claims held by certain Secured Creditors, as further identified and detailed in Exhibit-5 to the Plan, would receive a combination of Cash and Equity Interests in AAC in exchange for their Claim. The rate at which these Claims would receive AAC Equity Interests would be less favorable than all other Creditors and Equity Interest holders in the Debtor as they are receiving a partial Cash payment with their Claim settlement. These Secured Creditors will enter into a Settlement and Release Agreement for these Claims, subject to Bankruptcy Court approval, that will become effective on the Confirmation of the Plan and receipt of the Closing Payment from the Purchaser under the Purchase Agreement.

iv)    All Unsecured Creditor Claims that arose from the provision of goods and services to the Debtor in the normal course of business will be paid in Cash in full on the Effective Date of the Plan.

v)    Certain Claims held by certain Secured Creditors, as further identified and detailed in <u>Exhibit-12</u> to the Plan would receive a combination of Cash and Equity Interests in AAC in exchange for their Claim. The rate at which these Claims would receive AAC Equity Interests would be less favorable than all other Creditors and Equity Interest holders in the Debtor as they are receiving a partial Cash payment with their Claim settlement.

vi)    Except for certain Unsecured Creditors whose Claims are being assumed by the Purchaser, all Unsecured Creditor Claims that are held by shareholders, or those Unsecured Creditor who wanted to be shareholders of the Debtor at the time of becoming Unsecured Creditors will receive AAC Equity Interests in full satisfaction of their Claims. The rate at which these Claim holders will receive AAC Equity Interests will be pari parsu to that of the Equity Interest Holders- Series A-2 Stock.

vii)    Certain Unsecured Claims held by Officers and Directors of the Debtor will be settled by a negotiated Cash payment and substantial full release of the remaining balance of the Claim after the Case payment as further described in <u>Exhibit-12</u> to the Plan. These Officer and Directors will enter into a Settlement and Release Agreement for these Claims, subject to Bankruptcy Court approval, that will become effective on the Confirmation of the Plan and receipt of the Closing Payment from the Purchaser under the Purchase Agreement.

viii)    Certain Claims held by Wolfgang and Elizabeth Hammersmith ("Founders") for loans made to the Debtor will first be reduced by a Set-off for amounts loaned the Founders, and then the remaining balance of these Claims will be settled in exchange for AAC Equity Interests. The AAC Equity Interests that the Founders receive for these Claims will be at a rate that is pari parsu to the rate that the Secured Creditors will receive in item v above, but is less favorable than the rate all the other Equity Interest holders will be receiving for their Claims.

ix)    Any Claims held by the Purchaser weather they are for payments made in accordance with the Purchase Agreement, or the DIP Financing Agreement shall be settled in full in exchange for receiving the Acquired Assets under the Purchase Agreement.

x)    The Claims held by Equity Interests – Common Stock Options, will first be converted from stock options into common stock at a rate of 1 share of common stock for every two share purchase options the holder holds at no cost to the Claim holder. This is being done as these Claim holders insured for the maintenance and preservation of the Acquired Assets under the Purchase Agreement that is enabling the Plan and the settlement of Claims thereunder

xi)    The Claims, or portion thereof being settled in exchange for AAC Equity Interests that are held by Equity Interests – Series A-2 Stock, Equity Interests – Series A-1 Stock, Equity Interests – Series Z Stock, Equity Interests – Common Stock, Equity Interests – Common Stock Options, Secured Creditors –Participatory Claims and Creditor Claims –Compromised, shall share in the 10,477,5000 shares of AAC being issued to the Debtor as part of the Closing Payment, shall be disbursed among the holders of these Claims on a pro rata basis based on the number of common equivalent shares held by the Claim Holder under their Claim just immediately prior to the Effective Date of the Plan and the corresponding Disbursement of the shares pursuant to the Plan by the Disbursement Agent.

xii) The Claims held represented by Equity Interest – Common Stock Purchase Warrants are for warrants to purchase common stock at prices ranging from $.25 per share to $.40 per share, which is substantially greater than the current estimated value of Debtors stock based on the Purchase Agreement and the Plan which is $.03 to $.04 per share of the Debtor. These facts combined with the fact that the Debtor will have no assets and no operations after the Asset Sale, and pursuant the Plan will be wound down and dissolved, the Debtor is proposing that these warrants be declared to be void and cancelled, and will have no participation in any distribution under the Plan.

Exhibit-1 to the Plan presented the Debtors Balance Sheet as of the petition Date January 30, 2012, and presented the effect of the Asset Sale and full implementation of the Plan on the Debtor's Balance Sheet.

## 3. Sources of Consideration for Plan Distributions

Upon the Closing Date, Purchaser shall provide the Closing Date Payment, including all Cash consideration necessary for the Debtor, Reorganized Debtor or Disbursement Agent, as applicable, to make payments or Distributions to the holders of Allowed Claims entitled to such Distributions under the Plan as set forth in the Purchase Agreement as provided by the Purchaser.

## 4. Operations of the Debtor between the Confirmation Date, the Effective Date and the Closing Date

The Debtor shall continue to operate as Debtor in Possession during the period from the Confirmation Date through the Effective Date. Upon the Effective Date, the Reorganized Debtor will exist and operate the Business in accordance with terms and conditions of the Purchase Agreement and the Sale Order. Upon the Closing Date, the Reorganized Debtor will transfer the Acquired Assets to the Purchaser in accordance with the Purchase Agreement. In addition, on the Closing Date (or earlier in certain circumstances, as set forth in the Purchase Agreement), the Purchaser shall pay to the Reorganized Debtor the Closing Date Payment, which will be Disbursed by the Disbursement Agent as soon as reasonably practicable upon the Reorganized Debtor' receipt of the Closing Date Payment. Should the Closing Date occur on or before the Effective Date, the Reorganized Debtor will exist solely for the purpose of implementing the Plan and winding up their remaining operations after the Closing in accordance with the terms of the Plan, the Purchase Agreement and the Sale Order.

Should the Closing Date occur on or before the Confirmation Date and the Effective Date combined, then the Closing Date Payment, less any Pay-downs made pursuant to a Pay-down Order shall be held in trust for the benefit of the Estate, in the IOLTA Trust Account of the Debtor's Counsel Special Counsel for the Purchase Agreement, Beresford Booth, PLLC. Once the Plan is Confirmed and Effective, the Net Proceeds of the Sale shall be released to the Disbursement Agent for disbursement in accordance with the terms of the Plan, the Purchase Agreement and the Sale Order.

## 5. Term of Injunction or Stays

Unless otherwise provided, all injunctions or stays provided for in the Chapter 11 Case pursuant to sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Chapter 11 Case is closed.

## 6.  **Corporate Existence**

Except as otherwise provided herein, in the New Corporate Governance Documents as described in Section G below, the Debtor, as Reorganized, shall continue to exist after the Effective Date as a separate corporate entity, with all the powers of a corporation pursuant to the applicable law in the jurisdiction in which the Debtor is incorporated or formed, subject to the terms of the Plan.

## 7.  **Amended Certificates of Incorporation and New By-Laws**

As required by the Purchase Agreement, after the Effective Date and the Closing Date the Reorganized Debtor may amend and restate its Articles of Incorporation and other constituent documents as permitted by the laws of the State of Washington and its Amended Articles of Incorporation and New By-Laws.

## 8.  **Reorganized Debtor's Boards of Directors**

The Reorganized Debtor's Board of Director's upon the Effective Date shall be made up of the following three members:

> ➢ Rod Nicholls
>
> ➢ Jose Antonio Rios
>
> ➢ An Independent Director to be elected upon Confirmation of the Plan by the holders of the five (5) largest Claims in Class 6 – Unsecured Creditors – Participatory Claims.

## 9.  **Officers of Reorganized Debtor**

Upon the Plan's Effective Date, the officers of the Reorganized Debtor will be determined by its Board of Director listed in Section H above.

## 10. **Corporate Action**

Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including (1) selection of the directors and officers of the Reorganized Debtor; and (4) all other actions contemplated by the Plan (whether to occur before, on or after the Effective Date).  All matters provided for in the Plan involving the corporate structure of the Debtor or the Reorganized Debtor, and any corporate action required by the Debtor or the Reorganized Debtor in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the directors or officers of the Debtor or the Reorganized Debtor.

On or (as applicable) before the Effective Date, the appropriate officers of the Debtor or the Reorganized Debtor, as applicable, shall be authorized and directed to issue, execute and deliver the agreements, documents, securities, certificates of incorporation, operating agreements and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtor, including any and all agreements, documents, securities and instruments relating to the foregoing.  The authorizations and approvals contemplated by this Article V shall be effective notwithstanding any requirements under non-bankruptcy law.

## 11. Effectuating Documents; Further Transactions

On and after the Effective Date, the Reorganized Debtor and the managers, officers and members of the board of directors thereof are authorized to issue, execute, deliver, file or record such contracts, securities, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan and the securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtor, without the need for any approvals, authorization or consents except for those expressly required pursuant to the Plan.

## 12. Section 1146 Exemption from Certain Taxes and Fees

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property in contemplation of, in connection with, or pursuant to the Plan and/or the Purchase Agreement shall not be subject to any stamp tax or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct and be deemed to direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment. Such exemption specifically applies, without limitation, to (1) the transfer of the Acquired Assets to the Purchaser pursuant to the Purchase Agreement; (2) the creation of any mortgage, deed of trust, lien or other security interest; (3) the making or assignment of any lease or sublease; (4) any Restructuring Transaction; or (5) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan, including: (a) any merger agreements; (b) agreements of consolidation, restructuring, disposition, liquidation or dissolution; (c) deeds; or (d) assignments executed in connection with any transaction occurring under the Plan.

## 13. Preservation of Rights and Causes of Action

In accordance with section 1123(b) of the Bankruptcy Code, and except where such Causes of Action have been expressly released (including, for the avoidance of doubt, pursuant to the Releases by the Debtor provided by Article IX.B hereof and pursuant to the Sale Order), the Debtor shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, including Causes of Action under chapter 5 of the Bankruptcy Code, whether arising before or after the Petition Date, and the Reorganized Debtor' rights to commence, prosecute or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. No Entity may rely on the absence of a specific reference in the Plan, the Disclosure Statement, or the Schedule of Retained Causes of Action, to any Cause of Action against them as any indication that the Debtor or Reorganized Debtor, as applicable, will not pursue any and all available Causes of Action against them. No preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such retained Causes of Action upon, after or as a consequence of the Confirmation or consummation of the Plan.

## 14. Dissolution of Corporate Entities

After the Closing Date, and at such time as the New Board considers appropriate and consistent with the implementation of the Plan (including the satisfaction of Distributions thereunder) pertaining to the Reorganized Debtor, its Board of Directors or any officer of such Reorganized Debtor will dissolve such Reorganized Debtor and complete the winding up thereof in accordance with applicable law. As soon as practicable after all aspects of the Plan pertaining to each Reorganized Debtor have been completed, each Reorganized Debtor will be dissolved and wound up in accordance with applicable law. The Confirmation Order will serve as evidence of dissolution of the Reorganized Debtor to be submitted to the applicable state or provincial authority.

## G.  TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

The Debtor does not have an Executory Contracts or Unexpired Leases so there are no assumptions or rejections to be made.

## H.  POVISIONS GOVERNING DISTRIBUTIONS

### 1.  Initial Distribution Date

On the Initial Distribution Date or as soon thereafter as is reasonably practicable, the Disbursement Agent shall make, or shall make adequate reserves for, the Distributions required to be made under the Plan.

### 2.  Closing Date Payment Distribution Date

On, or as soon as reasonably practicable after, the transfer of the Closing Date Payment to the Debtor, which will occur concurrent with the Closing, the Disbursement Agent shall make, or make adequate reserves for the Distributions required to be made under the Plan from the Closing Date Payment in accordance with the Plan.

### 3.  Record Date for Distributions

As of the entry of the Confirmation Order, the various transfer registers for each of the Classes of Claims or Interests as maintained by the Debtor or their respective agents shall be deemed closed, and there shall be no further changes made to reflect any new record holders of any Claims or Interests.  The Debtor and the Indenture Trustees shall have no obligation to recognize any transfer of Claims or Interests occurring on or after the Distribution Record Date.

### 4.  Timing and Calculation of Amounts to Be Distributed

Except as otherwise provided in the Plan, on the applicable Distribution Date, each holder of an Allowed Claim or Interest against the Debtor, or the Trust Agreements, shall receive the full amount of the Distributions that the Plan provides for Allowed Claims or Interests in the applicable Class and in the manner provided herein.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims, Distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VIII hereof.  Except as otherwise provided herein, holders of Claims shall not be entitled to interest, dividends or accruals on the Distributions provided for herein, regardless of whether such Distributions are delivered on or at any time after the Effective Date.

### 5.  Fractional Distributions

Cash shall not be distributed under the Plan in denominations of less than one cent ($0.01).  The Disbursing Agent shall have no obligation to make any Distribution of Cash that is less than $10.00.

6. **Disbursing Agent**

Except as otherwise provided herein, all Distributions under the Plan shall be made by the Reorganized Debtor or the Purchaser on behalf of the Reorganized Debtor, as Disbursing Agent, or such other Entity designated by the Reorganized Debtor pursuant to the terms and conditions of the Purchase Agreement, in consultation with the Creditors' Committee, as a Disbursing Agent, within five (5) business days of the Effective Date. If the Disbursing Agent is not one of the Reorganized Debtor or the Purchaser, such entity shall obtain a bond or surety for the performance of its duties, and all costs and expenses of procuring any such bond or surety shall be borne by the Debtor, Reorganized Debtor, as applicable.

7. **Rights and Powers of Disbursing Agent**

    1.   Powers of the Disbursing Agent

The Disbursing Agent shall be empowered to: (a) affect all actions and execute all agreements, instruments and other documents necessary to perform its duties under the Plan; (b) make all Distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

    2.   Expenses Incurred On or After the Effective Date

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable, actual and documented fees and expenses incurred by any Disbursing Agent in carrying out its obligations under this Article VII of the Plan on or after the Effective Date (including taxes) and any reasonable, actual and documented compensation and expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent related thereto shall be paid in Cash from the Closing Payment, in its reasonable discretion.

8. **Distributions to Holders of Disputed Claims**

Notwithstanding any provision otherwise in the Plan and except as may be agreed to by the Debtor or the Reorganized Debtor, as applicable, in each case in their sole discretion, and the holder of a Disputed Claim, no partial payments and no partial Distributions shall be made with respect to any Disputed Claim until all Disputed Claims held by the holder of such Disputed Claim or Interest have become Allowed Claims or have otherwise been resolved by settlement or Final Order.

9. **Delivery of Distributions and Undeliverable or Unclaimed Distributions**

    1.   Delivery of Distributions in General

Except as otherwise provided in the Plan and subject to Bankruptcy Rule 9010, Distributions to holders of Allowed Claims shall be made to holders of record as of the Distribution Record Date by the Disbursing Agent: (a) to the signatory set forth on any of the Proofs of Claim filed by such holder or other representative identified therein (or at the last known addresses of such holder if no Proof of Claim is filed or if the Debtor have been notified in writing of a change of address); (b) at the addresses set forth in any written notices of address changes delivered to the Disbursing Agent after the date of any related Proof of Claim; (c) at the addresses reflected in the Schedules if no Proof of Claim has been filed and the Disbursing Agent has not received a written notice of a change of address; or (d) on any counsel that has appeared in the Chapter 11 Case on the holder's behalf. Distributions under the Plan on account of Allowed Claims shall not be subject to levy, garnishment, attachment or like legal process, so that each holder of an Allowed Claim shall have and receive the benefit of the Distributions in the manner set forth in the Plan. None of

the Debtor, the Reorganized Debtor and the applicable Disbursing Agent shall incur any liability whatsoever on account of any Distributions under the Plan except for gross negligence, willful misconduct or fraud.

2.  Undeliverable Distributions and Unclaimed Property

In the event that any Distribution to any holder is returned as undeliverable, no Distribution to such holder shall be made unless and until the Disbursing Agent has determined the then current address of such holder, at which time such Distribution shall be made as soon as practicable after such Distribution has become deliverable or has been claimed to such holder without interest; provided, however, that such Distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and forfeited at the expiration of six months from the applicable Distribution Date.  After such date, all "unclaimed property" or interests in property shall revert to the Purchaser (notwithstanding any applicable federal or state escheat, abandoned or unclaimed property laws to the contrary) and shall be transferred by the Disbursing Agent or Reorganized Debtor (as applicable), in a supplemental Distribution to the Purchaser in accordance with the Plan, and the Claim of any holder to such "unclaimed property" or interests in property shall be discharged and forever barred.

10. **Withholding and Reporting Requirements**

In connection with the Plan and all instruments issued in connection therewith, the Disbursing Agent shall comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority, and all Distributions under the Plan shall be subject to any such withholding or reporting requirements.

11. **Setoffs**

Subject to the Sale Order, the Debtor, the Reorganized Debtor and the Disbursement Agent may withhold (but not set off except as set forth below) from the Distributions called for under the Plan on account of any Allowed Claim an amount equal to any claims, equity interests, rights and Causes of Action of any nature that the Debtor, the Reorganized Debtor or the Disbursement Agent may hold against the holder of any such Allowed Claim.  In the event that any such claims, equity interests, rights and Causes of Action of any nature that the Debtor, the Reorganized Debtor or the Disbursement Agent may hold against the holder of any such Allowed Claim are adjudicated by Final Order or otherwise resolved, the Debtor may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off against any Allowed Claim and the Distributions to be made pursuant hereto on account of such Allowed Claim (before any Distribution is made on account of such Allowed Claim) the amount of any adjudicated or resolved claims, equity interests, rights and Causes of Action of any nature that the Debtor, the Reorganized Debtor or the Disbursement Agent may hold against the holder of any such Allowed Claim, but only to the extent of such adjudicated or resolved amount.  Neither the failure to effect such a setoff nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtor, the Reorganized Debtor or the Disbursement Agent of any such claims, equity interests, rights and Causes of Action that the Debtor, the Reorganized Debtor or the Disbursement Agent may possess against any such holder, except as specifically provided herein.

12. **Claims Paid or Payable by Third Parties**

The Debtor, the Reorganized Debtor, the Disbursement Agent, as applicable, shall reduce in part or in full a Claim or Interest to the extent that the holder of such Claim or Interest receives payment in part or in full on account of such Claim or Interest from a party that is not a Debtor, Reorganized Debtor, the Disbursement Agent. To the extent a holder of a Claim or Interest receives a Distribution on account of such Claim or Interest and receives payment from a party that is not a Debtor, a Reorganized Debtor, or the Disbursement Agent on account of such Claim or Interest, such holder shall, within two weeks of receipt thereof, repay or return the Distribution to the applicable Reorganized Debtor or Disbursement Agent, as applicable, to the extent the holder's total recovery on account of such Claim or Interest from the third party and under the Plan exceeds the amount of such Claim or Interest as of the date of any such Distribution under the Plan.

13. **Post-Petition Interest**

Unless expressly provided herein, the Confirmation Order, the Final DIP Order or any contract, instrument, release, settlement or other agreement entered into in connection with the Plan, or required by the Bankruptcy Code (including without limitation sections 506(b) and 1129(b) of the Bankruptcy Code), postpetition interest shall not accrue on or after the Petition Date on account of any Claim, except to those Claims listed in Exhibit-3 and Exhibit-4 to the Plan, respectively.

14. **Section 506(c) Reservation**

The Debtor and the Reorganized Debtor reserve all rights under section 506(c) of the Bankruptcy Code with respect to any and all Secured Claims, except to the extent waived pursuant to the Sale Order.

I. **PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS**

1. **Prosecution of Objections to Claims**

The Debtor, the Reorganized Debtor or the Disbursement Agent, as applicable, shall have the exclusive authority to file, settle, compromise, withdraw or litigate to judgment any objections to Claims as permitted under the Plan. From and after the Effective Date, the Reorganized Debtor or the Disbursement Agent may settle or compromise any Disputed Claim without approval of the Bankruptcy Court. The Debtor, the Reorganized Debtor and the Disbursement Agent reserve all rights to resolve any Disputed Claim outside the Bankruptcy Court under applicable governing law. All objections, affirmative defenses and counterclaims shall be litigated to Final Order; provided, however, that the Debtor, Reorganized Debtor and Disbursement Agent shall have the authority to file, settle, compromise or withdraw any objections to Claims. Unless otherwise ordered by the Bankruptcy Court, to the extent not already objected to by the Debtor, the Disbursement Agent shall file and serve all objections to Claims as soon as practicable, but, in each instance, not later than one hundred eighty (180) days following the Effective Date or such later date as may be approved by the Bankruptcy Court.

2. **Allowance of Claims**

Except as expressly provided herein or in any order entered in the Chapter 11 Case before the Effective Date (including the Confirmation Order), the Reorganized Debtor and the Disbursement Agent as applicable, after the Effective Date will have and retain any and all rights and defenses held by the Debtor with respect to any Claim as of the Petition Date. All claims of any Entity against any Debtor shall be disallowed unless and until such Entity pays, in full, the amount it owes each such Debtor.

3. **Estimation of Claims**

The Debtor (before the Effective Date), the Disbursement Agent or the Reorganized Debtor (on or after the Effective Date) may, at any time, and from time to time, request that the Bankruptcy Court estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether an objection was previously filed with the Bankruptcy Court with respect to such Claim, or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any Disputed Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim against any party or Entity, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Debtor (before the Effective Date), the Disbursement Agent or the Reorganized Debtor (on or after the Effective Date), may elect to pursue any supplemental proceedings to object to any ultimate Distribution on such Claim. All of the objection, estimation, settlement and resolution procedures set forth in the Plan are cumulative and not necessarily exclusive of one another. Claims may be estimated and subsequently compromised, objected to, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

4. **Deadline to File Objections to Claims**

Any objections to Claims shall be filed on or before the date that is the later of (a) fifteen days (15) days before the Confirmation Date and (b) the last day of such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court for objecting to certain Claims.

**J. SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS**

1. **Compromise and Settlement of Claims, Interests and Controversies**

As discussed in detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the Distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests and controversies relating to the contractual, legal and subordination rights that a holder of a Claim may have with respect to any Allowed Claim or Interest, or any Distribution to be made on account of such Allowed Claim or Interest (the "Plan Settlement"). The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Plan Settlement, as well as a finding by the Bankruptcy Court that such Plan Settlement is in the best interests of the Debtor, their Estates and holders of Claims and Interests and is fair, equitable and reasonable. In accordance with the provisions of the Plan, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtor may compromise and settle Claims against them and Causes of Action against other Entities.

<<Remainder of Page Left Intentionally Blank>>

## 2. **Releases by the Debtor**

Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or the Plan Supplement, for good and valuable consideration, including the contributions of the Released Parties to facilitate the implementation of the Plan, the Plan Settlement, the Settlement and the other contracts, instruments, releases, agreements or documents executed and delivered in connection with the Plan, the Released Parties and each of them are deemed released and discharged by the Debtor, the Reorganized Debtor and the Estates from any and all claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, liquidated or un-liquidated, fixed or contingent, matured or un-matured, existing or hereinafter arising, in law, equity or otherwise, that the Debtor, the Reorganized Debtor, the Estate or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date (and, with regard to the New Boards of the Reorganized Debtor, subsequent to the Effective Date) in any way relating to the Debtor, the Chapter 11 Case, the Plan or the Disclosure Statement, or related agreements, instruments or other documents, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes gross negligence, fraud or willful misconduct, as determined by a Final Order; provided, that nothing in this Article IX.B shall release the Purchaser or, solely to the extent it is a party to the Purchase Agreement.

## 3. **Releases by Holders of Claims and Interests**

As of the Effective Date, to the fullest extent permissible under applicable law, as such law may be extended or interpreted subsequent to the Effective Date, for good and valuable consideration, including the contributions of the Released Parties to facilitate the implementation of the Plan, the Plan Settlement, the Settlement and the other contracts, instruments, releases, agreements or documents executed and delivered in connection with the Plan, each holder of a Claim or an Interest shall be deemed to have conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged the Debtor, the Reorganized Debtor and the Released Parties and each of them from any and all Claims, Interests, obligations, rights, suits, damages, causes of action, remedies and liabilities whatsoever, including any derivative Claims, asserted on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, liquidated or un-liquidated, fixed or contingent, matured or unmatured, existing or hereafter arising, in law, equity or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date (and, with regard to the Board of the Reorganized Debtor, subsequent to the Effective Date) in any way relating to the Debtor, the Chapter 11 Case, the Plan, or the Disclosure Statement, or related agreements, instruments or other documents that did or would have given rise to a Claim in the Chapter 11 Case, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes gross negligence, fraud or willful misconduct, as determined by a Final Order; provided, that nothing herein shall be deemed a waiver or release of a Releasing Party's right to receive a Distribution pursuant to the terms of the Plan; provided, further, that nothing in this Article IX.C shall release the Debtor or the Reorganized Debtor from any claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities arising under the Purchase Agreement.

## 4. **Exculpation**

Except as otherwise specifically provided in the Plan or Plan Supplement, if any, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from, any Exculpated Claim, obligation, cause of action or liability for any Exculpated Claim, except to the extent such claim is attributable to gross negligence or willful misconduct, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Debtor and the Reorganized Debtor (and each of their respective Affiliates, agents, directors, officers, employees, advisors and attorneys) have, and upon Confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and Distributions pursuant to the Plan, and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or such Distributions made pursuant to the Plan.

Notwithstanding anything herein to the contrary, nothing in the foregoing "Exculpation" shall (1) release any Person or Entity from any liability resulting from any act or omission constituting fraud, willful misconduct, gross negligence, criminal conduct, malpractice, misuse of confidential information that causes damages or ultra vires act as determined by a Final Order or (2) limit the liability of the professionals of the Exculpated Parties to their respective clients pursuant to Washington State Law.

## 5. **Discharge of Claims and Termination of Interests**

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the Distributions, rights and treatment that are provided in the Plan shall be in full and final satisfaction, settlement, release and discharge, effective as of the Effective Date, of all Claims, Interests and causes of action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against and Interests in, the Debtor or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities and causes of action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim or Interest based upon such Claim, debt, right or Interest is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such Claim, debt, right or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the holder of such a Claim or Interest has accepted the Plan. Except as otherwise provided herein, any default by the Debtor or their Affiliates with respect to any Claim or Interest that existed before or on account of the filing of the Chapter 11 Case shall be deemed cured on the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring, except as otherwise expressly provided in the Plan.

<<Remainder of Page Left Intentionally Blank>>

6. **Injunction**

FROM AND AFTER THE EFFECTIVE DATE, ALL ENTITIES ARE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER, ANY CAUSE OF ACTION RELEASED OR TO BE RELEASED PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER.

FROM AND AFTER THE EFFECTIVE DATE, TO THE EXTENT OF THE RELEASES AND EXCULPATION GRANTED IN ARTICLE IX HEREOF, THE RELEASING PARTIES SHALL BE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER AGAINST THE RELEASED PARTIES AND THE EXCULPATED PARTIES AND THEIR ASSETS AND PROPERTIES, AS THE CASE MAY BE, ANY SUIT, ACTION OR OTHER PROCEEDING, ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, INTEREST OR REMEDY RELEASED OR TO BE RELEASED PURSUANT TO ARTICLE IX HEREOF.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN, THE PLAN SUPPLEMENT OR RELATED DOCUMENTS, OR FOR OBLIGATIONS ISSUED PURSUANT TO THE PLAN, ALL ENTITIES WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS OR INTERESTS THAT HAVE BEEN RELEASED PURSUANT TO ARTICLE IX.B OR ARTICLE IX.C OR, DISCHARGED PURSUANT TO ARTICLE IX.E, OR ARE SUBJECT TO EXCULPATION PURSUANT TO ARTICLE IX.D, ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS: (1) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (2) ENFORCING, ATTACHING, COLLECTING OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (3) CREATING, PERFECTING OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST SUCH ENTITIES OR THE PROPERTY OR ESTATE OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (4) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED, SETTLED OR DISCHARGED PURSUANT TO THE PLAN; AND (5) ACTING OR PROCEEDING IN ANY MANNER, IN ANY PLACE WHATSOEVER, THAT DOES NOT CONFORM WITH THE PROVISIONS OF THE PLAN TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW.

THE RIGHTS AFFORDED IN THE PLAN AND THE TREATMENT OF ALL CLAIMS AND INTERESTS HEREIN SHALL BE IN EXCHANGE FOR AND IN COMPLETE SATISFACTION OF ALL CLAIMS AND INTERESTS OF ANY NATURE WHATSOEVER, INCLUDING ANY INTEREST ACCRUED ON CLAIMS FROM AND AFTER THE PETITION DATE, AGAINST THE DEBTOR OR ANY OF THEIR ASSETS, PROPERTY OR ESTATES TO THE FULLEST EXTENT SET FORTH IN THE PLAN. ON THE EFFECTIVE DATE, IN ACCORDANCE WITH THE PLAN, ALL SUCH CLAIMS AGAINST THE DEBTOR SHALL BE FULLY RELEASED AND DISCHARGED, AND THE EQUITY INTERESTS SHALL BE CANCELLED.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR HEREIN OR IN OBLIGATIONS ISSUED PURSUANT HERETO FROM AND AFTER THE EFFECTIVE DATE, ALL CLAIMS AGAINST THE DEBTOR SHALL BE FULLY RELEASED AND DISCHARGED, AND ALL EQUITY INTERESTS SHALL BE CANCELLED, AND THE DEBTOR' LIABILITY WITH RESPECT THERETO SHALL BE EXTINGUISHED COMPLETELY, INCLUDING ANY LIABILITY OF THE KIND SPECIFIED UNDER SECTION 502(G) OF THE BANKRUPTCY CODE.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR HEREIN, ALL ENTITIES SHALL BE PRECLUDED FROM ASSERTING AGAINST THE DEBTOR, THE DEBTOR' ESTATE, THE REORGANIZED DEBTOR, EACH OF THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, AND EACH OF THEIR ASSETS AND PROPERTIES, ANY OTHER CLAIMS OR INTERESTS BASED UPON ANY DOCUMENTS, INSTRUMENTS OR ANY ACT OR OMISSION, TRANSACTION OR OTHER ACTIVITY OF ANY KIND OR NATURE THAT OCCURRED BEFORE THE EFFECTIVE DATE.

## 7. <u>Term of Injunctions or Stays</u>

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Case pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court or any order of the Canadian Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

## 8. <u>Injunction Against Interference With The Plan</u>

To the fullest extent permitted by applicable law, and except as may otherwise be stated in the Sale Order, upon the entry of the Confirmation Order, all of the Releasing Parties shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan or the Sale, including, without limitation, the transfer of the Acquired Assets to the Purchaser.

## 9. <u>Injunction Related to Releases and Exculpation</u>

The Confirmation Order shall permanently enjoin the commencement or prosecution by any person or entity, whether directly, derivatively or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities released pursuant to the Plan, including but not limited to the claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities released in Article IX of the Plan.

## 10. <u>Protection Against Discriminatory Treatment</u>

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtor or deny, revoke, suspend or refuse to renew a license, permit, charter, franchise or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtor or another Entity with whom such Reorganized Debtor have been associated, solely because one of the Debtor has been a debtor under chapter 11, has been insolvent before the commencement of the Chapter 11 Case (or during the Chapter 11 Case but before the Debtor is granted or denied a discharge) or has not paid a debt that is dischargeable in the Chapter 11 Case.

## 11. <u>No Consent to Change of Control Required</u>

To the fullest extent permitted by applicable law, except as otherwise expressly provided by order of the Bankruptcy Court, none of (a) the facts or circumstances giving rise to the commencement of, or occurring in connection with, the Chapter 11 Case or (b) any other transaction pursuant to the Plan (including, without limitation, the Restructuring Transactions) shall constitute a "change in ownership" or "change of control" (or a change in working control) of, or in connection with, any Debtor requiring the consent of any person other than the Debtor or the Bankruptcy Court.

12. **Release of Liens**

Except as otherwise provided herein or in any contract, instrument, release or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable Distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title and interest of any holder of such mortgages, deeds of trust, Liens, pledges or other security interests shall revert to the Reorganized Debtor and its successors and assigns. For the avoidance of doubt, all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estates shall be fully released and discharged on the Effective Date without any further action of any party, including, but not limited to, further order of the Bankruptcy Court or filing updated schedules or statements typically filed pursuant to the Uniform Commercial Code.

K. **CONDITIONS PRECEDENT TO CONFIRMATION OF THE PLAN AND THE EFFECTIVE DATE**

1. **Conditions Precedent to Confirmation**

It shall be a condition to Confirmation hereof that the following provisions, terms and conditions shall have been satisfied or waived pursuant to the provisions of Article X.C.

1. The Bankruptcy Court shall have entered a Final Order, in form and substance acceptable to the Debtor, approving the Disclosure Statement with respect to the Plan as containing adequate information within the meaning of section 1125 of the Bankruptcy Code.

2. **Conditions Precedent to the Effective Date**

It shall be a condition to the Effective Date that the following provisions, terms and conditions shall have been satisfied or waived pursuant to the provisions of Article X.C.

1. The Confirmation Order entered by the Bankruptcy Court shall be a Final Order acceptable in form and substance to the Debtor and the Creditors' Committee.

2. All of the schedules, documents, supplements and exhibits to the Plan shall have been filed.

3. All actions, documents, certificates, and agreements necessary to implement the Plan, including, without limitation, Amended and Restated Articles of Incorporation, shall have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws.

4. The Closing Date Payment shall have been received.

3. **Waiver of Conditions**

The conditions to Confirmation of the Plan and to the occurrence of the Effective Date set forth in this Article X may be waived at any time by the Debtor; provided, however, that the Debtor may not waive (i) entry of the Confirmation Order.

4. **Effect of Failure of Conditions**

If Confirmation of the Plan does not occur, the Plan shall be null and void in all respects, including, among other things, the allocation percentages set forth herein and the terms of the Plan Settlement, and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any claims by or Claims against the Debtor; (2) prejudice in any manner the rights of the Debtor, any holders of Claims or any other Entity; or (3) constitute an admission, acknowledgment, offer or undertaking by the Debtor, any holders or any other Entity in any respect.

## L. MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN

### 1. Modification and Amendments

Except as otherwise specifically provided herein, the Debtor reserves the right to modify the Plan as to material terms and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not re-solicit votes on such modified Plan. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Debtor expressly reserve their rights to alter, amend or modify materially the Plan with respect to any or all Debtor, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend or modify the Plan or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan. Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with this Article XI.

In addition, prior to the Effective Date, the Debtor may make appropriate technical adjustments and modifications to the Plan, without further order or approval of the Bankruptcy Court; provided, however, that such technical adjustments and modifications do not adversely affect in a material way the treatment of holders of Claims or Interests.

### 2. Effect of Confirmation on Modifications

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

### 3. Revocation or Withdrawal of the Plan

The Debtor reserve the right to revoke or withdraw the Plan (including any or all of the individual Plans for the Debtor) before the Effective Date and to file subsequent chapter 11 plans, provided, however, that the Debtor may not revoke or withdraw the Plan without the consent of the Creditors' Committee and such consent shall not be unreasonably withheld. In addition, the Debtor reserve the right to seek confirmation of some, but not all of the chapter 11 Plans for the Debtor. If the Debtor revoke or withdraw the Plan (or one or more of the individual Plans), or if Confirmation or the Effective Date does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims or Interests by any Debtor against any other Entity; (b) prejudice in any manner the rights of such Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by such Debtor or any other Entity.

## M.  RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain such jurisdiction over the Chapter 11 Case and all matters, arising out of or related to, the Chapter 11 Case and the Plan, including jurisdiction to:

1.  allow, disallow, determine, liquidate, classify, estimate or establish the priority, Secured or Unsecured status or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or Unsecured status, priority, amount or allowance of Claims;

2.  decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.  resolve any matters related to:  (a) the assumption, assumption and assignment or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable in any manner and to hear, determine and, if necessary, liquidate, any Claims arising therefrom, including Rejection Claims, Cure Claims pursuant to section 365 of the Bankruptcy Code or any other matter related to such Executory Contract or Unexpired Lease; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Reorganized Debtor amending, modifying or supplementing, after the Effective Date, pursuant to Article VI, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired.

4.  ensure that Distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

5.  adjudicate, decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.  adjudicate, decide or resolve any and all matters related to any Cause of Action;

7.  adjudicate, decide or resolve any and all matters related to section 1141 of the Bankruptcy Code;

8.  enter and enforce any order for the sale of property pursuant to sections 363, 1123 or 1146(a) of the Bankruptcy Code;

9.  resolve any avoidance or recovery actions under sections 105, 502(d), 542 through 551 and 553 of the Bankruptcy Code;

10.  resolve any cases, claims, controversies, suits, disputes or Causes of Action that may arise in connection with the consummation, interpretation or enforcement of the Plan or any entity's obligations incurred in connection with the Plan;

11.  resolve any cases, controversies, suits, disputes or Causes of Action that may arise in connection with or under the Notes;

12. issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation or enforcement of the Plan;

13. resolve any cases, controversies, suits, disputes or Causes of Action with respect to the discharge, releases, injunctions, exculpations, indemnifications and other provisions contained in Article IX and enter such orders as may be necessary or appropriate to implement such releases, injunctions and other provisions;

14. enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed or vacated;

15. determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan or the Disclosure Statement;

16. adjudicate any and all disputes arising from or relating to Distributions under the Plan;

17. consider any modifications of the Plan, cure any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

18. determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code, including requests by Professionals for payment of Accrued Professional Fees;

19. hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents or instruments executed in connection with the Plan;

20. hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

21. hear and determine all disputes involving the existence, nature or scope of the Debtor's discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred before or after the Effective Date;

22. enforce all orders previously entered by the Bankruptcy Court;

23. hear any other matter not inconsistent with the Bankruptcy Code;

24. enter an order concluding or closing the Chapter 11 Case;

25. hear and determine all matters concerning the Purchase Agreement, including matters relating to any Alternative Sale (even if such Alternative Sale occurs post Confirmation Date or post Effective Date), which includes the exclusive jurisdiction to (a) enforce the terms and provisions of the Sale Order, the Purchase Agreement and the Plan in all respects and to decide any disputes concerning the Sale Order, the Purchase Agreement, and the Plan, or the rights and duties of the parties thereunder or any issues relating to the Purchase Agreement and the Sale Order and the Plan including, but not limited to, the interpretation of the terms, conditions and provisions

hereof and thereof, the status, nature and extent of the Acquired Assets and any assumption or assignment of Executory Contracts or Unexpired Leases and all issues and disputes arising in connection with same and the relief authorized in the Sale Order, inclusive of those concerning the transfer of the Acquired Assets free and clear of all Encumbrances.

26.  hear and determine all matters concerning the Pay-down Orders

## N.  MISCELLANEOUS PROVISIONS

## 1.  <u>Immediate Binding Effect</u>

Subject to Article X.B, and notwithstanding Bankruptcy Rules 3020(e), 6004(h) or 7062 or any other Bankruptcy Rule, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtor, the Reorganized Debtor and any and all holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtor.

## 2.  <u>Additional Documents</u>

On or before the Effective Date, the Debtor may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtor or Reorganized Debtor, as applicable, and all holders of Claims receiving Distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

## 3.  <u>Dissolution of Creditors' Committee</u>

On the Effective Date, the Creditors' Committee shall dissolve, and its members shall be released and discharged from all further authority, duties, responsibilities and obligations relating to and arising from the Chapter 11 Case.  The retention and employment of the Professionals retained by the Creditors' Committee shall terminate as of the Effective Date, provided, however¸ that the Creditors' Committee shall exist, and its Professionals shall be retained, after such date with respect to (a) applications filed pursuant to sections 330 and 331 of the Bankruptcy Code, (b) enforcement of the provisions of the Purchase Agreement, the Global Settlement Order, the Plan or the Confirmation Order; and (c) the distributions from the Closing Date Payment and/or the proceeds of the Retained Causes of Action.

## 4.  <u>Successors and Assigns</u>

The rights, benefits and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign, affiliate, officer, director, manager, agent, representative, attorney, beneficiaries or guardian, if any, of each Entity.

## 5.  Service of Documents

After the Effective Date, any pleading, notice or other document required by the Plan to be served on or delivered to the Debtor or the Reorganized Debtor and the Disbursement Agent, and shall be served on:

If to the Debtor:

Vadium Technology, Inc.
401 Second Avenue, Suite 500
Seattle, WA 98104
Attn: R o d   N i c h o l l s , President

with copies to:

The Law Offices of Dallas Jolley
4707 South Junett Street, Suite B
Tacoma, WA 98409
Phone: (253) 761-8970
Fax:  (253) 761-7910
Attn: Dallas Jolley

After the Effective Date, the Debtor may, in their sole discretion, notify Entities that, in order to continue receiving documents pursuant to Bankruptcy Rule 2002, such Entities must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Debtor are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have filed such renewed requests.

## 6.  Entire Agreement

Except as otherwise indicated, the Plan and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings and representations on such subjects, all of which have become merged and integrated into the Plan.

## 7.  Severability of Plan Provisions

If, before Confirmation of the Plan, any term or provision of the Plan is held by the Bankruptcy Court or any other court exercising jurisdiction to be invalid, void or unenforceable, the Bankruptcy Court or other court exercising jurisdiction shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtor' consent; and (3) non-severable and mutually dependent.

## 8. **Exhibits**

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits and documents are filed, copies of such exhibits and documents shall be available upon request to the Debtor's counsel, by contacting Dallas Jolley at 4707 South Junett Street, Suite B, Tacoma, WA 98409, Phone: (253) 761-8970, Fax: (253) 761-7910. To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non- document portion of the Plan shall control.

## 9. **Votes Solicited in Good Faith**

Upon entry of the Confirmation Order, the Debtor will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code and any applicable non-bankruptcy law, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtor and their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code and, therefore, will have no liability for the violation of any applicable law, rule or regulation governing the solicitation of votes on the Plan.

## 10. **Closing of Chapter 11 Case**

The Reorganized Debtor shall, promptly after the full administration of the Chapter 11 Case, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Case.

## 11. **Conflicts**

Except as set forth in the Plan, to the extent that any provision of the Disclosure Statement or any other order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Plan shall govern and control; provided, however, that if there is a conflict between this Plan and a Plan Supplement document, the Plan Supplement document shall govern and control; and provided further, however, that to the extent that any provision of the Plan conflicts with or is in any way inconsistent with any provision of the Confirmation Order, the Confirmation Order shall govern and control. Additionally, to the extent that any provision of the Plan or Confirmation Order conflicts with or is in any way inconsistent with any provision of the Sale Order, the Purchase Agreement, the Sale Order, the Purchase Agreement, as applicable, shall govern and control.

<<Remainder of Page Left Intentionally Blank>>

# IX - SOLICITATION AND VOTING PROCEEDURES

This Disclosure Statement, accompanied by a ballot or ballots to be used for voting on the Plan, is being distributed to the holders of Claims in Classes 2, 6, 7, 9, 10, 11, and 12. Only the holders of Claims in Classes 2, 6, 7, 9, 10, 11, and 12 are entitled to vote to accept or reject the Plan and may do so by completing the ballot and returning it in the envelope provided. Additionally, the procedures used to tabulate the votes cast for or against the Plan can be found in the Disclosure Statement and Voting and Solicitation Procedures Order, attached hereto as <u>Exhibit B</u> and incorporated herein by reference, and should be read in conjunction with this Disclosure Statement in formulating a decision to vote to accept or reject the Plan.

The Debtor has engaged The Law Offices of Dallas Jolley as their Voting and Claims Agent to assist in the solicitation process. The Voting and Claims Agent will, among other things, answer questions, provide additional copies of all solicitation materials, and generally oversee the solicitation process for their assigned Claims. The Voting and Claims Agent will also process and tabulate ballots for each of their respective Classes that are entitled to vote to accept or reject the Plan and will file a voting report as soon as practicable before the Confirmation Hearing.

## A. Holders of Claims Entitled to Vote on the Plan

Under the provisions of the Bankruptcy Code, not all holders of claims against and interests in a debtor are entitled to vote on a chapter 11 plan. As shown in the table below, the Debtor is soliciting votes to accept the Plan only from holders of Claims in Classes 2, 6, 7, 9, 10, 11, and 12 (the "***Voting Classes***"). The holders of Claims in the Voting Classes are Impaired under the Plan and are receiving property under the Plan. Therefore, holders of Claims in the Voting Classes have the right to vote to accept or reject the Plan.

The Debtor is <u>not</u> soliciting votes from (a) holders of Unimpaired Claims in Classes 1, 3, 4, 5, 8, 13 and 14 because those parties are conclusively presumed to have accepted the Plan or (b) holders of Interests in Class 15 because those parties are conclusively presumed to have rejected the Plan. The following table provides a summary of the status and voting rights of each Class (and, therefore, of each holder within such Class) under the Plan:

| Class | Claim Description | Status | Voting Rights |
|:---:|:---:|:---:|:---:|
| 1 | Secured Creditors - Liquidated | Unimpaired | Deemed to accept the plan not entitled to Vote |
| 2 | Secured Creditors – Participatory | Impaired | Entitled to Vote |
| 3 | Other Priority Creditors | Unimpaired | Deemed to accept the plan not entitled to Vote |
| 4 | Unsecured Creditors - Liquidated | Unimpaired | Deemed to accept the plan not entitled to Vote |
| 5 | Unsecured Creditors – Furloughed Former Employees | Unimpaired | Deemed to accept the plan not entitled to Vote |
| 6 | Unsecured Creditors - Participatory | Impaired | Entitled to Vote |
| 7 | Unsecured Creditors – Assumptions and Settlements | Impaired | Entitled to Vote |
| 8 | Unsecured Creditor - Purchaser | Unimpaired | Deemed to accept the plan not entitled to Vote |
| 9 | Unsecured Creditors - | Impaired | Entitled to Vote |

| | Compromised | | |
|---|---|---|---|
| 10 | Interest Holders – Series A-2 Equity | Impaired | Entitled to Vote |
| 11 | Interest Holders – Series A-1 Equity | Impaired | Entitled to Vote |
| 12 | Interest Holders – Series Z Equity | Impaired | Entitled to Vote |
| 13 | Interest Holders – Common Equity | Unimpaired | Deemed to accept the plan not entitled to Vote |
| 14 | Interest Holders – Common Stock Options | Unimpaired | Deemed to accept the plan not entitled to Vote |
| 15 | Interest Holders – Common Stock Warrants | Impaired | Deemed to reject the plan not entitled to Vote |

## B.  Voting Record Date

The Voting Record Date is 5:00 p.m. prevailing Pacific Time on August 3, 2012.  The Voting Record Date is the date on which it will be determined which holders of Claims and Interests in the Voting Class are entitled to vote to accept or reject the Plan and whether Claims and Interests have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee can vote as the holder of a Claim or Interest.

## C.  Voting on the Plan

The Voting Deadline is 5:00 p.m. prevailing Pacific Time on August 31, 2012.  In order to be counted as votes to accept or reject the Plan, all Ballots must be properly executed, completed and delivered (either by using the return envelope provided, by first class mail, overnight courier or personal delivery) so that it is actually received on or before the Voting Deadline by either the Voting and Claims Agent at the following address

Vadium Technology, Inc.
c/o The Law Offices of Dallas Jolley
ATTN: _____
PO Box_____
Tacoma, WA_____

If you have any questions on the procedure for voting on the Plan, please call the Voting and Claims Agent at the following telephone number: 253-761-8970.

## D.  Ballots Not Counted

No Ballot will be counted toward Confirmation if, among other things:  (a) it is illegible or contains insufficient information to permit the identification of the holder of the Claim or Interest; (b) it was transmitted by facsimile or other electronic means; (c) it was cast by an entity that is not entitled to vote on the Plan; (d) it was cast for a Claim listed in the Schedules as contingent, un-liquidated or disputed for which the applicable bar date has passed and no proof of claim was timely filed; (e) it was cast for a Claim that is subject to an objection pending as of the Record Date (unless temporarily or finally allowed in accordance with the Solicitation and Voting Procedures); (f) it was sent to the Debtor, the Debtor' agents/representatives (other than the Voting and Claims Agent), an indenture trustee or the Debtor' financial or legal advisors instead of to the Voting and Claims Agent; (g) it is unsigned; or (h) it is not marked to either accept or reject the Plan or it is marked both to accept and reject the Plan.

Please refer to the Voting and Tabulation Procedures set forth in the Disclosure Statement and Voting and Solicitation Procedures Order, attached hereto as <u>Exhibit B</u>, for additional requirements with respect to voting to accept or reject the Plan.

IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE VOTING AND CLAIMS AGENT.  ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT IN COMPLIANCE WITH THE VOTING AND TABULATION PROCEDURES WILL <u>NOT</u> BE COUNTED.

<<Remainder of Page Left Intentionally Blank>>

# X - CONFIRMATION OF THE PLAN

**A.   The Confirmation Hearing**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing to consider Confirmation.  Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation.

The Bankruptcy Court has scheduled the Confirmation Hearing for S e p t e m b e r  7 , 2012 at 9 : 3 0 a.m. (prevailing Pacific Time) before the Honorable Judge Marc L Barecca, United States Bankruptcy Judge, in the Bankruptcy Court, located at 7 0 0 S t e w a r t S t r e e t , S u i t e 6 3 0 1 , S e a t t l e , W A 9 8 1 0 1 .  **The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any adjournment thereof**.

At least 28 days before the Voting Deadline, the Debtor will (a) serve the Confirmation Hearing Notice upon all known creditors of the Debtor and holders of the Senior Secured Notes as of the Voting Record Date and (b) publish the Confirmation Hearing Notice in _____, which will contain, among other things, details regarding voting on and objecting to Confirmation, including the Voting Deadline and the Plan Objection Deadline, and the date, time and location of the Confirmation Hearing.

**B.   Deadline to Object to Confirmation of the Plan**

Objections to Confirmation must be filed and served at or before **5:00 p.m.** (prevailing Pacific Time) on **August 31, 2012** in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement.  This means that written objections to Confirmation, if any, that conform to the applicable provisions of the Disclosure Statement and Voting and Solicitation Procedures Order, the Bankruptcy Code, the Bankruptcy Rules and the Local Bankruptcy Rules, must be filed, together with a proof of service, with the Bankruptcy Court and served so as to be <u>actually received</u> on or before the Plan Objection Deadline by the following parties:

- ➢  <u>Counsel to the Debtor</u>: T h e L a w O f f i c e s o f D a l l a s J o l l e y ; Attn: Dallas Jolley, 4707 South Junett Street, Suite B, Tacoma, WA 98409;

- ➢  <u>Counsel to the Purchaser</u>: Tacey Goss, PS, Attn: S. Shawn Tacey, 330 112th Avenue NE #301, Bellevue, WA 98004;

- ➢  <u>Creditors' Committee</u>:  Terry Korotzer, Chairman – VTI Creditors' Committee , 6853 19th Avenue NE, Seattle, WA 98115; and

- ➢  <u>U.S. Trustee</u>: Office of the United States Trustee for the W e s t e r n D i s t r i c t o f W a s h i n g t o n , Attn: William Courshon, 700 Stewart Street, Suite 5103, Seattle, WA 98101.

## UNLESS OBJECTIONS TO CONFIRMATION ARE TIMELY SERVED AND FILED, THEY MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

## C. Requirements for Confirmation of the Plan

Among the requirements for Confirmation are the following: (i) the Plan is accepted by all Impaired Classes of Claims or, if the Plan is rejected by an Impaired Class, that it "does not discriminate unfairly" and is "fair and equitable" as to such Class; (ii) the Plan is feasible; and (iii) the Plan is in the "best interests" of holders of Claims and Interests that are Impaired under its provisions.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code. The Debtor believes that the Plan satisfies or will satisfy all of the necessary requirements of chapter 11 of the Bankruptcy Code. Specifically, in addition to other applicable requirements, the Debtor believes that the Plan satisfies or will satisfy the applicable Confirmation requirements of section 1129 of the Bankruptcy Code set forth below:

➢ The Plan complies with the applicable provisions of the Bankruptcy Code.

➢ The Debtor, as the Plan proponents, have complied with the applicable provisions of the Bankruptcy Code.

➢ The Plan has been proposed in good faith and not by any means forbidden by law.

➢ Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the chapter 11 case, or in connection with the Plan and incident to the case, has been disclosed to the Bankruptcy Court, and any such payment: (i) made before Confirmation is reasonable or (ii) subject to the approval of the Bankruptcy Court is reasonable, if it is to be fixed after Confirmation.

➢ Either each holder of an impaired Claim or Interest in the Debtor has accepted (or is deemed to have accepted) the Plan, or each non-accepting creditor will receive or retain under the Plan on account of such Claim or Interest, property of a value, as of the Effective Date of the Plan, that is not less than the amount that the holder would receive or retain if the Debtor were liquidated on that date under chapter 7 of the Bankruptcy Code.

➢ Each Class of Claims or Interests that is entitled to vote on the Plan will have accepted the Plan.

➢ Except to the extent that the holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that Administrative Claims and Priority Non-Tax Claims will be paid in full on the Effective Date, or as soon thereafter as is reasonably practicable.

➢ At least one Class of impaired Claims will have accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in that Class.

➢ All fees of the type described in 28 U.S.C. §1930, including the fees of the U.S. Trustee, will be paid as of the Effective Date.

### D. Standards Applicable to Releases

Article IX of the Plan provides for releases of certain claims against non-Debtor in consideration of services provided to the Estates, valuable compromises made by the Settlement Parties to achieve the Settlement, and other investments made by the Released Parties. The non-Debtor released parties are: (a) the Debtor; (b) the current and former directors and officers of the Debtor who were directors or officers of the Debtor as of or after the Petition Date; (c) the Creditors' Committee and the current and former members thereof; (d) the New Boards; ( e ) the D i s b u r s e m e n t  A g e n t ; (f) the Reorganized Debtor; and (g) with respect to each of the foregoing Entities in clauses (a) through (f), such Entities' subsidiaries, affiliates, members, officers, directors, agents, financial advisors, accountants, investment bankers, consultants, attorneys, employees, partners, and representatives, in each case, only in their capacity as such. As set forth in the Plan, the releases are given by (i) the Debtor; (ii) the Reorganized Debtor; and (iii) to the greatest extent permitted under applicable law, all holders of Claims or Interests against the Debtor. The released claims and Exculpated Claims are limited to those claims or causes of action that may have arisen in connection with, related to or arising out of the Plan, this Disclosure Statement, the Debtor or the Debtor's Chapter 11 case.

The Debtor believes that the releases set forth in the Plan are appropriate because, among other things, the releases are narrowly tailored to the Debtor's restructuring proceedings, and each of the Released Parties has afforded value to the Debtor and aided in the reorganization process, which facilitated the Debtor' ability to propose and pursue confirmation of the Plan. The Debtor believes that each of the Released Parties has played an integral role in formulating the Plan and has expended significant time and resources analyzing and negotiating the issues presented by the Debtor's prepetition capital structure.

Regarding releases of non-debtors within the jurisdiction of the United States Court of Appeals for the Ninth Circuit holds that section 105, by itself, does not provide a basis for non-debtor releases. Further, the Court interprets section 524(e) of the Bankruptcy Code, which states in pertinent part that a "discharge of a debt of the debtor does not affect the liability of any other entity on, or in property of any other entity for, such debt", as expressly precluding the approval of non-debtor releases. See Resorts International, Inc. v. Lowenschuss (In re Lowenschuss), 67 F.3d 1394, 1401 (9th Cir. 1995), and the Tenth Circuit Court of Appeals in In re Western Real Estate Fund, Inc., 922 F.2d 592, 600 (10th Cir. 1990. As this case is pending in the Ninth Circuit, third party releases may still be approved if the plan is confirmed. See Republic Supply Co. v. Shoaf, 815 F.2d 1046 (5th Cir. 1987); Trulis v. Barton, 107 F.3d 685 (9th Cir. 1994).

### E. Best Interests of Creditors/ Hypothetical Liquidation Analysis

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each class, that each holder of a claim or an interest in such class either (i) has accepted the plan or (ii) will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the Debtor liquidated under chapter 7 of the Bankruptcy Code. To make these findings, a bankruptcy court must: (i) estimate the cash liquidation proceeds that a chapter 7 trustee would generate if the debtor's chapter 11 case were converted to a chapter 7 case and the assets of such debtor's estate were liquidated; (ii) determine the liquidation distribution that each non-accepting holder of a claim or an interest would receive from such liquidation proceeds under the priority scheme dictated in chapter 7; and (iii) compare the holder's liquidation distribution to the distribution under the plan that the holder would receive if the plan were confirmed and consummated.

To satisfy the requirements of section 1129(a)(7) of the Bankruptcy Code, the Debtor prepared the h y p o t h e t i c a l liquidation analysis attached hereto as Exhibit-R (the "***Liquidation Analysis***"). Based on the Liquidation Analysis, the Debtor believe that holders of Claims against the Debtor will receive equal or greater value as of the Effective Date under the Plan than such holders would receive in a chapter 7 liquidation and that the Plan will therefore meet the "best interests" test provided in section 1129(a)(7) of the Bankruptcy Code.

As a general matter, it should be noted that the Debtor only has two categories of assets: (a) assets which will be transferred to the Purchaser upon consummation of the Sale Transaction, and (b) the cash proceeds from the Sale Transaction. If the Debtor liquidated the assets that are intended to be transferred, they would not be able to receive the remaining $9.2 million of the purchase price under the Purchase Agreement and, further, would be in breach of the Purchase Agreement, subjecting the estate to damages worth at least the amounts already paid by the Purchaser. The Liquidation Analysis attached to this Disclosure Statement does not address this. Separately, if the Debtor liquidated the cash proceeds from the Sale Transaction, any such liquidation will result in creditors receiving less value in a Chapter 7 liquidation than under the Plan because (r) such distributions would likely be delayed and (c) the Debtor would incur substantial costs in connection with such liquidation as set forth in the Liquidation Analysis.

## F. Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a chapter 11 plan is not likely to be followed by liquidation or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in the chapter 11 plan). Under the Plan, however, although the Debtor will be "reorganizing" for a short period of time, the Debtor will simply be operating the business until consummation of the Sale Transaction to the Purchaser. Upon such consummation, the Reorganized Debtor will transfer its assets to the Purchaser and wind up its estate by making a distribution (or distributions) to its creditors and equity interest holders pursuant to the Plan. Further, the operating expenses to be incurred by the Reorganized Debtor (and the Debtor, if necessary) after January 30, 2012 will be funded by the Purchaser, pursuant to the Purchase Agreement. Therefore, because (1) the recovery available to creditors is not dependent on the operations of the Reorganized Debtor and (2) all expenses of the Debtor after January 30, 2012 will be borne by the Purchaser, the Debtor has not prepared projections, but believe the Plan is feasible.

## G. Acceptance by Impaired Classes

The Bankruptcy Code requires that, except as described in the following section, each impaired class of claims or interests must accept a plan in order for it to be confirmed. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to the class is not required. A class is "impaired" unless the plan: (i) leaves unaltered the legal, equitable and contractual rights to which the claim or the interest entitles the holder of the claim or interest; or (ii) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable or contractual rights to which such claim or interest entitles the holder of such claim or interest.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of allowed claims in that class, counting only those claims that actually voted to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually voting cast their ballots in favor of acceptance. For a class of impaired interests to accept a plan, section 1126(d) of the Bankruptcy Code requires acceptance by interest holders that hold at least two-thirds in amount of the allowed interests of such class, counting only those interests that actually voted to accept or reject the plan. Thus, a class of interests will have voted to accept the plan only if two-thirds in amount actually voting cast their ballots in favor of acceptance.

**H.  Effect of Confirmation and Consummation of the Plan**

Following Confirmation, subject to Article X of the Plan, the Plan will be consummated on the Effective Date.  Among other things, on the Effective Date, certain release, injunction, exculpation and discharge provisions set forth in Article IX of the Plan will become effective.  As such, it is important to read the provisions contained in Article IX of the Plan very carefully so that you understand how Confirmation and consummation of the Plan – which effectuates such provisions – will affect you and any Claim you may hold against the Debtor and other Claim holders so that you cast your vote accordingly.  Further discussion of the releases contemplated in the Plan is provided in section VIII of this Disclosure Statement.

<<Remainder of Page Left Intentionally Blank>>

# XI - SECURITIES LAW MATTERS

No registration statement will be filed under the Securities Act of 1933, as amended (the "Securities Act"), or pursuant to any state securities laws with respect to the offer and distribution under the Plan. The Debtors believe that the provisions of section 1145(a)(1) of the Bankruptcy Code exempt the offer and distribution of the AAC Equity Interests (each as defined in the Plan, the "1145 Securities") from federal and state securities registration requirements.

**A. Bankruptcy Code Exemptions from Registration Requirements.**

**1.  Securities Issued in Reliance on Section 1145 of the Bankruptcy Code.**

Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under the Securities Act and state laws if three principal requirements are satisfied: (i) the securities must be offered and sold under a plan of reorganization and must be securities of the debtor, of an affiliate participating in a joint plan with the debtor or of a successor to the debtor under the plan; (ii) the recipients of the securities must each hold a prepetition or administrative expense claim against the debtor or an interest in the debtor; and (iii) the securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor, or principally in such exchange and partly for cash or other property.

The exemptions provided for in section 1145 do not apply to an entity that is deemed an "underwriter" as such term is defined in section 1145(b) of the Bankruptcy Code. Section 1145(b) defines an "underwriter" as one whom, except with respect to "ordinary trading transactions" of an entity that is not an "issuer":

(a) purchases a claim against, an interest in, or a claim for administrative expense against, the debtor, with a view to distributing any security received in exchange for such a claim or interest ("accumulators");

(b) offers to sell securities offered under a plan for the holders of such securities ("distributors");

(c) offers to buy securities from the holders of such securities, if the offer to buy is

   (i)    with a view to distributing such securities and

   (ii)   made under a distribution agreement; and

(d) is an "issuer" with respect to the securities, as the term "issuer" is defined in section 2(a)(11) of the Securities Act, which includes affiliates of the issuer, defined as persons who are in a relationship of "control" with the issuer.

Persons who are not deemed "underwriters" may generally resell the securities they receive under the Plan without registration under the Securities Act or other applicable law. Persons deemed "underwriters" receiving securities under the Plan may sell such securities without registration only pursuant to exemptions from registration under the Securities Act and other applicable law.

## 2. Subsequent Transfers of 1145 Securities Distributed Pursuant to the Plan and Additional Restrictions on Transfers Imposed by Purchaser.

Section 1145(c) of the Bankruptcy Code provides that securities issued pursuant to section 1145(a)(1) are deemed to have been issued in a public offering. In general, therefore, resales of and subsequent transactions in the 1145 Securities will be exempt from registration under the Securities Act pursuant to section 4(1) of the Securities Act, unless the holder thereof is deemed to be an "issuer," an "underwriter" or a "dealer" with respect to such securities. For these purposes, an "issuer" includes any "affiliate" of the issuer, defined as a person directly or indirectly controlling, controlled by or under common control with the issuer. "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract or otherwise. A "dealer," as defined in section 2(a)(12) of the Securities Act, is any person who engages either for all or part of his or her time, directly or indirectly, as agent, broker or principal, in the business of offering, buying, selling or otherwise dealing or trading in securities issued by another person. Whether or not any particular person would be deemed to be an "affiliate" of Reorganized GMR or an "underwriter" or a "dealer" with respect to any 1145 Securities will depend upon various facts and circumstances applicable to that person.

Notwithstanding the provisions of section 1145(b) regarding accumulators and distributors referred to above, the staff of the SEC has taken the position that resales of securities distributed under a plan of reorganization by accumulators and distributors of securities who are not affiliates of the issuer of such securities are exempt from registration under the Securities Act if effected in "ordinary trading transactions." The staff of the SEC has indicated in this context that a transaction by such non-affiliates may be considered an "ordinary trading transaction" if it is made on a national securities exchange or in the over-the-counter market and does not involve any of the following factors:

(a) (i) concerted action by the recipients of securities issued under a plan in connection with the sale of such securities or (ii) concerted action by distributors on behalf of one or more such recipients in connection with such sales;

(b) the use of informational documents concerning the offering of the securities prepared or used to assist in the resale of such securities, other than a Bankruptcy Court approved disclosure statement and supplements thereto, and documents filed with the SEC pursuant to the Exchange Act; or

(c) the payment of special compensation to brokers and dealers in connection with the sale of such securities designed as a special incentive to the resale of such securities (other than the compensation that would be paid pursuant to arm's-length negotiations between a seller and a broker or dealer, each acting unilaterally, not greater than the compensation that would be paid for a routine similar-sized sale of similar securities of a similar issuer).

The staff of the SEC has not provided any guidance for privately arranged trades. The views of the staff of the SEC on these matters have not been sought by the Debtor and, therefore, no assurance can be given regarding the proper application of the "ordinary trading transaction" exemption described above. Any person intending to rely on such exemption is urged to consult their counsel as to the applicability thereof to their circumstances.

The 1145 Securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of those states. However, the availability of such state exemptions depends on the securities laws of each state, and holders of Claims and Interests may wish to consult with their own legal advisors regarding the availability of these exemptions in their particular circumstances.

Notwithstanding the provisions of Section 1145(c) as described above, the 10,477,500 Shares of Common Stock of the Purchaser that is to be paid to the Debtor's Estate as part of the Asset Sale, which are to be further distributed to Holders of Claims and Equity Interests in satisfaction of their Claims pursuant to the Plan of Reorganization, as a condition of issuance under the Plan, are to be made specifically subject to following transfer restrictions:

(i)      Notwithstanding the provisions of Section 1145 of the United States Bankruptcy Code, the Common Stock distributed pursuant to the Plan, have not been registered under the Securities Act or any other applicable securities laws, and the Shares must be held indefinitely unless subsequently registered under the Securities Act or an exemption from such registration is available (such as Rule 144 or the resale provisions of Rule 701 under the Securities Act) and the Company is under no obligation to register the Shares;

(ii)     The share certificate representing the Common Stock of the Purchaser issued pursuant to the Plan will be stamped with the legends specific as identified in <u>Exhibit-L</u> to this Disclosure Statement and <u>Exhibit-19</u> to the Plan; and

(iii)    The Purchaser will make a notation in its records of the aforementioned restrictions on transfer and legends.

**GIVEN THE COMPLEX NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER, AFFILIATE OR DEALER, AND THE RESTRICTIONS ON TRANSFER THE ISSUER HAS IMPOSED AS A CONDITION OF ISSUANCE OF THE SECURITIES PURSUANT TO THE ASSET SALE AND THE PLAN, THE DEBTOR BELIEVES THE SHARES OF COMMON STOCK OF THE PURCHASER ISSUED UNDER THE PLAN ARE NOT FREELY TRANSFERABLE AND ARE SUBJECT TO RULE 144 AND POTENTIAL FUTURE MARKET STANDOFF AGREEMENTS WITH FUTURE POTENTIAL UNDERWRITERS AND AS SUCH THE DEBTOR MAKES NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON TO TRADE IN SECURITIES TO BE DISTRIBUTED PURSUANT TO THE PLAN. THE DEBTOR RECOMMENDS THAT HOLDERS OF CLAIMS AND INTERESTS CONSULT THEIR OWN COUNSEL CONCERNING THE TRADING OF SUCH SECURITIES.**

<<Remainder of Page Left Intentionally Blank>>

# XII - RISK FACTORS

*Holders of Claims and Interests should read and consider carefully the risk factors set forth below, as well as the other information set forth in this Disclosure Statement and the documents delivered together herewith, referred to or incorporated by reference herein, before voting to accept or reject the Plan. Although these risk factors are many, these factors should not be regarded as constituting the only risks present in connection with the Debtor' business or the Plan and its implementation.*

## A. Risks Related to Confirmation of the Plan

### 1. The Debtor May Not be Able to Obtain Confirmation of the Plan.

To emerge successfully from chapter 11, the Debtor, like any debtor, must obtain approval of a chapter 11 plan and thereafter confirm and successfully implement the Plan. This process requires the Debtor to (a) meet certain statutory requirements concerning the adequacy of disclosure with respect to any proposed plan; (b) solicit and obtain creditor acceptances of the proposed plan; and (c) fulfill other statutory conditions with respect to plan confirmation.

With regard to any proposed chapter 11 plan, the Debtor may not receive the requisite acceptances to confirm the Plan. If the requisite acceptances of the Plan are received, the Debtor intends to seek Confirmation by the Bankruptcy Court. If the requisite acceptances are not received, the Debtor may amend the Plan and nevertheless seek Confirmation notwithstanding the dissent of certain Classes of Claims. The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allows the Bankruptcy Court to confirm a plan that has been rejected by an "impaired" class of claims if it determines that the plan satisfies section 1129(b) of the Bankruptcy Code. To confirm a plan over the objection of a dissenting class, a bankruptcy court also must find that at least one impaired class has accepted the plan, with such acceptance being determined without including the acceptance of any "insider" in such class.

Even if the requisite acceptances of the Plan are received, the Bankruptcy Court might not confirm the Plan as proposed. A dissenting holder of a Claim against or Interest in the Debtor could challenge the balloting procedures and results as not being in compliance with the Bankruptcy Code. Further, even if the Bankruptcy Court determined that the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for confirmation had not been met. Specifically, section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, a finding by the Bankruptcy Court that (a) a debtor's plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of the debtor's plan is not likely to be followed by a liquidation or a need for further financial reorganization; and (c) the value of distributions to non- accepting holders of claims within a particular class under the debtor's plan will not be less than the value of distributions such holders would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code. A bankruptcy court may determine that a proposed plan does not satisfy one or more of these requirements, in which case the proposed plan would not be confirmed by a bankruptcy court.

If the Plan is not confirmed by the Bankruptcy Court, it is unclear what, if any, distributions holders of Claims or Interests ultimately would receive on account of their Claims or Interests. There also can be no assurance that the Debtor will be able to successfully develop, prosecute, confirm and consummate an alternative chapter 11 plan that is acceptable to the Bankruptcy Court and the Debtor's creditors and other parties in interest. Additionally, it is possible that third parties may seek and obtain approval to terminate or shorten the exclusive period under section 1121 of the Bankruptcy Code during which only the Debtor may propose and solicit votes on a chapter 11 plan. Finally, the Debtor's emergence from bankruptcy is not assured. Although the Debtor expect to emerge from bankruptcy, there can be no assurance that the Debtor will successfully reorganize or of when this reorganization will occur.

## 2. Parties in Interest May Object to the Releases Provided by the Plan

Certain creditors may assert that the Debtor cannot demonstrate that they meet the standards for approval of non-consensual releases from third parties established by the United States Court of Appeals for the Second Circuit.

## 3. Parties in Interest May Object to the Debtor' Classification of Claims and Equity Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if the claim or interest is substantially similar to the other claims or interests in that class. The Debtor believe that the classification of holders of claims against and holders of interests in the Debtor under the Plan complies with the requirements set forth in the Bankruptcy Code because the classes established under the Plan each encompass claims or interests that are substantially similar to similarly classified claims or interests. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

## 4. The Conditions Precedent to the Effective Date of the Plan May Not Occur

As more fully set forth in the Plan, the Effective Date is subject to a number of conditions precedent. If these conditions precedent are not met or waived pursuant to the provisions of the Plan, the Effective Date will not occur.

## 5. The Debtor May Object to the Amount or Classification of a Claim

Except as otherwise provided in the Plan, the Debtor reserve the right to object (prior to or after the occurrence of the Effective Date) to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied on by any holder of a Claim where such Claim is subject to an objection. Any holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

## 6. The Debtor Cannot State with Certainty what Recovery Will be Available to Creditors

There may be litigation regarding one or more issues involving the Plan and the chapter 11 case. The Debtor cannot know with any certainty at this time whether or not these matters will be settled, whether the Debtor will prevail in these litigations, and what expenses the Debtor will incur in connection with these matters. Any expenses incurred by the Debtor will reduce the value of the Debtor' Estates and the funds available to for distribution to creditors. To the extent the Debtor do not prevail in such litigations, the distributions contemplated by the Plan may be materially altered.

In addition, the Debtor, the Creditors' Committee and the Purchaser may not agree on the scope of the Purchaser's obligation to provide funding to the Debtor to operate the Business and administer the Chapter 11 Case after January 30, 2012. Depending upon how this issue is resolved, the Debtor's funds available for distribution to creditors may be materially reduced and result in lower distributions being made to the Debtor's unsecured creditors under the Plan.

<<Remainder of Page Left Intentionally Blank>>

**Vadium Technology, Inc.**
**Disclosure Statement - 7/3/2012**
**Page 89 of** 102

**7.** **The Debtor Cannot State with Certainty when Funds Will be Available for Distribution to Creditors**

Pursuant to the terms of the Purchase Agreement, the Closing (and therefore the Debtor' receipt of the remaining $9.2 million of the Purchase Price) is subject to various conditions outside the control of the Debtor. Although there are certain circumstances under which the Debtor will receive the remainder of the Purchase Price prior to Closing, these circumstances are also largely outside the control of the Debtor. As a result, the Debtor cannot know with any certainty at this time when they will receive the remainder of the Purchase Price (which potentially may not be until 2013). As a result, the timing of distributions to unsecured creditors cannot be known at this time.

**B.** **Certain Risks Relating to the AAC Equity Interests to be Distributed Under the Plan**

**1.** **Significant Holders**

After the Effective Date and upon the Closing of the Asset Purchase and the Distribution of the AAC Equity Interests pursuant to the Plan, Belhara, Secure Mobile Solutions, Inc. ("Belhara") will own or control up to 60.0% of the issued and outstanding voting securities of the Purchaser. This ownership position will have the effect of vesting a substantial degree of control of the Purchaser in Belhara for an indefinite period of time. Belhara will be able to significantly influence or control the election of certain members of the Purchaser's Board of Directors and significantly influence or control the outcome of corporate actions requiring shareholder approval, such as mergers, acquisitions, or sale of substantially all the assets of the Company.

**2.** **No Public Market or Established Unit Price**

There is no public market for the Purchaser's securities, which have not been registered under the Securities Act of 1933 or any state securities laws. Because of the absence of a public market, the offering price for the Securities was arbitrarily determined by the Debtor and the Purchaser as part of the Asset Sale and bears no relationship whatsoever to the its assets, book value, investors' equity, net worth or any other established criteria of value. Furthermore, there can be no assurance that a public market for the shares will develop at any time in the future. Other sources of possible liquidity for holders of the Purchaser's securities may include a sale of the Purchaser, or a purchase of securities by the Purchaser or one of its investors, but there is likewise no certainty whether or when any such liquidity might be created.

**3.** **Incomplete Management Team**

The Purchaser will need to recruit and retain additional experience management, to fill out certain key officer and director positions.

**4.** **Minimal Revenues; History of Losses**

The Purchaser has generated revenues since inception. To achieve revenue growth and profitability, the Purchaser must, among other things: (i) respond effectively to competitive developments, (ii) attract, retain and motivate qualified employees, and (iii) successfully launch its product offerings. There can be no assurance that the Purchaser's strategies will be successful or that the Purchaser will experience increased revenues, become profitable or have positive cash flow at any time in the future.

**5.** **Risk of Additional Dilution**

Recipients of AAC Equity Interests pursuant to the Plan are likely to experience substantial dilution as a result of future financings. The Purchaser's Articles of Incorporation do not provide preemptive rights and even with the Distribution and all of the AAC Equity Interests pursuant to the Plan, the Purchaser will still have additional shares of Common Stock and Preferred Stock authorized but unissued, which can be issued by the Board of Directors of the Purchaser if they consider it to be in the Purchaser's best interests. The Purchaser intends to issue options and shares of Common Stock to consultants and employees that may or may not be at prices less than those paid by current and future investors. In the event the Purchaser finds it necessary to raise additional capital, it may issue shares of Common Stock or other securities at a price per share less than that paid by current holders.

**6.** **Dependence on, and Ability to Retain and Recruit, Key Personnel**

The development and maintenance of the products envisioned by management of the Purchaser requires highly skilled technical personnel. The globally, the information security industry is a highly competitive labor market. It may not be possible to recruit or retain the caliber of personnel necessary to execute the Purchaser's business. Personnel are required that have strong technical development and support skills in unique areas. There may be few qualified individuals to recruit, and such qualified individuals are in great demand and paid highly competitive compensation packages. The inability of the Purchaser to recruit and retain such key personnel could have a material adverse impact on the Purchaser's business, financial condition and results of operations.

7. **Uncertain Ability to Secure and/or Protect Proprietary Technology and Intellectual Property Rights**

The Purchaser's success will depend in part on its ability to protect its technology, and preserve its trade secrets. The Purchaser will need to rely substantially upon continuing technological innovations, trade secrets and know-how to develop and maintain a competitive position, it will also need to rely on a combination of patent, copyright and trademark laws, confidentiality procedures, and contractual provisions to protect its proprietary rights. There can be no assurance that any patent applications or patent disclosures relating to its technology will result in patents being issued, or that any patents will provide a competitive advantage or will afford protection against competitors with similar technology, or will not be successfully challenged or circumvented by competitors. There can be no assurance that the trade secrecy and other measures taken by the Purchaser will be adequate to prevent or deter misappropriation of its technology, or that competitors will not be able to independently develop technologies having similar functions or performance characteristics. There can be no assurance that the Purchaser will have an adequate legal remedy to prevent or seek redress for future unauthorized misappropriations of the Purchaser's technology.

**8.** **Success Dependent on Acceptance of Products and Services**

The Purchaser's business model and strategies may be new or unproven. The Purchaser may be offering new kinds of products and services that may have no clearly established success in the marketplace. Furthermore, numerous companies have attempted to implement one-time pad encryption technology and have been unsuccessful. As is typical of any new and rapidly evolving market, demand and market acceptance for recently introduced products and services are subject to a high level of uncertainty and risk. Moreover, because this market is new and rapidly evolving, it is difficult to predict its future growth rate, if any, and its ultimate size. If the market fails to develop, develops more slowly than expected or becomes saturated with competitors, or if the Purchaser's products and services do not achieve or sustain market acceptance, the Purchaser's business, results of operations and financial condition would be materially and adversely affected.

9. **Difficulties Associated with Brand Development May Harm the Company's Ability to Attract Customers**

Developing, maintaining and growing awareness about the Purchaser's brand is an important aspect of the Purchaser's efforts to continue to attract new customers. The importance of brand recognition will increase in the future because of the potential increase in the number of companies providing products and services that are competitive to those offered by the Purchaser. There can be no assurance that the Purchaser's efforts to build brand awareness will be successful.

10. **Inability to Respond to Rapid Change in the Company's Industry**

The information security market is characterized by rapidly changing technologies, frequent new product and service introductions and evolving industry standards. The recent advances in computing power, mathematics, and wide spread deployment of mobile telephony technologies and intense competition in the Purchaser's industry exacerbate these market characteristics. To achieve the Purchaser's goals, the Purchaser needs to effectively integrate the various software programs and tools required to enhance and improve the Purchaser's product offerings and manage the Purchaser's business. The Purchaser's future success will depend on the Purchaser's ability to adapt to rapidly changing technologies by continually improving the performance features and reliability of the Purchaser's services. The Purchaser may experience difficulties that could delay or prevent the successful development, introduction or marketing of new products and services. In addition, the Purchaser's new enhancements must meet the requirements of its current and prospective users and must achieve significant market acceptance. The Purchaser could also incur substantial costs if it needs to modify its service or infrastructure to adapt to these changes.

C. **Risks Relating to Forward-Looking Statements**

1. **Financial Information is Based on the Debtor' Books and Records and, Unless Otherwise Stated, no Audit was Performed**

The financial information contained in this Disclosure Statement has not been audited. In preparing this Disclosure Statement, the Debtor relied on financial data derived from their books and records that was available at the time of such preparation. Although the Debtor have used their reasonable business judgment to ensure the accuracy of the financial information provided in this Disclosure Statement, and while the Debtor believe that such financial information fairly reflects, in all material respects, the financial results of the Debtor, the Debtor are unable to warrant or represent that the financial information contained herein and attached hereto is without inaccuracies.

"Forward-looking statements," within the meaning of the Private Securities Litigation Reform Act of 1995, consist of any statement other than a recitation of historical fact and can be identified by the use of forward-looking statement terminology such as "may," "expect," "anticipate," "estimate" or "continue" or the negative thereof of other variations thereon or comparable terminology. The reader is cautioned that all forward-looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward-looking statements. The Liquidation Analysis and other information contained in this Disclosure Statement are estimates only, and the timing and amount of actual distributions to creditors may be affected by many factors that cannot be predicted. Therefore, any analyses, estimates or recovery projections may or may not turn out to be accurate and could differ materially from those set forth in this Disclosure Statement.

D.       **Risks Relating to Recoveries Under the Plan**

1.    **The Recovery to Holders of Allowed Claims Cannot Be Stated with Absolute Certainty**

The Claims estimates set forth herein are based on various assumptions.  The actual amounts of Allowed Claims may differ significantly from those estimates should one or more underlying assumption proves to be incorrect.  Such differences may adversely affect the percentage recovery to holders of such Allowed Claims under the Plan.  Moreover, the estimated recoveries set forth herein are necessarily based on numerous assumptions, the realization of many of which are beyond the Debtor's control, including, without limitation, (a) an assumed date for the occurrence of the Effective Date, (b) the Bankruptcy Court's approval of the Plan, and (c) litigation costs not exceeding certain expected levels.  The actual amounts of Allowed Claims may differ significantly from those estimates should one or more underlying assumption prove to be incorrect, which could affect the percentage recovery to holders of such Allowed Claims under the Plan, in some instances adversely.

The distributions available to holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders the subordination of any Allowed Claims to other Allowed Claims, whether the Debtor object to the amount or classification of any Claim, or whether, subject to the terms and conditions of the Plan, the Debtor are required to modify certain terms or conditions of the Plan in order to Confirm the Plan.  Additionally, the distributions available to holders of Allowed Claims will primarily be paid from the Closing Date Payment to be paid by the Purchaser pursuant to the terms of the Purchase Agreement, but which has not yet been received by the Debtor.  The occurrence of contingencies that could affect distributions available to holders of Allowed Claims under the Plan, however, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

E.       **Disclosure Statement Disclaimer**

1.    **No Representations Made Outside this Disclosure Statement are Authorized**

The information contained in this Disclosure Statement is for purposes of soliciting acceptances of the Plan and may not be relied upon for any other purposes.  Except as otherwise provided herein or in the Plan, no representations relating to the Debtor, the chapter 11 case, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision.  You should promptly report unauthorized representations or inducements to the counsel to the Debtor, to the Creditors' Committee and the U.S. Trustee.

2.    **The Disclosure Statement was not Approved by the Securities Exchange Commission or Any State Regulatory Authority**

This Disclosure Statement has not been filed with the SEC or any state regulatory authority.  Neither the SEC nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained herein, and any representation to the contrary is unlawful.  This Disclosure Statement has been prepared pursuant to Bankruptcy Code section 1125 and Bankruptcy Rule 3016(b) and is not necessarily in accordance with the requirements of federal or state securities laws or other similar laws.

### 3. The Information Herein was Provided by the Debtor and Relied upon by Their Advisors

Counsel to and other advisors retained by the Debtor have relied upon information provided by the Debtor in connection with the preparation of this Disclosure Statement. Although counsel to and other advisors retained by the Debtor have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not verified independently the information contained herein.

### 4. Potential Exists for Inaccuracies and the Debtor have No Duty to Update

The statements contained in this Disclosure Statement are made by the Debtor as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since that date. While the Debtor have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtor nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Further, although the Debtor may subsequently update the information in this Disclosure Statement, the Debtor has no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

### 5. No Legal or Tax Advice is Provided to you by this Disclosure Statement

This Disclosure Statement is not legal advice to you. The contents of this Disclosure Statement should not be construed as legal, business or tax advice. Each holder of a Claim or an Interest should consult his or her own legal counsel and accountant with regard to any legal, tax and other matters concerning his or her Claim or Equity Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

### 6. No Admissions are Made by this Disclosure Statement

The information and statements contained in this Disclosure Statement will neither constitute an admission of any fact or liability by any Entity (including, without limitation, the Debtor) nor be deemed evidence of the tax or other legal effects of the Plan on the Debtor, the Reorganized Debtor, holders of Allowed Claims or Equity Interest or any other parties in interest. The vote by a holder of an Allowed Claim for or against the Plan does not constitute a waiver or release of any Claims or rights of the Debtor or the Reorganized Debtor (or any party in interest, as the case may be) to object to that holder's Allowed Claim, or recover any preferential, fraudulent or other voidable transfer or assets, regardless of whether any Claims or Causes of Action of the Debtor or their respective Estates are specifically or generally identified herein.

In addition, no reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement. The Debtor or the Reorganized Debtor may seek to investigate, file and prosecute Claims and Interests and may object to Claims after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Claims or objections to Claims.

<<Remainder of Page Left Intentionally Blank>>

## 7. Forward-Looking Statements in this Disclosure Statement

The Debtor makes statements in this Disclosure Statement that are considered forward-looking statements under the federal securities laws. The Debtor consider all statements regarding anticipated or future matters, including the following, to be forward-looking statements

- ➢ any future effects of the pendency of the Chapter 11 Case;

- ➢ the Debtor's expected future financial position, liquidity, results of operations, profitability and cash flows;

- ➢ the Closing of the Asset Sale;

- ➢ projected cost reductions, if any;

- ➢ projected and estimated environmental liabilities; other projected and estimated liability costs; results of litigation;

- ➢ disruption of operations

- ➢ regulatory changes;

- ➢ plans and objectives of management for future operations;

- ➢ contractual obligations;

- ➢ off-balance sheet arrangements;

- ➢ growth opportunities for existing services;

- ➢ projected price increases;

- ➢ projected general market conditions; and benefits from new technologies.

Statements concerning these and other matters are not guarantees of the Debtor's future performance. Such statements represent the Debtor's estimates and assumptions only as of the date such statements were made. There are risks, uncertainties and other important factors that could cause the Debtor's actual performance or achievements to be materially different from those they may project and the Debtor undertake no obligation to update any such statement. These risks, uncertainties and factors include:

- ➢ the Debtor's ability to develop, confirm and consummate the Plan;

- ➢ the potential adverse impact of the Chapter 11 Case;

- ➢ dependence upon key personnel;

- ➢ ability to implement cost reduction and market on the Debtor's operations, management and employees, and the risks associated with operating the business during the Chapter 11 Case;

- ➢ customer/partner/investor/strategic partner response to the Chapter 11 Case;

- ➢ inability to have claims discharged/settled during the Chapter 11 Case;

- general economic, business and market conditions, including the recent volatility and disruption in the capital and credit markets and the significant downturn in the overall economy;

- interest rate fluctuations;

- exposure to litigation;

- share initiatives in a timely manner;

- efficacy of new technologies and facilities;

- the financial condition of the Debtor' customers;

- adverse tax changes;

- limited access to capital resources; changes in laws and regulations; and natural disasters.

**<<Remainder of Page Left Intentionally Blank>>**

# XIII - CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following is a summary of certain U.S. federal income tax consequences of the Plan to the Debtor and certain holders of Claims. This summary is based on the Internal Revenue Code of 1986, as amended (the "*Tax Code*"), Treasury Regulations thereunder, and administrative and judicial interpretations and practice, all as in effect on the date of this Disclosure Statement and all of which are subject to change, with possible retroactive effect. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained, and the Debtor does not intend to seek a ruling from the Internal Revenue Service (the "*IRS*") as to any of the tax consequences of the Plan discussed below. Events occurring after the date of the Disclosure Statement, including changes in law and changes in administrative positions, could affect the U.S. federal income tax consequences of the Restructuring. No representations are being made regarding the particular tax consequences of the confirmation and consummation of an Offer or the Plan to the Company or any Holder. There can be no assurance that the IRS will not challenge one or more of the tax consequences of the Plan described below.

This summary does not apply to holders of Claims that are otherwise subject to special treatment under U.S. federal income tax law (including, for example, banks, governmental authorities or agencies, financial institutions, insurance companies, pass-through entities, tax-exempt organizations, brokers and dealers in securities, mutual funds, small business investment companies, employees, persons who receive their Claims or Interests pursuant to the exercise of an employee stock option or otherwise as compensation, persons holding Claims or Interests that are a hedge against, or that are hedged against, currency risk or that are part of a straddle, constructive sale, or conversion transaction and regulated investment companies). The following discussion assumes that holders of Allowed Claims hold such Claims as "capital assets" within the meaning of section 1221 of the Tax Code. Moreover, this summary does not purport to cover all aspects of U.S. federal income taxation that may apply to the Debtor and holders of Allowed Claims based upon their particular circumstances. Additionally, this summary does not discuss any tax consequences that may arise under any laws other than U.S. federal income tax law, including under state, local, or foreign tax law.

For purposes of this summary, a "U.S. Holder" means a holder of Claims that, in any case, is, for U.S. federal income tax purposes: (i) an individual who is a citizen or resident of the United States; (ii) a corporation, or other entity treated as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof or the District of Columbia; (iii) an estate, the income of which is subject to U.S. federal income taxation regardless of its source; or (iv) a trust (x) if a court within the United States is able to exercise primary supervision over its administration and one or more U.S. persons have the authority to control all of the substantial decisions of such trust or (y) that has a valid election in effect under applicable Treasury Regulations to be treated as a U.S. person. A "Non-U.S. Holder" means a holder of Claims that is not a U.S. Holder and is, for U.S. federal income tax purposes, an individual, corporation (or other entity treated as a corporation for U.S. federal income tax purposes), estate or trust.

If an entity taxable as a partnership for U.S. federal income tax purposes holds Claims, the U.S. federal income tax treatment of a partner (or other owner) of the entity generally will depend on the status of the partner (or other owner) and the activities of the entity. Such partner (or other owner) should consult its tax advisor as to the tax consequences of the entity's ownership or disposition of Claims, New Common Stock, and Rights Offering Preferred Stock, if any.

The U.S. federal income tax consequences of the Plan are complex. The following summary is for information purposes only and is not a substitute for careful tax planning and advice based on the particular circumstances of each holder of a Claim or Interest. Each holder of a Claim or Interest is urged to consult his, her, or its own tax advisors as to the U.S. federal income tax consequences, as well as other tax consequences, including under any applicable state, local, and foreign law, of the restructuring described in the Plan.

**IRS CIRCULAR 230 DISCLOSURE: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, ANY TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX-RELATED PENALTIES UNDER THE TAX CODE. THE TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ATTACHMENTS) WAS WRITTEN TO SUPPORT THE PROMOTION OR MARKETING OF THE TRANSACTIONS DESCRIBED IN THIS DISCLOSURE STATEMENT. EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

**A. Certain U.S. Federal Income Tax Consequences to the Reorganized Debtor**

**1. Sale of Assets to Purchaser**

Currently, the Debtor intends to treat the Sale Transaction of the Acquired Assets to the Purchaser as complete for U.S. federal income tax purposes in 2012. As a result, they will recognize approximately $11.4 million of gain on the Sale Transaction. The Debtor believes that it will have sufficient accumulated net operating losses to offset such income.

**2. Cancellation of Debt and Reduction of Tax Attributes**

As a result of the Plan, the Debtor's aggregate outstanding indebtedness will be substantially reduced. In general, absent an exception, a debtor will recognize cancellation of debt ("*COD*") income upon discharge of its outstanding indebtedness for an amount less than its adjusted issue price. The amount of COD income, in general, is the excess of (a) the adjusted issue price of the indebtedness discharged, over (b) the sum of the issue price of any new indebtedness of the taxpayer issued, the amount of cash paid and the fair market value of any other consideration, including stock of the Debtor, given in exchange for such indebtedness at the time of the exchange.

A debtor is not, however, required to include any amount of COD income in gross income if such debtor is under the jurisdiction of a court in a chapter 11 bankruptcy proceeding and the discharge of debt occurs pursuant to that proceeding. Instead, as a price for the exclusion of COD income under the foregoing rule, Section 108 of the Tax Code requires the debtor to reduce (as of the first day of the taxable year following the year of the debt discharge) its tax attributes by the amount of COD income which it excluded from gross income. As a general rule, tax attributes will be reduced in the following order: (i) net operating losses ("*NOLs*"), (ii) most tax credits, (iii) capital loss carryovers, (iv) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject), and (v) foreign tax credits. A debtor with COD income may elect first to reduce the basis of its depreciable assets under Tax Code Section 108(b)(5).

The amount of COD income (and, accordingly, the amount of tax attributes required to be reduced) cannot be known with certainty until after the Effective Date. Since the Debtor will be liquidated following the closing of the Sale Transaction, and it is anticipated that the Effective Date and liquidation will occur in the same tax year, *i.e.*, 2012, it is expected that no reduction of the tax attributes of the Debtor will be required because there will be no assets remaining at the Debtor.

<<Remainder of Page Left Intentionally Blank>>

**3. Corporate Alternative Minimum Tax**

In general, an alternative minimum tax ("**AMT**") is imposed on a corporation's alternative minimum taxable income at a 20% rate to the extent that such tax exceeds the corporation's regular federal income tax. For purposes of computing taxable income for AMT purposes, certain tax deductions and other beneficial allowances are modified or eliminated. In particular, even though a corporation otherwise might be able to offset all of its taxable income for regular tax purposes by available NOL carry-forwards, only 90% of a corporation's taxable income from AMT purposes may be offset by available NOL carry-forwards (as computed for AMT purposes). The Debtor currently estimates that upon completion of the Asset Sale and complete consummation of the Plan, that it will incur an AMT liability of approximately $235,000. Pursuant to the Purchase Agreement, this liability will be paid by the Purchase as part of the Asset Sale.

**B.  Certain U.S. Federal Income Tax Consequences to the U.S. Holders under the Plan**

The U.S. federal income tax consequences of the Plan to U.S. Holders and the character, amount and timing of income, gain or loss recognized as a consequence of the Plan and the distributions provided for or by the Plan generally will depend upon, among other things, (i) the manner in which a holder acquired a Claim; (ii) the length of time a Claim has been held; (iii) whether the Claim was acquired at a discount; (iv) whether the holder has taken a bad debt deduction in the current or prior years; (v) whether the holder has previously included accrued but unpaid interest with respect to a Claim; (vi) the holder's method of tax accounting; (vii) whether the holder will realize foreign currency exchange gain or loss with respect to a Claim; and (viii) whether a Claim is an installment obligation for federal income tax purposes. Therefore, holders of Claims are urged to consult their tax advisors for information that may be relevant to their particular situation and circumstances and the particular tax consequences to such holders as a result thereof.

**1.  Consequences to U.S. Holders of Allowed Unsecured Claims (Classes 2, 6, 7, 9, 10, 11, 12, 13 and 14)**

Holders of Allowed Unsecured Claims will receive their Pro Rata share (calculated with reference to all Allowed and Disputed Claims in Classes 2, 6, 7, 9, 10, 11, 12, 13 and 14 against the applicable Debtor) of (i) AAC Equity Interests applicable to such Claim Holder in accordance with the Plan.

Holders of Allowed Unsecured Claims should recognize gain or loss equal to the difference between (a) the fair market value as of the Effective Date of their share of AAC Equity Interests received from the Disbursement Agent pursuant to the Plan (to the extent such share is not allocable to accrued interest) and (b) the holder's tax basis in the Claims surrendered by the holder. Such gain or loss should be capital in nature and should be long-term capital gain or loss if the Claims were held for more than one year by the holder. To the extent that any portion of the AAC Equity Interests received in the exchange is allocable to accrued interest, the holder may recognize ordinary income (see discussion below). A holder's tax basis in the AAC Equity Interests should equal their fair market value as of the Effective Date. A holder's holding period for the AAC Equity Interests should begin on the day following the Effective Date.

<<Remainder of Page Left Intentionally Blank>>

## 2. Limitations on Use of Capital Losses

U.S. Holders of Claims who recognize capital losses as a result of the distributions under the Plan will be subject to limits on their use of capital losses. For non-corporate holders, capital losses may be used to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of (1) $3,000 ($1,500 for married individuals filing separate returns) or (2) the excess of the capital losses over the capital gains. Holders, other than corporations, may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income for an unlimited number of years. For corporate holders, losses from the sale or exchange of capital assets may only be used to offset capital gains. Holders who have more capital losses than can be used in a tax year may be allowed to carry over the excess capital losses for use in succeeding tax years. Corporate holders may only carry over unused capital losses for the five years following the capital loss year, but are allowed to carry back unused capital losses to the three years preceding the capital loss year.

## 3. Information Reporting and Backup Withholding

In general, U.S. Holders (other than corporations and other exempt holders) will be subject to information reporting requirements with respect to interest, dividends and other taxable distributions paid in respect of, and the proceeds from a sale, redemption or other disposition of, the AAC Equity Interests, if applicable. In addition, such U.S. Holders may be subject to backup withholding at a rate of 28% (but increasing to 31% for payments received after 2012) on such payments if such U.S. Holder (i) fails to provide an accurate taxpayer identification number to the payor; (ii) has been notified by the IRS of a failure to report all interest or dividends required to be shown on its U.S. federal income tax returns; or (iii) in certain circumstances, fails to comply with applicable certification requirements.

Any amounts withheld under the backup withholding rules will be allowed as a refund or a credit against a U.S. Holder's U.S. federal income tax liability, provided that the required information is furnished to the IRS on a timely basis. A U.S. Holder should consult its tax advisors regarding the application of information reporting and backup withholding rules in their particular situations, the availability of an exemption therefrom, and the procedure for obtaining such an exemption, if applicable.

## C. Importance of Obtaining Professional Tax Assistance

**THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE, AND LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.**

<<Remainder of Page Left Intentionally Blank>>

# XIV - RECOMMENDATION

Vadium Technology, Inc. submits that the Plan is preferable to the alternatives described in this Disclosure Statement because it provides for a larger and more equitable distribution to the Debtor' creditors and Interest holders than would otherwise result in any other alternative, including a liquidation under chapter 7 of the Bankruptcy Code. In addition, any alternative other than Confirmation could result in extensive delays and increased administrative expenses, resulting in smaller distributions to holders of Allowed Claims than those proposed under the Plan. The Debtor thus believes that approval of the Plan is in the best interests of all stakeholders in the Debtor's Chapter 11 case, and accordingly, the Debtor recommends that holders of Claims and Interests entitled to vote on the Plan vote to accept the Plan.

Dated: July 3, 2012

Respectfully submitted,

Vadium Technology, Inc.

By: _____
     Name: Rod Nicholls
     Title: President

Prepared by:

**THE LAW OFFICES OF DALLAS JOLLEY**
4707 South Junett Street, Suite B
Tacoma, WA 98409
(253) 761-8970 (Telephone)
(253) 761-7910 (Facsimile)
Dallas Jolley, Esq.

*Counsel to the Debtor and Debtor in Possession*

## Exhibits

(To Be Inserted)

**Vadium Technology, Inc.**
**Disclosure Statement - 7/3/2012**
**Page 102 of** 102